# 20-1212(L)

**20-1265(XAP)**

*To Be Argued By*:
DANIEL M. TRACER

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket Nos. 20-1212(L), 20-1265(XAP)

━━◆◆◆━━

IN RE 650 FIFTH AVENUE AND RELATED PROPERTIES.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

GEOFFREY S. BERMAN,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

MICHAEL D. LOCKARD,
DANIEL M. TRACER,
MARTIN S. BELL,
SAMUEL L. RAYMOND,
THOMAS MCKAY,
　*Assistant United States Attorneys,
　　　Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Jurisdiction for the Government's
    Cross-Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

Statement of the Issue Presented on the
    Government's Cross-Appeal . . . . . . . . . . . . . . . . .  3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  Factual Background . . . . . . . . . . . . . . . . . . . .  3

    B.  The Amended Complaint and Judgment
        Creditor Claims . . . . . . . . . . . . . . . . . . . . . .  7

    C.  The Prior Protective Orders . . . . . . . . . . . . .  9

    D.  The Post-Trial Stay Litigation . . . . . . . . . .  12

    E.  The Interim Protective Order and
        Claimants' Motion to Release Funds . . . . .  15

    F.  The District Court's Release Orders . . . . .  16

    G.  The Government's Request for a Probable
        Cause Determination and the Stay of the
        Release Orders . . . . . . . . . . . . . . . . . . . . . .  18

ARGUMENT:

Claimants Should Not Be Permitted to Dissipate
    Funds Subject to Forfeiture . . . . . . . . . . . . . . . .  19

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  21

PAGE

    1.  Section 983 and *Monsanto*. . . . . . . . .  21

    2.  Section 985. . . . . . . . . . . . . . . . . . . . . .  23

    3.  Due Process . . . . . . . . . . . . . . . . . . . . .  24

    4.  Standard of Review . . . . . . . . . . . . . . .  25

B.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . .  25

    1.  Section 983, Not Section 985,
       Applies . . . . . . . . . . . . . . . . . . . . . . . . .  25

       a.  Rental Income is Not
           "Real Property" . . . . . . . . . . . . . . .  26

       b.  There Was No "Seizure" of
           Rental Income . . . . . . . . . . . . . . . .  30

    2.  There Was No Due Process
       Violation. . . . . . . . . . . . . . . . . . . . . . . .  33

    3.  This Court's *Monsanto* Order
       Was Not Unlawful . . . . . . . . . . . . . . . .  40

    4.  The District Court Ordered the
       Wrong Remedy. . . . . . . . . . . . . . . . . . .  44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

PAGE

# TABLE OF AUTHORITIES

*Cases*:

*Bailey v. United States*,
516 U.S. 137 (1995) . . . . . . . . . . . . . . . . . . . 28, 31

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
416 U.S. 663 (1974) . . . . . . . . . . . . . . . . 25, 35, 40

*Caplin & Drysdale, Chartered v. United States*,
491 U.S. 617 (1989) . . . . . . . . . . . . . . . . . . . *passim*

*Connecticut v. Doehr*,
501 U.S. 1 (1991) . . . . . . . . . . . . . . . . . . . . . 34, 35

*Flatow v. Islamic Republic of Iran*,
67 F. Supp. 2d 535 (D. Md. 1999) . . . . . . . . . . . 6

*Gabay v. Mostazafan Foundation of Iran*,
968 F. Supp. 895 (S.D.N.Y. 1997) . . . . . . . . . . . 6

*In re 650 Fifth Avenue and Related Properties*,
08 Civ. 10934 (KPF), 2013 WL 5178677
(S.D.N.Y. Sep. 16, 2013) . . . . . . . . . . . . . . . 10, 36

*In re 650 Fifth Avenue and Related Properties*,
830 F.3d 66 (2d Cir. 2016) . . . . . . . . . . . . . . . . 11

*In re 650 Fifth Avenue and Related Properties*,
934 F.3d 147 (2d Cir. 2019) . . . . . . . . 4, 5, 6, 15, 42

*Kirschenbaum v. Assa Corp.*,
934 F.3d 191 (2d Cir. 2019) . . . . . . . . . . . . . . . . 5

*Mathews v. Eldridge*,
424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . 24

PAGE

*Mitchell v. W.T. Grant Co.*,
    416 U.S. 600 (1974) . . . . . . . . . . . . . . . . . . . . . . 35

*Pinsky v. Duncan*,
    898 F.2d 852 (2d Cir. 1990) . . . . . . . . . . . . . . . 34

*Russello v. United States*,
    464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. $37,780 in United States Currency*,
    920 F.2d 159 (2d Cir. 1990) . . . . . . . . . . . . . . . 44

*United States v. 408 Peyton Rd., S.W., Atlanta, Fulton Cty., Ga.*,
    162 F.3d 644 (11th Cir. 1998) . . . . . . . . . . . . . . 46

*United States v. 51 Pieces of Real Prop. Roswell, N.M.*,
    17 F.3d 1306 (10th Cir. 1994) . . . . . . . . . . . . . . 47

*United States v. 777 Greene Avenue*,
    609 F.3d 94 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 38

*United States v. Al Kassar*,
    660 F.3d 108 (2d Cir. 2011) . . . . . . . . . . . . . . . 25

*United States v. All Assets & Equip. of W. Side Bldg. Corp.*,
    58 F.3d 1181 (7th Cir. 1995) . . . . . . . . . . . . . . . 46

*United States v. Bonventre*,
    720 F.3d 126 (2d Cir. 2013) . . . . . . . . . . . . . . . 36

*United States v. Cosme*,
    796 F.3d 226 (2d Cir. 2015) . . . . . . . . . . 44, 45, 47

*United States v. Daccarett,*
6 F.3d 37 (2d Cir. 1993) . . . . . . . . . . . . . . . 44, 47

*United States v. Daugerdas,*
892 F.3d 545 (2d Cir. 2018) . . . . . . . . . . . . . . . 25

*United States v. James Daniel Good Real Property,*
510 U.S. 43 (1993) . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Juwa,*
508 F.3d 694 (2d Cir. 2007) . . . . . . . . . . . . . . . 37

*United States v. Marsh,*
105 F.3d 927 (4th Cir. 1997) . . . . . . . . 37, 43, 46

*United States v. Melrose East Subdivision,*
357 F.3d 493 (5th Cir. 2004) . . . . . . . . . . . . . . 22

*United States v. Monsanto,*
491 U.S. 600 (1989) . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Monsanto,*
924 F.2d 1186 (2d Cir. 1991) . . . . . . . . . . . 35, 39

*United States v. Parcel of Property,*
337 F.3d 225 (2d Cir. 2003) . . . . . . . . . . . . . . 44

*United States v. Premises and Real Property at 4492
South Livonia Rd.,*
889 F.2d 1258 (2d Cir. 1989) . . . . . . . . . . . . . . 44

*United States v. Real Prop. Located at 1184 Drycreek
Rd., Granville, Ohio 43023,*
174 F.3d 720 (6th Cir. 1999) . . . . . . . . . . . . . . 46

PAGE

*United States v. Real Prop. Located at 20832 Big*
   *Rock Drive, Malibu, Cal. 902655,*
   51 F.3d 1402 (9th Cir. 1995) . . . . . . . . . . . . . . 46

*United States v. Real Prop. Located at Incline Vill.,*
   958 F. Supp. 482 (D. Nev. 1997) . . . . . . . . . . . 46

*United States v. Walsh,*
   712 F.3d 119 (2d Cir. 2013) . . . . . . . . . . . . . 37, 43

*Statutes*:

18 U.S.C. § 981 . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

18 U.S.C. § 983 . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 985 . . . . . . . . . . . . . . . . . . . . . . . *passim*

21 U.S.C. § 853 . . . . . . . . . . . . . . . . . . . . . . . 21, 22

21 U.S.C. § 881 . . . . . . . . . . . . . . . . . . . . . . . 31, 46

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket Nos. 20-1212(L), 20-1265 (XAP)

-------

IN RE: 650 FIFTH AVENUE COMPANY AND RELATED
PROPERTIES.

-------

## BRIEF FOR THE UNITED STATES OF AMERICA

-------

### Preliminary Statement

Appellants the Alavi Foundation ("Alavi") and the 650 Fifth Avenue Company (the "Partnership," and, together, "Claimants"), appeal from orders issued on February 13, 2020 and March 2, 2020 (together, the "Release Orders"), in the United States District Court for the Southern District of New York, by the Honorable Loretta A. Preska, Senior United States District Judge. The Release Orders modified a protective order to permit the release of previously restrained funds generated by the operation of a commercial office tower located at 650 Fifth Avenue (the "Building") from December 12, 2019 forward. The Government cross-appeals from the Release Orders.

On December 17, 2008, the Government filed an initial complaint seeking the forfeiture of assets owned by Assa Corp., Assa Co. Ltd., and Bank Melli Iran, including their interests in the Building. On November

12, 2009, the Government filed an amended complaint (the "Amended Complaint") also seeking the forfeiture of the interests of Alavi and the Partnership in the Building and all property traceable thereto, as well as in properties located in New York, Virginia, Maryland, Texas, and California, and the contents of certain bank accounts (collectively, the "Defendant Properties"). The Amended Complaint alleges that the Defendant Properties are forfeitable pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C) as proceeds of violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 through 1706, and the Iranian Transactions and Sanctions Regulations ("ITSRs"), 31 C.F.R. Part 560; and as property involved in, and proceeds traceable to property involved in, money laundering, in violation of 18 U.S.C. §§ 1956 and 1957. On December 17, 2009, Claimants filed claims contesting the forfeiture of the Defendant Properties.

Trial commenced on May 30, 2017 and concluded on June 29, 2017, when the jury returned a verdict finding the Building and Alavi's interests in the Partnership forfeitable, finding the remaining Defendant Properties forfeitable in part, and finding that Claimants are not innocent owners of the properties. Judgment was entered on October 4, 2017.

Claimants filed timely appeals. On January 5, 2018, while the appeal was pending, this Court entered an order prohibiting distribution of the Building's rental income to Claimants, relying on *United States v. Monsanto*, 491 U.S. 600 (1989) and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617

(1989). On August 9, 2019, this Court vacated the judgment and remanded for further proceedings. On December 12, 2019, this Court entered an order denying Claimants' motion to modify the January 5, 2018 order without prejudice to raising the issues with the District Court.

On December 12, 2019, after the mandate issued, the District Court entered an interim protective order continuing the terms of this Court's January 5, 2018 order. The District Court then entered the Release Orders on February 13 and March 2, 2020.

## Statement of Jurisdiction for the Government's Cross-Appeal

On April 13, 2020, the Government filed a timely notice of appeal. This Court's jurisdiction is invoked pursuant to Title 28, United States Code, Section 1292(a)(1). The Solicitor General has approved the prosecution of this cross-appeal.

## Statement of the Issue Presented on the Government's Cross-Appeal

Whether the District Court erred by modifying a valid restraining order to authorize the release of funds subject to forfeiture, thus assuring they will be dissipated and thereby immunized from forfeiture.

## Statement of Facts

### A. Factual Background

Alavi is a New York not-for-profit corporation created in 1973 by Mohammad Reza Pahlavi, then Shah

of Iran. In 1974, Alavi acquired property located at 650 Fifth Avenue, New York, New York. One year later, it borrowed $42 million from Bank Melli Iran, owned by the Government of Iran, to retire mortgages on the property and construct a 36-story skyscraper featuring retail and office space: the Building. *See In re 650 Fifth Avenue and Related Properties*, 934 F.3d 147, 154 (2d Cir. 2019).

In 1979, the country of Iran underwent a revolution and the Shah was overthrown. (SA 109).[1] A revolutionary government led by the Ayatollah Ruhollah Khomeini, the Supreme Leader of the Islamic Republic of Iran, assumed control. (SA 109). The Ayatollah created the Bonyad Mostazafan va Janbazan ("Bonyad Mostazafan"), a state-run foundation under the authority of Ayatollah Khomeini, to nationalize foreign businesses operating within Iran and confiscate property of the former Shah. (SA 12-14, 19-24, 29, 31). The Bonyad Mostazafan confiscated and managed the Pahlavi

---

[1] "Br." refers to Claimants' brief on appeal; "A." refers to the appendix filed with that brief; "SPA" refers to the special appendix filed with that brief; "SA" refers to the supplemental appendix filed with the Government's brief; "Dkt." refers to an entry on the District Court's docket for this case; "App. Dkt." refers to an entry on this Court's docket for this appeal; and "2017 App. Dkt." refers to an entry on this Court's docket for a prior appeal in this case, No. 17-3258. Unless otherwise noted, case text quotations omit all internal quotation marks and alterations.

family's assets, including the Pahlavi Foundation in Iran and the Building. (SA 11-12, 14, 26-28).

For various reasons, Alavi ran into financial trouble in the 1980s. (SA 127-30). *See also In re 650 Fifth Avenue*, 934 F.3d at 54. After lengthy efforts, the only solution the Government of Iran could devise for these problems was for Alavi and Bank Melli Iran to convert their mortgage relationship into a partnership. (SA 111-12, 117-18). It was agreed that "Bank Melli Iran will partner with the New York Foundation"; that Bank Melli Iran would create "two partnerships in Jersey Island"; that Bank Melli Iran would "cooperate with the New York Foundation"; and that a Bank Melli Iran representative would "supervise the plan." (SA 116; *see also* SA 113-15).

Accordingly, in 1989, Alavi entered into a partnership agreement with Assa Corporation ("Assa Corp.") to form the 650 Fifth Avenue Company (*i.e.*, the Partnership) under New York law. Assa Corp. is a New York corporation formed in 1989. It is wholly owned by Assa Company Limited ("Assa Ltd.," and collectively with Assa Corp., "Assa"), a corporation formed in Jersey, Channel Islands. Assa is owned and controlled by the Government of Iran. *In re 650 Fifth Avenue*, 934 F.3d at 55; *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 200 (2d Cir. 2019). Alavi transferred the Building to the Partnership and Assa contributed $44.8 million in order to satisfy the Bank Melli Iran mortgage. Ultimately, Alavi owned 60% of the Partnership and Assa owned 40%. The Partnership owned 100% of the Building. Alavi is the managing partner of the Partnership.

The Partnership has no employees, and its primary operational activity is engaging outside companies to manage the Building. *In re 650 Fifth Avenue*, 934 F.3d at 154-55.

In the early 1990s, following Ayatollah Khomeini's death, the new Supreme Leader, Ayatollah Ali Khamenei, transferred control of Alavi from the Bonyad Mostazafan to the Iranian Ambassador to the United Nations. (SA 30, 123-25, 131-33). At the Ayatollah's direction, the majority of Alavi's board members resigned and were replaced by the Ambassador's nominees. (SA 119-22, 126). The new President was the Ambassador's "puppet." (SA 15-17, 18).

In the 1990s, Alavi, Assa, and the Partnership were sued by judgment creditors of the government of Iran seeking to enforce their judgments against the Building. These lawsuits were dismissed, in part, because Alavi's directors falsely denied under oath having received any instructions from the Ayatollah or the Government of Iran. *See Gabay v. Mostazafan Foundation of Iran*, 968 F. Supp. 895 (S.D.N.Y. 1997); *Flatow v. Islamic Republic of Iran*, 67 F. Supp. 2d 535 (D. Md. 1999).

On October 25, 2007, Bank Melli Iran was designated by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), pursuant to Executive Order 13,382, for supporting proliferators of weapons of mass destruction. *See* Additional Designation of Entities Pursuant to Executive Order 13,382, 72 Fed. Reg. 62,520-01 (Nov. 5, 2007*); see also* http://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20071120.aspx.

On December 17, 2008, Alavi's president was served with a grand jury subpoena for testimony and documents. (SA 81-83). That night, Alavi's President destroyed documents relating to Assa and attempted to dispose of them in a public trash can. (SA 3-7, 8-10, 84-108). He later pled guilty to obstructing justice. (SA 53-80).

Between 1996 and 2008, the Partnership received more than $228 million in gross rents from the Building. (SA 32). During this time period, the Partnership spent more than $143 million in operating expenses, including the costs of operating, maintaining, and improving the Building. (SA 33). Between 2000 and 2008, Alavi received more than $36.9 million in income from the Partnership. (SA 44). Between 1997 and 2008, Assa received more than $26.9 million from the Partnership. (SA 44). Neither the Partnership, nor Alavi, nor Assa had any significant sources of income other than the Building and proceeds derived from the Building's income. (SA 32-52). Alavi used its income from the Partnership to pay, among other things, for expenses, repairs, taxes, and improvements for Alavi's properties. (SA 45-49).

## B. The Amended Complaint and Judgment Creditor Claims

On November 12, 2009, the United States filed the Amended Complaint, alleging that the Defendant Properties are forfeitable, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C), as (a) property constituting or derived from proceeds of violations of the IEEPA

and the ITSRs; and (b) property involved in, or traceable to property involved in, money laundering. (Dkt. 51 ("Am. Compl.")). As relevant here, the Defendant Properties include the Building and all property traceable thereto, including all rental income generated by the Building.

The Amended Complaint alleges that Alavi, Assa, and the Partnership operated the Building for the benefit of the Government of Iran, including departments and agencies of the Government of Iran and Bank Melli Iran; and concealed the Government of Iran's control over Assa, the Building, and the Partnership from private litigants and U.S. government authorities. (*See generally* Am. Compl. ¶¶ 19-119). As a result, among other things, the Building generated tens of millions of dollars that were distributed to Assa for Bank Melli Iran's benefit, including after the ITSRs were implemented in 1995 in response to the Government of Iran's continued hostile and malign activities threatening the United States' national security, and even after Bank Melli Iran was designated in 2007 by OFAC for supporting proliferators of weapons of mass destruction. Claimants filed claims asserting interests in the Defendant Properties, disputing that they are the proceeds of crime or traceable to criminal proceeds and property, and alleging that they are innocent owners. (Dkt. 54, 56, 167).

Between January 2009 and March 2010, judgment creditors of the Government of Iran—victims of Iranian government-sponsored acts of terrorism who hold unsatisfied judgments for damages against the regime

(the "Judgment Creditors")—filed claims asserting interests in the Defendant Properties or in the distribution of the proceeds of those properties and filed independent actions for the turnover of the Defendant Properties to satisfy their damages judgments against the Government of Iran. The Government and the Judgment Creditors have entered into a settlement whereby the net proceeds of any forfeited property will be distributed to the Judgment Creditors on a *pro rata* basis. (Dkt. 1122, 2088).

## C.  The Prior Protective Orders

Since shortly after the inception of this action, the District Court and this Court have imposed a series of protective orders to maintain and preserve the Defendant Properties. In connection with the filing of an initial complaint against Assa's and Bank Melli Iran's interests in December 2008, the District Court issued a Post-Complaint Protective Order, pursuant to 18 U.S.C. § 983(j), prohibiting the transfer or encumbrance of the property subject to forfeiture, requiring the preservation of books and records, and requiring the production of records and an accounting from the Partnership and its agents. (Dkt. 2).

After the Amended Complaint was filed, the District Court appointed former United States Magistrate Judge Kathleen A. Roberts, pursuant to Section 983(j), to act as monitor for the Partnership, Alavi, and the Defendant Properties under a consent protective order. (A. 338). Pursuant to that order and subsequent orders, Judge Roberts was authorized to, among other things, review and approve any disbursements by the

Partnership, review and approve any leases or other agreements by the Partnership, oversee operations of the Defendant Properties, review and approve any expenditures by Alavi, and report to the Court. (A. 338; *see also* Dkt. 161, 265, 995, 1023, 1408, 1472, 2062 at 16, 2078).[2]

On September 16, 2013, the District Court granted the Government's motion for summary judgment as to the forfeitability of Alavi, Assa, and the Partnership's interests in the Building as well as other assets. *In re 650 Fifth Avenue and Related Properties*, 08 Civ. 10934 (KPF), 2013 WL 5178677 (S.D.N.Y. Sep. 16, 2013). The Government moved to modify the protective order to prohibit further disbursements of income from the Building except to operate and maintain the Defendant Properties, relying on, *inter alia*, *Monsanto* and *Caplin & Drysdale*. In an order dated November 22, 2013, the District Court found probable cause supporting the restraint of the Defendant Properties. (A. 353-54). The District Court thus modified the protective order to prohibit the use of the Building's income for certain purposes, but applied a balancing test to permit Claimants to continue to use the Building's income to

---

[2] Use of the Building's income in order to operate the Building and to maintain the Building and other Defendant Properties has been allowed under every iteration of the protective order.

pay attorneys' fees. (A. 354-55). Neither party appealed the November 22, 2013 order.[3]

Claimants appealed the District Court's grant of summary judgment. This Court vacated the order granting summary judgment and remanded for additional pretrial proceedings. *In re 650 Fifth Avenue and Related Properties*, 830 F.3d 66 (2d Cir. 2016). On remand, at Claimants' request, the District Court amended the protective order to remove certain restrictions on Claimants' use of income generated by the Building pending trial, and returned management authority to Alavi subject to enhanced supervision authority and approval requirements of the Monitor. (Dkt. 1408, 1472).

In May and June 2017, a jury trial was held on the forfeitability of Claimants' interests in the Defendant Properties, resulting in a jury verdict finding, in relevant part, that Claimants' interests in the Partnership

––––––––––

[3]  Claimants' repeated suggestion that the Government has agreed to use of rental income to pay legal fees for "more than seven years" prior to the Release Orders is thus inaccurate. (Br. 1, 13). The District Court recognized as much when Claimants made a similar suggestion below. (SPA 44). In fact, the Government has opposed the dissipation of rental income since November 2013, when the District Court found probable cause for continued restraint but rejected the Government's attempt to prohibit spending entirely. That the Government did not appeal that ruling does not signify the Government's agreement with it.

and the Building, as well as funds derived from the Building, were forfeitable as proceeds of IEEPA offenses and as properties involved in or traceable to money laundering, and that Claimants are not innocent owners. (Dkt. 1896). The District Court simultaneously conducted a bench trial, which resulted in findings that the Defendant Properties were subject to turnover to the Judgment Creditors under the Terrorism Risk Insurance Act and the Foreign Sovereign Immunities Act. (Dkt. 1895).

## D. The Post-Trial Stay Litigation

On July 27, 2017, Claimants moved to stay the anticipated judgment as well as any restrictions on the dissipation of assets. (Dkt. 1989). Claimants argued, among other things, that "they would cease to be viable as business organizations and would lose the ability to continue with their legal defense" without the ability to access the proceeds of the Building. (*Id.* at 6). The District Court denied these applications (Dkt. 2062) and entered a modified protective order that, among other things, prohibited the dissipation of forfeitable assets, including to pay attorneys' fees, pending a final judgment of forfeiture (Dkt. 2078, 2089).[4]

––––––––––

[4] Between approximately mid-2016 and the effective date of the post-trial stay order, Alavi and the Partnership spent more than $19 million in forfeitable Building income on legal fees, gave nearly $1 million in gifts to third parties, and spent approximately $1 million on Alavi operations (principally officer salaries and board member honoraria). Thus, in approximately

On or about October 12, 2017, Claimants filed a notice of appeal. Claimants sought a stay pending appeal and an emergency stay, requesting, among other things, the ability to use income from the Defendant Properties to pay expenses, including legal fees. (2017 App. Dkt. 13). Claimants represented to this Court that, without access to those funds, "Claimants could be precluded from pursuing this appeal at all." (*Id*. at 18 n.1; *see also* 2017 App. Dkt. 70 at 19 (arguing that preventing Claimants from using income from the Building to fund their defense "would effectively bar Claimants from pursuing this appeal at all")). On November 16, 2017, this Court granted Claimants' motion and entered an order containing all of the provisions they requested. (2017 App. Dkt. 94).

The Government and the Judgment Creditors sought reconsideration of that portion of the order permitting expenditure of the Building's income for purposes other than operating and maintaining the value of the Defendant Properties. (2017 App. Dkt. 98). The Government argued that such expenditures are contrary to *Monsanto* and *Caplin & Drysdale*, and should

––––––––––

one year, more than $21 million in forfeitable property was dissipated on expenditures unrelated to operating and maintaining the value and availability of the Defendant Properties, which will never be recovered for the Government or the Judgment Creditors. When, as discussed, this Court temporarily lifted restraints on the use of forfeitable funds, total attorneys' fees grew to nearly $23.9 million. (Dkt. 2181 at 7-8; Dkt. 2200 at 25-26).

be prohibited. Claimants opposed, repeating their argument that, if denied access to income from the Building, they "would be forced to close [their] doors before [they] even ha[ve] an opportunity to exercise [their] appellate rights, and would be unable to pursue this appeal." (2017 App. Dkt. 100 at 3).

This Court rejected Claimants' argument and entered an order prohibiting further expenditures of funds generated by the Defendant Properties except in order to maintain the Defendant Properties. (SA 1 (the "*Monsanto* Order")). The order relied on *Monsanto* and *Caplin & Drysdale*. (SA 1).

Claimants moved for rehearing and to allow the expenditure of the Building's income for expenses and legal fees, arguing that *Monsanto* and *Caplin & Drysdale* did not apply and asserting again that Claimants would be unable to maintain their appeal without access to funds. (2017 App. Dkt. 116 at 1). This Court denied the motion in relevant part on February 13, 2018. (2017 App. Dkt. 138).

Notwithstanding repeated representations about being unable to participate further in the appeal without access to the Building's rental income, Claimants continued to vigorously press their appeals from both the forfeiture and turnover judgments and—as was their right—filed numerous oversized motions and oversized briefs and participated in an extended oral argument before this Court.

### E. The Interim Protective Order and Claimants' Motion to Release Funds

On August 9, 2019, this Court vacated the forfeiture judgment and remanded for further proceedings. *In re 650 Fifth Ave.*, 934 F.3d at 153. On August 30, 2019, Claimants asked this Court to reinstate the prior monitorship and interim trusteeship orders, which would permit Claimants to spend the Building's income on legal fees and other expenses. (2017 App. Dkt. 320). Claimants argued that, otherwise, they "will not be able to . . . fund their legal defense." (*Id.* at 4). On December 12, 2019, this Court denied that motion without prejudice to addressing the request to the District Court. (2017 App. Dkt. 336). The mandate issued the same day.

Upon issuance of the mandate, the Government moved the District Court, on notice to Claimants, for the entry of an interim protective order mirroring the provisions of this Court's *Monsanto* Order pending the resolution of Claimants' objections, in light of exigent circumstances created by the possible lapse of the Trustee's authorities. (A. 392). The District Court entered an interim protective order on December 12, 2019. (A. 420 (the "Interim Protective Order")). The Interim Protective Order mirrored the terms of this Court's November 16, 2017 order as modified by the *Monsanto* Order, including prohibiting the Trustee from making disbursements of rental income to Alavi or Assa. (A. 431).

On January 8, 2020, Claimants moved to modify the Interim Protective Order, principally seeking release of rental income, and again asserting that "the

necessity of this modification cannot be overstated" because such income is "Claimants' sole means to pay for this litigation." (A. 441). And although the Claimants argued, *inter alia*, that the restrictions on Claimants' use of income generated by the Building amounted to an unlawful seizure without a probable-cause determination and prior notice and opportunity to be heard, they argued that such a hearing could not be held until after all outstanding discovery and suppression issues were resolved. (A. 457). The Government opposed Claimants' motion. (Dkt. 2181).

## F.  The District Court's Release Orders

The District Court held oral argument on Claimants' motion on February 12, 2020. With respect to Claimants' argument that rental income restrained pursuant to this Court's *Monsanto* Order should be released, the District Court noted that "it's awfully hard for me to think that a seizure that was ordered by the Court of Appeals somehow becomes unlawful later on when the Court of Appeals makes its decision." (SPA 80).

On February 13, 2020, the District Court issued an order granting Claimants' motion in part, authorizing the release of income generated by the Building from the date of the Interim Protective Order (December 12, 2019) until the date of any future probable cause determination. (SPA 1-2).

On March 2, 2020, the District Court issued an opinion setting forth its reasoning. (SPA 3-21). The District Court found that the motion "hinges at one

level" on whether 18 U.S.C. § 985 "applies to the re-
straints imposed on the Building's rental income."
(SPA 12-13). The District Court concluded that the
rental income "is an interest in real property that
places it within the ambit of Section 985" and that the
restraints imposed on the rental income by the Interim
Protective Order amounted to a "seizure" as that term
is used in Section 985. (SPA 13). Thus, because Section
985(d) requires either a hearing or an *ex parte* showing
of probable cause and exigent circumstances before
"real property" may be "seized," the District Court held
that it was required to modify the Interim Protective
Order to release the rental income until such a hearing
could be conducted (or an appropriate *ex parte* showing
was made). (SPA 13).

The District Court's opinion did not acknowledge
that the hearing requirement in Section 985(d) applies
by its terms to "real property," not to an "interest in
real property." Nor did the District Court's opinion
acknowledge that Section 985 specifically distin-
guishes between "seizures" and "restraining orders."
Rather, the District Court relied in significant part on
*United States v. James Daniel Good Real Property*, 510
U.S. 43 (1993), a case involving a possessory seizure of
real property, not a restraining order governing the
use of property that is easily dissipated, like the rental
income at issue here. (SPA 15-18).

The District Court's Release Orders did not permit
the release of any funds restrained by this Court prior
to December 12, 2019. On March 30, 2020, the District
Court entered a modified protective order implement-
ing the Release Orders. (Dkt. 2223, 2225).

### G. The Government's Request for a Probable Cause Determination and the Stay of the Release Orders

On February 28, 2020, the Government filed an *ex parte* application pursuant to 18 U.S.C. § 985(d)(1)(B)(ii) to restrain the Partnership's funds, arguing that, if Section 985(d) applied, exigent circumstances created by Claimants' express intentions to dissipate the funds, rendering them unavailable for forfeiture, permitted the Court to make a probable cause finding prior to notice and an opportunity to be heard. (Dkt. 2196, 2200 (the "TRO Application")).[5] As part of the TRO Application, the Government confirmed, as it had previously advised the District Court, that although probable cause had already been found for forfeiture, the Government was prepared to proceed promptly with a probable cause hearing in order for Claimants to have an opportunity to be heard once again. (Dkt. 2200 at 42). The Government further advised that, though the application was made *ex parte*, as provided by statute, the Government did not object to its public filing. The District Court converted the application into a motion on notice, with an opportunity for Claimants to be heard. (Dkt. 2196).

––––––––––

[5] The TRO application did not rely on any evidence obtained or derived from the search of Alavi's offices in December 2008 that was later held to be unlawful. (Dkt. 2200 at 5 n. 5, 7 n.6). The same is true of the factual background in Part A of the Statement of Facts.

Claimants opposed the motion, arguing that a probable cause hearing is necessary, but that the District Court cannot hold one until, *inter alia*, the completion of discovery. (Dkt. 2205 at 9). The motion remains pending.

On June 4, 2020, the District Court entered an order staying the Release Orders pending appeal. (Dkt. 2276). In the stay order, the District Court found that the Government had made a "substantial case" on the merits, and observed that "Claimants' repeated claims that they would be unable capably to participate in this litigation save for the immediate release of funds have never panned out." (*Id*. at 5, 10-11). The District Court also rejected Claimants' contention, made again on appeal (Br. 22), that the Government's motives in seeking to preserve funds for forfeiture were improper. (Dkt. 2276 at 13 n.5).

## ARGUMENT

### Claimants Should Not Be Permitted to Dissipate Funds Subject to Forfeiture

On appeal, Claimants argue that the District Court erred by ordering the release of rental income generated by the operation of the Building from only December 12, 2019 forward. Instead, Claimants contend, the District Court should have released all such rental income since January 5, 2018, the date of this Court's *Monsanto* Order. (Br. 3). Yet again, they claim that

these funds—which amount to tens of millions of dollars[6]—are necessary to litigate their claims. (Br. 4).

Claimants should not be permitted to dissipate funds subject to forfeiture, even if the intended use of those funds is to pay for legal fees. The funds in question are properly subject to restraint under 18 U.S.C. § 983(j) and *Monsanto*, as this Court has recognized in a prior order, and the District Court erred when it found that 18 U.S.C. § 985(d) required a different result. (*See* Part B.1). The restraints on rental income imposed in this case are also consistent with Due Process. (*See* Part B.2). On both points, Claimants' arguments to the contrary conflate restraint of the Building itself with the restraint of funds that are subject to independent forfeiture claims and, unlike a building, will be effectively immunized from forfeiture if released. This Court should therefore reverse the District Court's Release Orders insofar as they authorized the release of rental income from December 12, 2019 forward.

Claimants' challenge to the aspect of the Release Orders that declined to release rental income from the period January 5, 2018 to December 12, 2019 is meritless for the same reasons. And this aspect of the Release Orders should be affirmed for an additional reason: Such rental income was properly restrained pursuant to a valid order of this Court entered after ample

---

[6] The precise figures are reported in quarterly reports filed by the monitor, which are filed under seal but can be provided to the Court if requested.

pre-restraint notice and opportunity to be heard. (*See* Part B.3).

Finally, even if the rental income from either or both periods was unlawfully restrained, the remedy is not for the funds to be released so that they can be spent and effectively immunized from forfeiture. Rather, under this Court's precedent, the remedy is for the District Court to promptly make a probable cause determination, as the Government has asked it to do. (*See* Part B.4).

## A. Applicable Law

### 1. Section 983 and *Monsanto*

The district court is authorized to "enter a restraining order or injunction, . . . create receiverships, appoint conservators, custodians, . . . or take any other action to seize, secure, maintain, or preserve the availability of property subject to civil forfeiture." 18 U.S.C. § 983(j)(1). Such an order may be entered upon application by the United States "upon the filing of a civil forfeiture complaint alleging that the property with respect to which the order is sought is subject to civil forfeiture." 18 U.S.C. § 983(j)(1)(A).

While Section 983(j) provides that the district court "may" authorize such restrictions, the Supreme Court has clarified that such discretion "cannot sensibly be construed to give district court discretion to permit the dissipation" of forfeitable property. *United States v. Monsanto*, 491 U.S. 600, 612-13 (1989). Construing 21 U.S.C. § 853(e), which is the criminal analogue of Sec-

tion 983(j) and contains materially identical language,[7] the Court rejected a criminal defendant's attempt to use funds alleged to be forfeitable to pay retained counsel, explaining:

> Whatever discretion Congress gave the district courts in §§ 853(e) and 853(c), that discretion must be cabined by the purposes for which Congress created it: "to preserve the availability of property . . . for forfeiture." . . . Permitting a defendant to use assets for his private purposes that, under this provision, will become the property of the United States if a conviction occurs cannot be sanctioned.

*Id*. at 613; *see also Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 632-34 (1989) (companion case rejecting Fifth and Sixth Amendment challenges

————————

[7] *Compare* 21 U.S.C. § 853(e) ("Upon application of the United States, the court may enter a restraining order or injunction, . . . or take any other action to preserve the availability of [property subject to forfeiture]."), *with* 18 U.S.C. § 983(j)(1) ("Upon application of the United States, the court may enter a restraining order or injunction, . . . or take any other action to preserve the availability of property subject to forfeiture."). *See also United States v. Melrose East Subdivision*, 357 F.3d 493, 499, 502-05 (5th Cir. 2004) (noting that Section 983(j) was enacted after *Monsanto*, and finding *Monsanto* controlling in Section 983(j) context).

to this construction). In *Caplin & Drysdale*, the Court emphasized that permitting funds subject to forfeiture to be used for attorney's fees was contrary not only to the Government's interest in "separating a criminal from his ill-gotten gains," but also to the legitimate interest in "recovering *all* forfeitable assets." 491 U.S. at 629. In this very case, this Court has recognized that *Monsanto* and *Caplin & Drysdale* apply in the context of Section 983(j). (SA 1).

### 2. Section 985

Section 985 sets forth certain provisions relating to "civil forfeitures of real property and interests in real property." 18 U.S.C. § 985(a). Ordinarily, "real property that is the subject of a civil forfeiture action shall not be seized before entry of an order of forfeiture" and "the owners or occupants of real property shall not be evicted from, or otherwise deprived of the use and enjoyment of, real property that is the subject of a pending forfeiture action." *Id.* § 985(b)(1).

However, "real property may be seized prior to the entry of an order of forfeiture if" the Government notifies the court that it intends to seize the property and the court either (i) "issues a notice of application for warrant, causes the notice to be served on the property owner and posted on the property, and conducts a hearing in which the property owner has a meaningful opportunity for the property owner to be heard," or (ii) "makes an *ex parte* determination that there is probable cause for the forfeiture and that there are exigent circumstances that permit the Government to seize the property without prior notice and an opportunity

for the property owner to be heard." 18 U.S.C. § 985(d)(1).

By the statute's plain text, these requirements govern only when "real property" may be "seized." Section 985 does not, however, "affect the authority of the court to enter a restraining order relating to real property." 18 U.S.C. § 985(f)(3).

### 3. Due Process

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." Whether the seizure or restraint of property for the purpose of civil forfeiture comports with Due Process is guided by the three-part inquiry set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which requires the court to consider "the private interest affected by the official action; the risk of erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards; and the Government's interest, including the administrative burden that additional procedural requirements would impose." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993).

In *James Daniel Good Real Property*, the Supreme Court held that, absent exigent circumstances, the Due Process Clause prohibits the Government in a civil forfeiture action from seizing real property without first affording the owner notice and an opportunity to be heard. *Id.* at 46. In so holding, the Court emphasized that because "real property cannot abscond," the Government interest in seizing such property before a

hearing is significantly diminished. *Id.* at 56-57. The Court relied on this fact to distinguish its holding from *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974), in which the Court held that the Government may seize a yacht subject to civil forfeiture without affording prior notice or a hearing. "Central to [the Court's] analysis in *Calero-Toledo* was the fact that a yacht was the 'sort of property that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given.'" *James Daniel Good Real Property*, 510 U.S. at 52 (quoting *Calero-Toledo*, 416 U.S. at 678). The Court further emphasized that in the case of real property, the Government has means less restrictive than seizure to protect its interest in preserving the property for forfeiture, including restraining orders. *Id.* at 58-59.

### 4. Standard of Review

This Court "review[s] a district court's legal conclusions regarding forfeiture *de novo* and its factual determinations for clear error." *United States v. Daugerdas*, 892 F.3d 545, 552 (2d Cir. 2018); *see also United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) (questions of statutory interpretation reviewed *de novo*).

## B. Discussion

### 1. Section 983, Not Section 985, Applies

Upon application of the United States after the filing of a civil forfeiture complaint alleging that property is subject to civil forfeiture, the district court is authorized to "enter a restraining order" or "take any

other action" to "preserve the availability of" such property for forfeiture. 18 U.S.C. § 983(j)(1)(A). The entry of such an order is required where requested by the Government, even where a defendant seeks to use the property to pay legal expenses. *Monsanto*, 491 U.S. at 612-13; *see also* SA 1 (this Court applying *Monsanto* in this case). The District Court was thus obliged to restrain the Claimants from spending the rental income from the Building on legal fees.

The District Court erred when it modified the Interim Protective Order to authorize release of rental income from December 12, 2019 forward. The District Court justified this modification by applying 18 U.S.C. § 985(d), which requires a hearing or *ex parte* showing of probable cause and exigent circumstances before "real property" may be "seized." (SPA 12-13). This was erroneous, for two reasons. First, rental income is not "real property." Second, the rental income was not "seized," as that term is used in the statute.

### a.     Rental Income is Not "Real Property"

Section 985 governs forfeitures of "real property and interests in real property." 18 U.S.C. § 985(a), (f). But the specific provisions of that section mandating a pre-seizure hearing or *ex parte* showing of probable cause and exigent circumstances apply only to seizures of "real property." *See* 18 U.S.C. § 985(b)(1), (d)(1). These subsections make no mention of "interests in real property." Unlike the Building itself, rental income from a building clearly is not "real property." *See* Black's Law Dictionary (11th ed. 2019) (defining "real

property" to mean "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land"). The District Court did not appear to rule otherwise, describing the rental income as "an interest in real property." (SPA 13).[8] But the District Court nevertheless failed to acknowledge that Section 985(d)'s requirement of a pre-seizure hearing or *ex parte* showing by its terms applies only to seizures of "real property." Section 985(d) is therefore inapplicable by its plain terms.

Several canons of construction support this reading of the statute. Most notably, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally

―――――――――

[8] It is not clear that rental income qualifies as an "interest in real property," either. The income generated from rents is simply a proceed that, once earned, is fungible cash that should be treated as personal property. It is distinct from an interest in property, like a security interest or a leasehold interest. It is also distinct from the right to receive rents in the first instance. *See* Black's Law Dictionary (11th ed. 2019) (defining "property interest" as "[a]n interest, perhaps including rights of possession and control, held by an owner, beneficiary, or remainderman in land, real estate, business, or other tangible items"). The Court need not resolve this question, however, because, as noted, Section 985(d) does not apply to an "interest in real property," and, as discussed below, the rental income was not "seized."

and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Thus, this Court must presume that Congress intentionally excluded "interests in real property" from Section 985(d), meaning that such interests do *not* require the same pre-seizure process that "real property" does.

Similarly, where Congress uses two different terms in the same statute, this Court must assume that Congress did so "because it intended each term to have a particular, nonsuperfluous meaning." *Bailey v. United States*, 516 U.S. 137, 146 (1995). Thus, "real property" and "interests in real property" in Section 985(a) and (f) each must have a distinct meaning. But if Section 985(d)'s reference to "real property" actually encompasses both, the phrase "interests in real property" in Section 985(a) and (f) would be rendered superfluous.

Other portions of Section 985 provide support for reading the term "real property" in Section 985(d) to mean only "real property." For example, to establish exigent circumstances justifying pre-hearing seizure of such property, the Government must show that less restrictive means would not suffice to prevent the "sale, destruction, or continued unlawful use of the real property." 18 U.S.C. § 985(d)(2). As applied to "real property," this makes perfect sense, as "sale" and "destruction" are two ways by which a property owner might prevent forfeiture of such property. But one does not commonly refer to the "destruction" of an "interest in real property," such as a leasehold interest. If such an "interest in real property" were covered by Section 985(d), one would have expected Congress to also list

ways in which a property owner might defeat forfeiture of that type of property, such as "transfer." Or, if rental income qualifies as an "interest in real property," "spend."

Claimants argue that Section 985 "represents Congress's codification of the constitutional protections that the Supreme Court recognized in" *James Daniel Good Real Property*. (Br. 16). That does not help the Claimants' argument, because *James Daniel Good Real Property* supports the Government's construction of Section 985. That case involved a possessory seizure of real estate, not a mere restraint of rental income. 510 U.S. at 59. Indeed, the Court expressly distinguished between the physical seizure of real property at issue in that case and other, less intrusive, measures to protect real property subject to forfeiture —including a restraining order or *lis pendens*. *Id*. The Court ultimately found that, absent exigent circumstances, Due Process required notice and a hearing before the seizure of real property. *Id*. at 46. But in so doing, the Court specifically distinguished between the interests at stake in the seizure of real property— which cannot abscond—and the seizure or restraint of other types of property which easily can be destroyed or concealed. *See id*. at 52, 56-57.

Section 985 is fully consistent with that distinction. Seizures of "real property" require a pre-seizure hearing or *ex parte* showing of probable cause and exigent circumstances. Seizures of interests that easily can be destroyed or concealed do not. *See* 18 U.S.C. § 985(d). Because rental income is not "real property," but ra-

ther is the type of interest that can easily be dissi-
pated, the District Court erred by applying Section
985(d).

### b. There Was No "Seizure" of Rental Income

Even if the requirement in Section 985(d) of a pre-
seizure hearing or *ex parte* showing of probable cause
and exigent circumstances applies to the seizure of
rental income derived from "real property," it is inap-
plicable here, because the restraints on rental income
imposed in this case did not constitute a "seizure" as
that term is used in Section 985. Rather, the rental in-
come is subject to exactly the sort of "restraining or-
der" expressly authorized by both Section 983(j) and
Section 985(f)(3).

In Section 985, Congress specifically distinguished
between "seizures" and "restraining order[s]." For ex-
ample, although "real property" ordinarily may not be
"seized" prior to the entry of an order of forfeiture,
there is an exception for exigent circumstances. To es-
tablish exigent circumstances, the Government must
show that less restrictive means, "such as . . . *a re-
straining order* . . . would not suffice to protect the Gov-
ernment's interests." 18 U.S.C. § 985(d)(1)-(2) (empha-
sis added). Similarly, despite requiring certain proce-
dural protections for "seizures" of real property, Sec-
tion 985 makes clear that it does not affect the district
court's authority "to enter *a restraining order* relating
to real property." *Id.* § 985(f)(3) (emphasis added).

Thus, as used in Section 985, "seizure" and "restraining order" mean different things. *See Bailey*, 516 U.S. at 146.

This interpretation comports with the plain meaning of the terms "seizure" and "restraining order." A "seizure" is "[t]he act or an instance of taking possession of a person or property by legal right or process," whereas a "restraining order" is "[a] court order entered to prevent the dissipation or loss of property." *See* Black's Law Dictionary (11th ed. 2019). The Supreme Court has repeatedly recognized this distinction. *See, e.g., James Daniel Good Real Property*, 510 U.S. at 62 (distinguishing between a seizure and "less restrictive measures" such as a "restraining order"); *Monsanto*, 491 U.S. at 615 (describing an action "restrain[ing] [a litigant] from disposing of [his property]," as a "less severe" government intrusion than a "seiz[ure]").

Once again, to the extent Section 985 codifies *James Daniel Good Real Property*, that supports the Government's reading. In that case, the government never sought or obtained a restraining order governing the income generated by the property; rather, the government obtained an *ex parte* warrant of arrest *in rem*, pursuant to 21 U.S.C. § 881(a)(7), authorizing the government to seize real estate used to store controlled substances and paraphernalia. *James Daniel Good Real Property*, 510 U.S. at 47. The government executed the warrant and seized the real property, which was being rented to tenants. The government did not dispossess the tenants, but instead entered into occupancy agreements with them directing that rent be

paid to the United States Marshal. *Id.* There was no dispute that the property had been, in fact, physically seized: "[T]he Government seized property . . . to assert ownership and control over the property itself." *Id.* at 52. Moreover, the scope of the government's authority under the arrest warrant *in rem* was broad: It had "the right to prohibit sale, . . . to evict occupants, to modify the property, to condition occupancy, to receive rents, and to supersede the owner in all rights pertaining to the use, possession, and enjoyment of the property." *Id.* at 54.[9]

The contested provisions of the protective orders in this case give the Government none of those rights. None of the protective orders have given the Government the authority to evict tenants, to interfere in the use of the Building, to modify the Building, or even to receive possession of the restrained rents. Unlike in *James Daniel Good Real Property*, the Partnership has not been deprived of the funds at issue—they remain in the Partnership's possession, and the income the Partnership derives from the operation of the Building can be used for any appropriate Partnership purpose.

---

[9] In evaluating the interests of the property owner under the *Mathews* test, the Court did note that the owner's loss of rental income was not "unworthy of due process protection." *Id.* at 54. But it did not purport to hold that the restraint of such income, standing alone, required a pre-deprivation hearing, as discussed below. (*See* Part B.2).

They simply cannot be distributed to the partners or dissipated.[10]

The restrictions imposed by the protective orders in this case are thus in the nature of a restraining order, not a seizure. In *James Daniel Good Real Property*, the Court specifically drew a distinction between the seizure at issue in that case and less restrictive measures, like a restraining order. 510 U.S. at 62. Section 985 reflects that distinction. Thus, because the rental income was not "seized," as that term is used in the statute, Section 985(d) has no application.

## 2. There Was No Due Process Violation

The restraints on rental income imposed by the protective orders in this case do not violate Claimants' Due Process rights. The challenged restraints on rental income were not imposed until years into the case, after the parties had litigated summary judgment and a jury trial. And the protective orders impose relatively modest restraints on property that would otherwise assuredly be dissipated, thus immunizing it from forfeiture. Under the circumstances, the Claimants received all the process they are due.

The District Court did not appear to rule otherwise, but rather held that its interpretation of Section 985's

---

[10] Claimant Alavi, unlike the Partnership, has no ownership interest in either the Building or the Partnership's income. Alavi is entitled, absent the restraining order provisions, only to such distributions of Partnership income as the Partnership approves.

statutory requirements was informed by Due Process precedents, and that the restraint on rental income was a "seizure both for purposes of Section 985 and the Due Process clause." (SPA 19; *see* SPA 14-19). As set forth above, the District Court erred in its interpretation of the term "seizure" as used in Section 985. (*See* Part B.1.b). And even if the restraint on rental income amounts to a "seizure" as that term has been used in Due Process cases, it does not automatically follow that a pre-deprivation hearing is necessary or that the process that preceded the deprivation here was inadequate. Rather, the Court must conduct the *Mathews* balancing to determine what process is due before such a deprivation is proper. The District Court did not perform that analysis, but simply concluded that what occurred here was a seizure and went no further. (SPA 19). To the extent this was a conclusion that a Due Process violation occurred, it was error.

At the outset, it bears emphasizing that, in the Due Process analysis, the term "seizure" does not carry the same significance as in the analysis of whether the statutory requirements in Section 985(d)—which are keyed to that term—have been met. This is because Due Process analysis is not triggered only by a " 'seizure' in the literal sense." *Pinsky v. Duncan*, 898 F.2d 852, 854 (2d Cir. 1990). Rather, even a lesser deprivation of a property interest may be "worthy of due process protection." *Id.*; *see also Connecticut v. Doehr*, 501 U.S. 1, 12 (1991). Thus, in *James Daniel Good Real Property*, the Court observed that even if the only effect of the seizure of real property was deprivation of rental income, that loss could not be classified as "*de minimis* for purposes of procedural due process" and

thus was not "unworthy of due process protection." 510 U.S. at 54-55. But that does not mean that every interference with a possessory interest requires a pre-deprivation hearing. Courts have found no pre-deprivation hearing necessary in various contexts, despite the infringement of a possessory interest. *See, e.g.*, *Calero-Toledo*, 416 U.S. at 679-80; *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 604-07 (1974); *United States v. Monsanto*, 924 F.2d 1186, 1192-93 (2d Cir. 1991) (*en banc*). Rather, where there is a meaningful interference with a property interest, the Court must balance the factors set forth in *Mathews* to determine what process is due. *See, e.g.*, *James Daniel Good Real Property*, 510 U.S. at 53; *Doehr*, 501 U.S. at 10-11; *Monsanto*, 924 F.2d at 1193. Here, that balancing demonstrates that the process afforded to Claimants was more than adequate.

First, the Government does not dispute that Claimants' private interests have been infringed to some degree by the restraint of rental income. But the orders restraining the use of rental income constitute a significantly less intrusive infringement than a literal seizure of real property or the outright possession of such rental income by the Government. *See, e.g.*, *James Daniel Good Real Property*, 510 U.S. at 62 (distinguishing between a seizure and "less restrictive measures" such as a "restraining order"); *Monsanto*, 491 U.S. at 615 (describing an action "restrain[ing] [a litigant] from disposing of [his property]," as a "less severe" government intrusion than a "seiz[ure]"). Moreover, not only is a restraining order generally less intrusive than a seizure, but the particular restraints in this case present a particularly modest infringement on Claimants' rights. Although rental income may not

be disbursed, it *may* be used for expenditures for the business purpose of the Partnership (and maintenance of Alavi's independently-owned properties), and, indeed, considerable sums have been used for that purpose. Thus, the private interests at stake weigh less heavily than they did in *James Daniel Good Real Property*, in which a pre-deprivation hearing was deemed necessary.

Second, there is little risk of erroneous deprivation of private interest through the procedures used in this case, and little value in additional procedural safeguards. Claimants have been actively litigating their claims for over a decade. In 2013, after years of discovery, and at a time when the rental income was not restrained in the manner now contested, the parties thoroughly briefed and the District Court decided cross-motions for summary judgment. *In re 650 Fifth Ave.*, 2013 WL 5178677. The District Court then separately found that there was in fact probable cause to forfeit the property at issue. (A. 353-54).[11] By that point in time—at which point the rental income had

_____

[11] The fact that the District Court's grant of summary judgment was vacated does not vitiate the separate probable cause finding, which was not challenged on appeal. The standard for summary judgment is more stringent than probable cause, and even a small subset of the evidence that the District Court considered in granting summary judgment would support a finding of probable cause. *See United States v. Bonventre*, 720 F.3d 126, 132 (2d Cir. 2013) (describing limited nature of inquiry at probable cause hearing).

not yet been restrained in the manner now contested—Claimants received all the process they were due. *See United States v. Marsh*, 105 F.3d 927, 932 (4th Cir. 1997). In *Marsh*, the Fourth Circuit found that the Government's initial, *ex parte* seizure of real property violated Due Process under *James Daniel Good Real Property*. But once the defendant subsequently received discovery and the magistrate judge held a hearing on summary judgment, the requirement of an adversarial hearing had been met. *Marsh*, 105 F.3d at 932. So too here.

But that is not all. After this Court vacated the grant of summary judgment, the parties' claims were litigated at a full-blown jury trial. Again, the property at issue was found to be forfeitable, employing a standard higher than probable cause. *See* 18 U.S.C. § 983(c) (burden of proof is preponderance of the evidence); *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) ("[P]robable cause is a lower standard than preponderance of the evidence."); *see also United States v. Walsh*, 712 F.3d 119, 125 (2d Cir. 2013) (probable cause hearing is not a "dress rehearsal of the trial"). Then, and only then, did the District Court first impose the restrictions on rental income that are now challenged. To be sure, that verdict has also been vacated. But whether procedural errors at a trial or in pre-trial proceedings required vacatur of a final verdict on forfeitability is a very different question than whether a property owner received adequate process before the temporary restraint of his property. The extensive process afforded to the Claimants before the restrictions were imposed makes this case fundamentally different from an *ex parte* seizure like that in *James Daniel*

*Good Real Property*, where the issuance of an *ex parte* warrant gave "little or no protection to the innocent owner." 510 U.S. at 55.

Moreover, with regard to the second factor, the court must consider whether the availability of post-deprivation process will recompense any losses caused by erroneous deprivation. *Id.* at 56. Because the rental income is merely subject to a restraining order, Claimants will be able to fully recoup the money if it is later determined that the rental income was not forfeitable. And while the Claimants have repeatedly made hyperbolic claims about their inability to continue their defense if the rental income is restrained, those claims "have never panned out," as the District Court recently found and the record clearly reflects. (Dkt. 2276 at 10-11).[12]

─────────

[12] *See, e.g.*, Dkt. 1989 at 6 (making this claim after the trial); 2017 App. Dkts. 13 at 18 n.1, 70 at 19, 100 at 3, 116 at 1 (making this claim repeatedly during pendency of 2017 Appeal); 2017 App. Dkt. 320 (making this claim to this Court after remand); A. 441 (making this claim to District Court on remand). After each of these assertions, the Claimants have continued to vigorously litigate this case, through representation by two major law firms. And it bears noting that Claimants in fact have no constitutional right to counsel in these proceedings, *see United States v. 777 Greene Avenue*, 609 F.3d 94, 97 (2d Cir. 2010), let alone the right to spend funds subject to forfeiture on such counsel.

This is therefore not a case where the possessory interest at issue was seized or infringed immediately upon the filing of a civil complaint and without notice and an opportunity for the owners to be heard. Rather, the restrictions at issue were imposed only after the Claimants had litigated their claims *for years*, including lengthy briefing on summary judgment motions and a full jury trial. The second *Mathews* factor thus shows that no additional process was necessary here.

Finally, the Government interest is significant. As in any case, the Government has a legitimate interest in preserving the proceeds of criminal activity for forfeiture. *See, e.g.*, *Caplin & Drysdale*, 491 U.S. at 629. That interest takes on particular weight here, where the net forfeiture proceeds will be distributed *pro rata* to Judgment Creditors who are the victims of Iranian government-sponsored acts of terrorism. *See Monsanto*, 924 F.2d at 1192 (recognizing legitimate interest in "permitting recovery of assets by their rightful owners"). Of course, the Government interest is not merely forfeiting the property, but seizing or restraining it in a manner sufficient to prevent its destruction or dissipation. *See James Daniel Good Real Property*, 510 U.S. at 56-57; *Monsanto*, 924 F.2d at 1192. The Supreme Court's reasoning in *James Daniel Good Real Property* makes clear why that interest weighs heavily here in the case of rental income. As noted, that case involved the seizure of real property, which "cannot abscond," and the Court specifically contrasted its holding from those in prior cases involving property that easily can be concealed or destroyed if notice to the owner is given prior to seizure. 510 U.S. at 57. The Court thus reaffirmed its conclusion that with respect

to property of that nature, such as a yacht, the Government's interest in immediate seizure "justified dispensing with the usual requirement of prior notice and a hearing." *Id.* (citing *Calero-Toledo*, 416 U.S. at 679).

Here, there is not merely a risk that the property at issue will be dissipated if released: That is avowedly Claimants' purpose. Claimants have made clear that they intend to disburse the rental income to their lawyers to pay "millions of dollars in fees" for services rendered, not to mention the millions more they will assuredly spend continuing to litigate this action with representation from two major law firms. (Br. 5 n.1; A. 463). Supreme Court precedent makes clear that even a criminal defendant has no right "to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Caplin & Drysdale*, 491 U.S. at 626. Yet that is exactly what Claimants intend to do, to the tune of millions of dollars that otherwise might go to victims of state-sponsored terrorism, and even though they have repeatedly demonstrated their ability to litigate this action despite the restraint imposed on rental income.

Claimants have received more than adequate process.

### 3. This Court's *Monsanto* Order Was Not Unlawful

The Release Orders authorized the release of rental income from December 12, 2019—*i.e.*, the date the mandate was issued and the Interim Protective Order was entered—forward. For the reasons set forth above,

the Release Orders were erroneous, and the rental income should not be released at all. But even if the Release Orders were affirmed in this respect, this Court should not grant Claimants' further request to authorize the release of rental income from January 5, 2018—*i.e.*, the date of this Court's *Monsanto* Order—to December 12, 2019.

By way of background, and as set forth above, after the trial verdict, Claimants sought a stay pending appeal, asking this Court to enter a proposed protective order appointing Judge Roberts as Trustee of the Defendant Properties, restraining the use of the Building's income, and permitting the expenditure of funds for Claimants' past and future legal fees. (2017 App. Dkt. 13). The Government opposed the requested stay on the grounds, *inter alia*, that the Claimants' proposed order permitted the dissipation of funds subject to forfeiture. (2017 App. Dkt. 62). Claimants filed a reply, arguing that *Monsanto* and *Caplin & Drysdale* did not apply and that the funds were needed in order for Claimants to prosecute their appeal. (2017 App. Dkt. 70). This Court initially entered the order requested by Claimants. (2017 App. Dkt. 94). The Government then moved for reconsideration solely with respect to the provision of Claimants' proposed protective order permitting funds generated by the Building to be dissipated on expenses other than the operation and maintenance of the Partnership and the Defendant Properties; Claimants opposed. (2017 App. Dkt. 98, 100). On January 5, 2018, this Court issued the *Monsanto* Order, modifying the previous stay order and prohibiting the dissipation of rental income for certain purposes, including legal fees. (SA 1). Claimants

sought partial rehearing, which was denied. (2017 App. Dkt. 116, 127, 131, 138). Thus, between January 5, 2018 and December 12, 2019, the rental income was restrained pursuant to this Court's *Monsanto* Order.

The District Court did not err by declining to release the funds restrained pursuant to the *Monsanto* Order. Claimants contend that the *Monsanto* Order was "based on the forfeiture judgment" that was subsequently vacated and therefore there is no valid "order of forfeiture" that would satisfy the requirements of Section 985 or Due Process. (Br. 3, 20-21). Put differently, they contend that this Court's subsequent ruling vacating the judgment rendered unlawful its earlier order restraining the rental income. The District Court rightfully found this position "awfully hard" to accept. (SPA 80).

Even if the *Monsanto* Order was based in part on a judgment that was subsequently vacated, it does not follow that the restraint imposed by the *Monsanto* Order violated Section 985 or Due Process. The question remains whether the process that preceded the issuance of that Order was adequate. Here, it undoubtedly was.

Claimants repeatedly invoke this Court's holding that the pre-trial and trial proceedings (which predated the *Monsanto* Order) suffered from procedural defects. But those defects only required the vacatur of the District Court's summary judgment ruling and the post-trial judgment. *In re 650 Fifth Avenue*, 934 F.3d at 173-74. Whether a district court properly granted summary judgment or whether evidentiary errors re-

quire a new trial are fundamentally different questions from whether a defendant received adequate notice and opportunity to be heard before he was temporarily restrained from using property. *See, e.g.*, *Walsh*, 712 F.3d at 125. Here, by the time this Court entered the *Monsanto* Order, Claimants had litigated this case for nearly a decade, including through cross-motions for summary judgment and a jury trial. *See* pp. 36-38, *supra*. And specifically in connection with the *Monsanto* Order, Claimants had ample notice and opportunity to be heard: They sought (and initially obtained) a stay, filed five memoranda on the issue, and obtained a protective order with nearly all of the terms they proposed. These proceedings more than satisfy any procedural requirement imposed by Section 985 or Due Process. *See Marsh*, 105 F.3d at 932. Moreover, the District Court had already made a finding of probable cause that the property was forfeitable (A. 353-54), which was never challenged on appeal, and the evidence adduced at the trial was more than sufficient to establish probable cause. *See* pp. 3-7, *supra*. As set forth in the Government's pending TRO application, the Government remains prepared to once again prove as much, as soon as the District Court is prepared to make a probable cause determination.

This Court should affirm the Release Orders insofar as they refused to release rental income from the period January 5, 2018 to December 12, 2019.

### 4. The District Court Ordered the Wrong Remedy

Finally, even assuming the District Court was correct in finding that the restraint of rental income from December 12, 2019 forward was improper (and even if the Claimants are correct that the restraint of rental income from January 5, 2018 forward was improper), the appropriate remedy is not to release the funds, thus assuring that they will be dissipated and thereby immunized from forfeiture. Rather, it is for the District Court to promptly conduct an appropriate probable cause hearing, as the Government has requested.

It is "settled law" in this Circuit that "even when the initial seizure is found to be illegal, the seized property can still be forfeited." *United States v. Cosme*, 796 F.3d 226, 235 (2d Cir. 2015). This Court repeatedly has held that, where property subject to forfeiture is unlawfully seized, the remedy is not to dismiss the forfeiture claims or immunize the property from forfeiture. *See, e.g.*, *United States v. Parcel of Property*, 337 F.3d 225, 234 (2d Cir. 2003); *United States v. Daccarett*, 6 F.3d 37, 46 (2d Cir. 1993); *United States v. $37,780 in United States Currency*, 920 F.2d 159, 163 (2d Cir. 1990); *United States v. Premises and Real Property at 4492 South Livonia Rd.*, 889 F.2d 1258, 1266 (2d Cir. 1989). In *Cosme*, this Court held that funds in certain bank accounts were improperly seized without a warrant or judicial finding of probable cause, but rejected the claimant's argument that the funds should be released. Instead, this Court remanded for the district court to determine whether "probable cause existed at the time of seizure to support forfeitability." *Cosme*,

796 F.3d at 236. This Court explained that returning the funds would effectively immunize them from forfeiture and, accordingly, the defendant would be able to seek return of his seized assets *only* if the district court determined that "no such probable cause existed." *Id.*

Here, as in *Cosme*, if the District Court finds that no probable cause existed at the time of the restraint, "then *and only then*" may Claimants seek release of the rental income. 796 F.3d at 236 (emphasis added). The District Court has not yet made such a finding. To the contrary, as noted, the District Court long ago made a probable cause finding that the funds are subject to forfeiture (A. 353-54), and the Government has once again asked the District Court to address the issue promptly (Dkt. 2200 at 42).[13]

The District Court's Release Orders authorized the release of the rental income, without any further discussion of the appropriateness of this remedy. (*See* SPA 2, 4, 21). In defense of the District Court's remedy, Claimants contend that "the release of rental income generated during the period of illegal seizure is a nec-

---

[13] Meanwhile, Claimants have attempted to manufacture a Catch-22, arguing that a probable cause hearing is necessary but cannot be held, at least not until some unspecified point in the future, and in the meantime the funds should be released. (*See* A. 457; Dkt. 2205 at 9). As the District Court has observed, "That can't be the law." (SPA 40).

essary remedy for a seizure ordered without due process of law." (Br. 18). But the out-of-circuit cases cited for this proposition are inapposite and, in any event, cannot countermand *Cosme.*

All of the cases cited by the Claimants address situations, like in *James Daniel Good Real Property*, where income derived from real property was held by the government solely by virtue of seizure warrants or arrest warrants *in rem* for real property issued on *ex parte* applications. Most of these cases involved forfeiture claims under 21 U.S.C. § 881(a)(7), which is significant because § 881(a)(7) does not authorize the forfeiture of *proceeds* of real property. Thus, in those cases the government collected rent from the property solely by virtue of the unlawful physical seizure. *See Marsh*, 105 F.3d at 929; *United States v. All Assets & Equip. of W. Side Bldg. Corp.*, 58 F.3d 1181 (7th Cir. 1995); *United States v. Real Prop. Located at 20832 Big Rock Drive, Malibu, Cal. 902655*, 51 F.3d 1402 (9th Cir. 1995); *United States v. Real Prop. Located at Incline Vill.*, 958 F. Supp. 482 (D. Nev. 1997). In this case, by contrast, the funds generated by the Building are themselves subject to forfeiture as proceeds of unlawful conduct, regardless of any seizure of the real property itself.

Two of the cited cases did not order a remedy, either because there was no loss of rents, *see United States v. 408 Peyton Rd., S.W., Atlanta, Fulton Cty., Ga.*, 162 F.3d 644 (11th Cir. 1998), or because there was no due process violation, *see United States v. Real Prop. Located at 1184 Drycreek Rd., Granville, Ohio 43023*, 174 F.3d 720 (6th Cir. 1999). And while the

Tenth Circuit ordered the return of rents collected after an unlawful seizure of real property, it reached that conclusion in a single sentence without apparently considering whether the rents were nevertheless proceeds subject to forfeiture or whether they should have been preserved for potential forfeiture, such as through a restraining order like the one in place here. *See United States v. 51 Pieces of Real Prop. Roswell, N.M.*, 17 F.3d 1306, 1316 (10th Cir. 1994).

In contrast to these cases, this Court has repeatedly held that, if property that is subject to forfeiture and easily dissipated is unlawfully seized, the remedy is not simply to release the property, but to hold the required proceedings to determine if the seizure should be vacated. *Cosme*, 796 F.3d at 236; *Daccarett*, 6 F.3d at 46. Those holdings apply here, and even more so given that that *Monsanto* and *Caplin & Drysdale* make the preservation of such forfeitable assets mandatory. (SA 1). Thus, even if the restraint of rental income was unlawful during either or both of the time periods at issue, the remedy is not for the rental income to be released. Instead, the District Court should promptly make a probable cause determination, as the Government has asked it to do, and release the rental income if and only if it determines that probable cause is lacking.

## CONCLUSION

**The District Court's Release Orders should be affirmed with respect to the continued restraint of rental income generated prior to December 12, 2019, and reversed to the extent they permit the release of rental income generated on or after December 12, 2019.**

Dated:    New York, New York
           June 15, 2020

                    Respectfully submitted,

                    GEOFFREY S. BERMAN,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for Defendant-Appellee.*

MICHAEL D. LOCKARD,
DANIEL M. TRACER,
MARTIN S. BELL,
SAMUEL L. RAYMOND,
THOMAS MCKAY,
    *Assistant United States Attorneys,*
             *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 11,466 words in this brief.

GEOFFREY S. BERMAN,
*United States Attorney for the*
*Southern District of New York*

By: THOMAS MCKAY,
*Assistant United States Attorney*