# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

October 30, 2020

Daniel Ruzumna
(212) 336-2034
druzumna@pbwt.com

Catherine O'Hagan Wolfe, Clerk of Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

> Re:   *In re: 650 Fifth Avenue Company and Related Properties,*
>       **20-1212; 20-1265**

Dear Ms. Wolfe:

On October 13, 2020, the District Court held a hearing pursuant to 18 U.S.C. § 985(d)(1) and found probable cause for the forfeiture of the building located at 650 Fifth Avenue in Manhattan (the "Building"). Consistent with this Court's October 7, 2020 order,[1] Claimants Alavi Foundation ("Alavi") and the 650 Fifth Avenue Company respectfully request that the Court restore jurisdiction and rule in Claimants' favor on the following issues:

First, whether or not the finding of probable cause is affirmed, the Court should find that any prohibition on the release of the Building's rental income is *prospective* only—*i.e.*, from the date of the probable cause finding (October 13, 2020) forward. The probable cause determination does not legitimize what the District Court correctly found was an unlawful seizure of the Building *before* the hearing at which probable cause was found, and does not address the appropriate remedy for that unlawful seizure. The Supreme Court held that virtually identical restrictions imposed without a pre-deprivation hearing on a rent-producing real property constituted an unlawful *seizure*, and *every court* that has addressed such seizures has ruled that the appropriate remedy for the unlawful seizure is the return of rents generated during the unlawful seizure. This Court should affirm the District Court's decision that Claimants are entitled to the return of the Building's rental income during the period of the unlawful seizure, and should further find that Claimants are entitled to the return of rental income earned starting

---

[1] The October 7, 2020 order specifically invited any party to "restore jurisdiction to this Court by notifying the Clerk of Court by letter that it seeks further appellate review" after a probable cause determination by the District Court, and instructed that upon such request, "the matter shall be returned to th[e assigned] panel." (20-1212(L) Dkt. 183.)

from January 5, 2018 because that is the date on which rental income was withheld from Claimants on the basis of a now-vacated verdict and judgment.[2]

Second, the probable cause finding cannot stand. The hearing was fatally tainted by the Government's continued insistence on disregarding this Court's rulings and instructions in two independent ways. The Government's showing included documents that were illegally seized from Claimants' offices and documents that were derived from the illegal search. Further, despite a documentary record that already makes a powerful case that the Government's forfeiture claim is precluded by the statute of limitations and despite the Government's abject refusal to comply with this Court's repeated orders to provide discovery on that issue, the District Court erroneously refused to consider this dispositive defense at the hearing. This Court should vacate the probable cause determination and remand the matter for a new hearing at which the District Court does not rely on tainted evidence and allows Claimants a meaningful opportunity to be heard on their statute of limitations defense.

These issues are of critical importance in this eleven-year-old case. They are of even greater significance in light of the Government's complete about-face regarding Claimants' ability to access the rental income generated by the Building. For nearly a decade, the parties operated pursuant to a jointly-proposed and District Court-approved agreement in which—at all times at which there had not been a finding of forfeiture—Claimants were able to access rental income generated by the Building for their legal fees and other expenses.[3] After this Court's 2019 decision, however, the Government claimed this longstanding protocol was unlawful and re-characterized it as an illicit dissipation of assets. The Government's motive was obvious: to materially impact and potentially to prevent the litigation of the forfeiture claims on the merits.[4]

---

[2] As discussed in greater detail below, the unlawful seizure actually began earlier—in September 2017. However, because the Building's rental income was released until January 5, 2018, Claimants now ask this Court only to address the correct remedy for the unlawful seizure of the Building between January 5, 2018 and October 13, 2020.

[3] In April 2010, the Government proposed, with Claimants' consent, a protective order whereby Claimants had access to the Building's rental income under the supervision of a District Court-appointed monitor. The only times such funds were withheld was when there was a grant of summary judgment forfeiting the Building (prior to the first reversal), and then when there was a jury verdict of forfeiture (prior to the second reversal).

[4] Claimants' longstanding counsel, the law firms of Patterson Belknap and Debevoise & Plimpton, filed a motion to withdraw in the actions below. Saif Agha, of the two-lawyer firm Agha & Agha, has entered an appearance on behalf of Claimants, without any guarantee of payment. At the time the withdrawal motion was filed, Patterson Belknap and Debevoise asked that it be held in abeyance, but have now filed a letter with the District Court asking that their motion be granted.

If the Government prevails, the exculpatory testimony of Alavi directors may never be heard by a jury. Accountability for the Government's illegal search and seizure of Claimants' offices may never happen. Disclosure of documents that will demonstrate that the Government's forfeiture claims are untimely may never occur. The Government is attempting the ultimate shortcut, one far more consequential than those for which this Court has twice chastised the Government.

The law requiring the release of rental income during the period of the Building's unlawful seizure (*i.e.*, from January 5, 2018 to October 13, 2020) is overwhelming, and a sufficient basis for relief even if the probable cause determination is affirmed. But the Court is not required to blind itself to the Government's tactics in assessing the appropriate remedy for the Government's unlawful seizure.

Given their paramount importance to the case, we respectfully request oral argument of the issues raised in this letter.

I. **The Court Should Affirm the District Court's Ruling that the Building Was Unlawfully Seized and Order the Return of Rents for the Entire Period of the Unlawful Seizure**

A. **Implications of the Probable Cause Finding**

On October 13, 2020, the District Court held a hearing pursuant to § 985(d)(1) and determined that probable cause existed to forfeit the Building.[5] However, as the District Court has already recognized (SPA-4), a finding of probable cause to forfeit real property after a hearing permits only a *prospective* seizure of that real property (or, as framed in § 985(b)(1)(B), "depriv[ation] of the use and enjoyment of" that real property). It does not excuse or retroactively legitimize the Government's previous unlawful seizure of the Building or Defendants' other real properties. *See United States v. James Daniel Good*, 510 U.S. 43, 62 (1993) ("[T]he suggestion that this one claimant must lose because his conviction was known at

---

[5] Though it initially moved to reinstate the December 12, 2019 Order (the "December 2019 Order"), which divested Claimants of all property rights as to the Building and five other Defendant Real Properties (*see In re 650 Fifth Avenue and Related Properties*, Case No. 08-cv-10934 (S.D.N.Y.) ("SDNY") Dkt. 2200 at 48), at the § 985(d) hearing, the Government narrowed its requested relief to the seizure of the past and future rental income generated by the Building (*see* SDNY Dkt. 2334, Tr. 7:6–14). As explained in this letter and by the Supreme Court in *United States v. James Daniel Good*, the pretrial withholding of rental income generated by a real property alone constitutes a significant infringement on an owner's rights *with respect to that real property* worthy of due process protection and requires a pre-deprivation hearing. 510 U.S. 43, 54 (1993). Before the October 13, 2020 hearing, the Government had not established that there was probable cause to forfeit the Building, which is the Government's sole basis for seeking to forfeit its rental income.

the time of the seizure . . . founders on a bedrock proposition: Fair procedures are not confined to the innocent. The question before us is the legality of the seizure, not the strength of the Government's case."); *Krimstock v. Kelly*, 306 F.3d 40, 62 (2d Cir. 2002) (Sotomayor, J.) ("[T]he importance of the claimant's possessory interest . . . is not diminished by the likelihood that the government will eventually prevail in forfeiture proceedings."). Accordingly, this Court must still determine whether the Government seized real properties in violation of § 985(d) and the Due Process Clause, when those unlawful seizures first began, and what is the appropriate remedy for the unlawful seizures.

The District Court's finding that the December 2019 Order constituted an unlawful seizure of real property should be affirmed. The December 2019 Order was entered without a hearing or a probable cause finding and effectuated far more than a restraint on the Building's rental income; it completely divested Claimants of all rights to the Building (including management rights, transfer rights, rights to physically occupy and improve the property, rights to negotiate and contract with tenants and third parties, and the right to collect rental income). (A-429–32.) But even if the December 2019 Order had been limited to the Building's rental income, the Supreme Court specifically held that, absent exigent circumstances,[6] such a deprivation would still demand a pre-seizure hearing at which Claimants had a meaningful opportunity to be heard:

> The Government makes much of the fact that Good was renting his home to tenants, and contends that the tangible effect of the seizure was limited to taking the $900 a month he was due in rent. But even if this were the only deprivation at issue, it would not render the loss insignificant or unworthy of due process protection. The rent represents a significant portion of the exploitable economic value of Good's home. It cannot be classified as *de minimis* for purposes of procedural due process.

*Good*, 510 U.S. at 54; *see also* 18 U.S.C. § 985(b)(1)(B) (providing that owners of real property "shall not be evicted from, or *otherwise deprived of the use and enjoyment of, real property*," except as set forth in that statute) (emphasis added). Here, Claimants were deprived of rental income from the Building since January 5, 2018. Contrary to claims by the Government, the Fifth Avenue Company is not the recipient of Building's rental income; rather, the income has been deposited into a bank account opened and controlled solely by the Court-appointed monitor and interim trustee—at the Government's request. (A-429–30.)

---

[6] The District Court found that "[t]he Government has made no showing demonstrating that exigent circumstances exist" (SPA-1), and the Government has not challenged that factual finding.

The Supreme Court has explained that a determination of whether an interference with property rights constitutes a seizure, as opposed to a restraint, depends on the meaningfulness of the interference, not its duration. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."); *see also United States v. Land, Winston Cty.*, 163 F.3d 1295, 1298 (11th Cir. 1998) ("To demonstrate the triggering of a 'seizure,' the claimant must put forth evidence that the government has interfered with her right to occupy, use, enjoy, or *receive rents from the defendant real property* while the forfeiture action is pending.") (emphasis added). Indeed, in *James Daniel Good*, the Court noted that "[t]he Government does not, *and could not*, dispute that the seizure" of the real property at issue "deprived him of property interests protected by the Due Process Clause" because the relevant court order gave the Government "the right to charge rent, to condition occupancy, and even to evict the tenants." 510 U.S. at 48 (emphasis added). Here, the Government's appointed designee (the monitor and interim trustee) possessed all of those rights and more. Accordingly, the fact that the District Court eventually held the § 985(d) hearing—eleven months after it received the mandate and entered the December 2019 Order—does not convert a seizure into a restraint for Due Process or statutory purposes.

### B. Timing of the Seizure of Real Property

The Government seized the Building (as well as Claimants' other real properties) long before it established probable cause at a "hearing in which the property owner ha[d] a meaningful opportunity to be heard." *See* 18 U.S.C. § 985(d)(1)(B)(i). The District Court held that the unlawful seizure began on "December 12, 2019, *i.e.*, the date of the issuance of the Second Circuit's mandate vacating the previous forfeiture judgment." (SPA-2; SPA-21.) Under controlling law, however, the unlawful seizure began in September 2017, when the District Court (Forrest, J.) entered an order depriving Claimants of all rights to their real properties on the basis of a now-vacated, and thus null, judgment. (A-386–91.)

On September 29, 2017, Judge Forrest entered an order (the "September 2017 Order") that deprived Claimants of all management rights, control over the Building and other real properties, and use and enjoyment of rental income generated by the Building.[7] (A-386–91.) As the September 2017 Order itself makes clear, the District Court premised the Order on the

---

[7] The Government's claim (echoed by the Iran Creditors) that Claimants requested or consented to this deprivation in September or November 2017 or in January 2018 is simply false. In light of the forfeiture trial verdict, which at that time had not been vacated, Claimants did not challenge the removal of certain property rights because there was no basis to do so at that time—the properties were subject to a judicial finding of forfeitability, and therefore neither *James Daniel Good* nor § 985 applied. Claimants did seek the release of rental income even after the verdict. (SDNY Dkt. 1989.)

forfeiture verdict. (A-387–88 ("WHEREAS, on June 29, 2017, the jury returned a verdict finding that . . . the Building is property involved in money laundering pursuant to 18 U.S.C. § 981(a)(1)(A); and, in part, constitutes or is derived from proceeds traceable to violations of the IEEPA and the ITSR, pursuant to 18 U.S.C. § 981(a)(1)(C).").) In response to Claimants' stay application, this Court briefly allowed them access to the Building's rental income on November 16, 2017 (A-412–14), but on January 5, 2018, Claimants were again stripped of their right to access to the rental income generated by their real property. (A-419.) Claimants, thus, were unambiguously "deprived of the use and enjoyment of" the "real property that is the subject of a pending forfeiture appeal" in the form of management and other property rights from September 29, 2017 onward, and in the form of rental income from January 5, 2018 onward. *See* 18 U.S.C. § 985(b)(1)(B). The tangible effects of the orders at issue here—which resulted in Claimants being excluded from Building management meetings, barred from accessing the books and records related to the real property, and stripped of all authority related to leasing decisions and capital improvements—outstrip to a significant degree the effect of the unconstitutional order in *James Daniel Good*, which the Government argued was "limited to taking the $900 a month [claimant] was due in rent." 510 U.S. at 54.

The Government cannot articulate a single real property ownership right that Claimants retained from January 5, 2018 through the District Court's February and March 2020 Orders, in which the District Court recognized that the rental income was being unlawfully withheld. Although the District Court ordered the restoration of Claimants' right to rental income in its February and March 2020 Orders and further ordered previously-withheld rents to be released from the date of the mandate (December 12, 2019) up until any hearing and probable cause determination, the District Court stayed that directive pending the outcome of these appeals (SDNY Dkt. 2276), and the rents continued to be withheld from Claimants. Until the District Court restored their management rights on March 30, 2020, Claimants had *no* rights as property owners of the Building or the other real properties.[8] And even after their management rights were reinstated by the March 30, 2020 Order, Claimants were left without the rental income that "represents a significant portion of the exploitable economic value" of their property. *James Daniel Good*, 510 U.S. at 54.

On August 9, 2019, this Court vacated the post-trial forfeiture judgment in this case, and that judgment is a legal nullity. *See United States v. Ayres*, 76 U.S. (9 Wall.) 608, 610 (1869); *see also Nara v. Frank*, 488 F.3d 187, 201 (3d Cir. 2007) ("When an appellate court

---

[8] Accordingly, even if this Court were to conclude that deprivation of the use and enjoyment of rental income alone is neither a seizure under *James Daniel Good* nor the "depriv[ation] of the use and enjoyment of[] real property that is the subject of a pending forfeiture action" under § 985(b)(1)(B), Claimants' real property was seized during the period in which they were deprived of all non-pecuniary ownership rights (such as management and control rights) from September 2017 until March 30, 2020.

vacates a lower court's order, it renders the lower court's order null and void."). Because the forfeiture verdict and judgment served as the bases for the September 2017 District Court order divesting Claimants of all property rights, as well as the January 2018 order prohibiting the release of the Building's rental income to Claimants, the September 2017 and January 2018 orders do not provide valid legal basis for the seizures of Claimants' properties. The unlawful seizures of the Building and other properties began in September 2017. With respect to rental income, the unlawful seizure continued until the District Court made a probable cause finding at the October 13, 2020 hearing.

C. **Return-of-Rents Remedy for the Period of the Unlawful Seizure**

Where, as here, the Government seizes real property without the pre-deprivation process required by § 985(d) and the Due Process Clause, the remedy adopted by every court to have considered the issue is the return of rents generated by the property during the period of illegal seizure. *See United States v. 1461 West 42nd Street, Hialeah, Fla.*, 251 F.3d 1329, 1334–35 & n.5 (11th Cir. 2001); *United States v. 1184 Drycreek Rd.*, 174 F.3d 720, 728 (6th Cir. 1999); *United States v. Marsh*, 105 F.3d 927, 931–32 (4th Cir. 1997); *United States v. All Assets & Equip. of W. Side Bldg. Corp.*, 58 F.3d 1181, 1193 (7th Cir. 1995); *United States v. 20832 Big Rock Dr.*, 51 F.3d 1402, 1406 (9th Cir. 1995); *United States v. 51 Pieces of Real Prop., Roswell, N.M.*, 17 F.3d 1306, 1316 (10th Cir. 1994). Even this Court has recognized that return-of-rents is "equitable relief this court has the authority to award" where the Government has unlawfully seized property in connection with a civil forfeiture case. *United States v. Parcel of Property*, 337 F.3d 225, 236 (2d Cir. 2003). In *Parcel of Property*, this Court noted that the district court held that the proper remedy for a "[*James Daniel*] *Good* violation" was "the payment of any rents received during the period the property was illegally held by the government," but also that the district court found that "the rental income actually collected after the seizure on the defendant properties was offset by the tax bill." *Id.* at 234–35.

Importantly, here the Government did not preserve for appeal the argument that the return-of-rents remedy should not be adopted in this case. Claimants argued before the District Court that the appropriate remedy for the unlawful seizure of the Building was the return of the wrongfully-withheld rental income, and the Government did not argue otherwise. (A-454; SDNY Dkt. 2181.) The District Court followed the uninterrupted line of cases approving of the return-of-rents remedy (SPA-2; SPA-21), and that ruling should be affirmed. The Government is required to raise arguments before the District Court, or it waives them on appeal. *See United States v. Canady*, 126 F.3d 352, 359 (2d Cir. 1997). Claimants are thus entitled to the return of rental income generated from January 5, 2018, the date from which the Building's rental income has been unlawfully withheld, until the District Court's probable cause finding on October 13, 2020.

Courts have reliably awarded the return-of-rents remedy even where, as here, a court subsequently finds probable cause for forfeiture after a procedurally-appropriate hearing or even renders judgment in favor of the Government. *See, e.g.*, *United States v. Land, Winston*

*Cty.*, 163 F.3d 1295, 1302 (11th Cir. 1998) (affirming judgment of forfeiture against real property seized without pre-deprivation procedure but remanding to district court "to determine whether [claimant] was deprived of any rents received or other proceeds realized during the period of illegal seizure"); *Marsh*, 105 F.3d at 931–32 (ordering return of rental income that accrued between seizure of real property and subsequent summary judgment in forfeiture case and, in the same order, affirming the grant of summary judgment in Government's favor); *51 Pieces of Real Prop., Roswell, N.M.*, 17 F.3d at 1315–16 (affirming judgment of forfeiture but ordering return of "rents that accrued during the illegal seizure of the properties at issue" that preceded the judgment); *United States v. Real Prop. Located at Incline Village*, 976 F. Supp. 1327, 1358 (D. Nev. 1997) ("The return-of-rents remedy vindicates the Due Process rights of an owner of real property to pre-seizure notice and hearing, and as such is wholly unconnected with the merits of the underlying forfeiture action."). For more than twenty-five years, the black-letter law has been that "[w]hen . . . the government fails to provide pre-deprivation notice and hearing, but the property is found to be subject to forfeiture after the process due has been afforded, . . . the government is responsible for rents and profits of which the claimant was deprived during the period of illegal seizure." *United States v. Real Prop. Located at 1184 Drycreek Road, Granville, Ohio 43023*, 174 F.3d 720, 728 (6th Cir. 1999); *United States v. 408 Peyton Rd., S.W., Atlanta, Fulton Cty., Ga.*, 162 F.3d 644 (11th Cir. 1998) ("[W]hen the Government fails to provide predeprivation notice and a hearing, but the property is found to be subject to forfeiture after the process due has been afforded, the proper remedy for a seizure in violation of the Fifth Amendment Due Process Clause is the return of any rents received or other proceeds realized from the property during the period of illegal seizure."). Indeed, since this is the *only* remedy available for a procedural violation of this sort, striking it would leave *James Daniel Good* (along with 18 U.S.C. § 985) entirely toothless and would eliminate the only deterrent to the Government's unlawful seizure of income-producing real property.

The return-of-rents remedy is particularly appropriate here, because the Government's violation of Claimants' statutory and constitutional rights has been a consistent theme of this litigation. *See In re 650 Fifth Ave. and Related Props.*, 934 F.3d 147, 173 (2d Cir. 2019) (finding that "a fair and adequate process . . . has been lacking in this case"). Even since this Court vacated the judgment against Claimants in August 2019, the Government has not taken *any* steps to pursue its forfeiture claims on the merits or to abide by this Court's past directives. It has not, for example, attempted to overcome the suppression of the documents that this Court declared presumptively suppressed in 2019. Nor has the Government made even a rudimentary effort to begin complying with its obligations to produce discovery related to Claimants' statute of limitations defense.

The Government's single-minded focus following its second appellate loss has been to ensure that Claimants' counsel cannot continue to litigate this case. Claimants recognize and accept that their entitlement to the Building's *ongoing* rental income ends as of the date the District Court properly finds probable cause for the property's forfeiture. *See United States v. Monsanto*, 491 U.S. 600, 616 (1989) (explaining that "no constitutional violation occurs when, *after probable cause is adequately established*, the Government obtains an order barring" a

property owner from spending potentially-forfeitable assets) (emphasis added). But the Government's attempt to seize Claimants' real properties without adequate notice or a hearing at which it tried to establish probable cause was strategic and vindictive. Had the Government temporarily consented to the release of the Building (and, thus, the rental income) following the vacatur of the 2017 judgment—as it did voluntarily following the vacatur of the 2013 judgment—and promptly sought to establish probable cause for forfeiture at a § 985(d) hearing, Claimants could have funded their legal defense with the nearly two years of rental income that they had been unable to access during the pendency of the second appeal. Aware that such a release would result on further litigation on the merits, the Government devoted 100% of its post-remand efforts to preventing *any* release of rental income. To allow the Government to prevail in this manner would undercut this Court's admonition that "[t]here are no shortcuts in the rule of law." *In re 650 Fifth Ave. and Related Props.*, 934 F.3d at 173.

## II. The Court Should Vacate the Probable Cause Determination

As discussed above, the validity of the District Court's October 13, 2020 probable cause determination is not relevant to the issues of (1) whether the earlier restrictions on Claimants' property rights resulted in an unlawful seizure of the Building, or (2) what is the appropriate remedy for such seizure; accordingly, those issues should be addressed regardless of how this Court rules regarding the District Court's probable cause determination. But beyond these critical issues, this Court should also vacate and remand the District Court's finding of probable cause for the reasons described below. Claimants are not seeking a remand of these issues to postpone the date on which the Building's rental income can be legally withheld; in fact, Claimants offered to stipulate that any probable cause determination would be retroactive to the October 2020 hearing date if the District Court delayed the hearing (SDNY Dkt. 2295 at 2; Dkt. 2299), but the Government refused. Claimants' proposal would have allowed any subsequent probable cause determination to have *nunc pro tunc* (or retroactive) effect, and would have limited the accrual of rental income subject to release to the period up to the date of the scheduled hearing (October 13, 2020). Claimants are still willing to stipulate to such a result.

### A. The District Court Erroneously Relied upon Tainted Evidence

The Government conducted a search in this case, seizing computers, servers, and electronic storage devices, including over 200 boxes of documents, some of which went back thirty years. The search was flagrantly illegal, as it was conducted pursuant to a facially deficient warrant. *In re 650 Fifth Avenue and Related Props.*, 830 F.3d 66, 83–84 (2d Cir. 2016); *In re 650 Fifth Avenue and Related Props.*, 934 F.3d at 160–61. The Government twice relied on the inevitable discovery doctrine in the District Court, and decisions in its favor were twice reversed by this Court. In the summer of 2019, this Court directed the District Court to require the Government to "submit a chart or similar exhibit documenting how it would have obtained each particular piece of evidence that the Claimants challenge," including "materials that informed the drafting of the amended complaint, as well as materials the Government has already used in this proceeding or intends to use at trial." *Id.* at 173–74 (emphasis omitted).

This Court further told the District Court to "apply the exclusionary rule," and consider other appropriate remedies, if the Government failed to make this showing with respect to its evidence.

Despite Claimants' repeated requests that the District Court address the suppression issue, it has done nothing in this regard. (*See, e.g.*, SDNY Dkt. 2176 at 18–19; Dkt. 2186 at 13.) Nor has the Government provided a chart or similar exhibit explaining how it would have obtained each particular piece of evidence on which its showing of probable cause relied. Because the analysis prescribed by this Court has not been conducted, Claimants and this Court have no way to discern how much of the Government's probable cause presentation and the District Court's probable cause determination are tainted by violations of the Fourth Amendment. As a result, the District Court's probable cause determination cannot stand. *Krimstock v. Kelly*, 306 F.3d 40, 48–49 (2d Cir. 2002) (Sotomayor, J.) (explaining that constitutional due process requires Government to rely on evidence "untainted" by the illegal seizure); *United States v. 4492 S. Livonia Rd.*, 889 F.2d 1258, 1264–66 (2d Cir. 1989) (holding that the Fourth Amendment prevents Government from relying on "illegally obtained evidence" to show probable cause for forfeiture); *Wong Son v. United States*, 371 U.S. 471, 478 (1963) ("The exclusionary prohibition extends as well to the indirect as the direct products of such invasions.").

The Government bears the burden of proving that it has not relied on evidence that is the direct product of its Fourth Amendment violations or evidence tainted by the same in its demonstration of probable cause. *See, e.g.*, *Nix v. Williams*, 467 U.S. 433, 441 (1984); *In re 650 Fifth Ave.*, 934 F.3d at 164–65. It has not borne it here. In arguing in its *ex parte* motion for a temporary restraining order that the Building should be forfeited, the Government asserted that "[n]one of the evidence" in its motion "consists of, or was derived from evidence seized from Alavi's offices in the December 2008 search." (SDNY Dkt. 2200 at 7 n.6.) When Claimants pointed out the falsity of that claim,[9] the Government recanted by "disclaim[ing] reliance" on the illegally seized exhibits that it had submitted to the District Court. (SDNY Dkt. 2214 at 14; SDNY Dkt. 2334, Tr. at 144:5–19.) And in the same submission in which the Government purported to disclaim reliance on illegally seized exhibits, it presented *additional* documents that had been illegally seized, purportedly in order to "correct the misimpression created by Alavi's selective citations." (SDNY Dkt. 2214 at 6–8 & n.7.)

Moreover, the District Court explicitly relied on fruits of the illegally seized documents in its probable cause determination—including by relying on journals seized from Alireza Ebrahimi pursuant to a warrant issued on May 12, 2009, six months after the unlawful search of Claimants' offices. (*See, e.g.*, SDNY Dkt. 2201, Exs. 82–86.) The affidavit submitted in support of that warrant was explicitly based in part on the affiant's (Special Agent Steve

---

[9] Four of the exhibits in support of the Government's motion were seized in the illegal search. The four exhibits are SDNY Dkt. 2201 Exs. 35, 98, 104, and 105.

Gonzalez) "review of documents" seized during the illegal search of Claimants' properties. (*See* SDNY Dkt. 2206, Ex. 1 at ¶ 24 (relying on "preliminary results of a judicially-authorized search of the Alavi Foundation's offices"); ¶ 27 (relying on "preliminary review of the materials recovered during the [December 2008] search" and citing of the contents of those documents).) Other than conclusory statements that the affidavit relied on other sources as well, the Government did nothing to show lack of taint. In particular, the Government stated that the affidavit was based on interviews of Mr. Ebrahimi, some of which were before the search and some of which were after, and interviews of other Alavi board members that took place prior to the illegal search, and that the affidavit's reliance on documents sized in the illegal search "is one paragraph that describes the generally corroborative nature of some of those documents, confirming what it is that the Alavi board members already had said about meetings with Iranian Government officials." (SDNY Dkt. 2334, Tr. at 144:20–145:21.).

This anemic taint analysis should not stand. First, the impact of the search documents is not confined to "one paragraph" that can be neatly excised from the rest of the affidavit: Agent Gonzalez's affidavit repeatedly refers to the illegally seized documents, both as background justification for the additional search and as support for the agent's specific conclusions. (SDNY Dkt. 2206, Ex. 1 at ¶ 21 (referring to the "massive amount of documentation and computer files" seized during the illegal search); ¶ 24 (explaining that Ebrahimi's purported interview statements were "corroborat[ed]" by the illegally-seized documents); ¶ 27 (describing documents seized during the illegal search).) Second, the interviews of Mr. Ebrahimi on January 20 and February 10, 2009, *after* the illegal search was executed, provided the Government with valuable information that it used in the Affidavit to justify the search of Mr. Ebrahimi's office and residence. It was during these interviews that Mr. Ebrahimi discussed his detailed journals and that Agents asked for them. (SDNY Dkt. 2206, Ex. 1 at ¶¶ 28–29.) Mr. Ebrahimi made multiple statements in these two interviews that the Government used to show probable cause. For example, in his January 20, 2009 interview, Mr. Ebrahimi provided the Government with information about conversations he had with ambassadors from the Iranian Mission to the United Nations ("IMUN"). (SDNY Dkt. 2206, Ex. 1 at ¶ 23(f).) In his February 10, 2009 interview, Mr. Ebrahimi made statements about certain Alavi meetings being held in Tehran before 2001, and discussed unofficial meetings with the IMUN Ambassador. (SDNY Dkt. 2206, Ex. 1 at ¶ 23(b).) Neither the Government nor the District Court conducted any analysis of whether these statements were themselves tainted by the illegal search.

Furthermore, the Government relied on fruit of the poisonous tree when it cited to testimony from Special Agents Ennis and Dan McWilliams. Ennis and McWilliams extensively reviewed and were responsible for the illegally-seized documents. (*See, e.g.*, SDNY Dkt. 2206, Ex. 2 at 111:7–15 (Ennis' testimony that he, McWilliams, and Special Agent George Alexander reviewed unlawfully-seized evidence); Ex. 3 at 534:6–12 (Alexander testimony identifying McWilliams as the "primary reviewer" of the documents after December 2010).) The Government has made no showing that the agents' review of the illegally-seized materials did not inform the testimony on which the Government relied; it has merely claimed that the

testimony on which it was relying to show probable cause concerned interviews that Ennis and McWilliams conducted, mainly, prior to the illegal search. (SDNY Dkt. 2334, Tr. at 145:22–146:14.) A probable cause determination cannot properly be based on this evidence until the Government does what this Court directed it to do: demonstrate on a document-by-document and witness-by-witness basis that challenged evidence is not directly or indirectly derived from the illegal search.

> **B.     The District Court Erroneously Refused to Consider Claimants' Statute of Limitations Defense in Making Its Probable Cause Finding**

As was their right, Claimants presented evidence at the probable cause hearing that the Government knew or should have known of the offenses allegedly giving rise to forfeiture prior to the limitations period. Claimants also requested an adverse inference based on the Government's failure to produce a single page of additional statute of limitations-related discovery in the nearly fifteen months since this Court ordered it to do so for the second time.[10] The District Court refused to consider Claimants' affirmative defense on its merits, stating that the defense "differs in a material way" from other affirmative defenses that "can be more easily raised in the context of a probable cause proceeding." (SDNY Dkt. 2334, Tr. at 185:9–13.) But even the Government conceded that Claimants' statute of limitations defense was relevant to the District Court's probable cause analysis. (SDNY Dkt. 2334, Tr. at 148:17–149:1.) Consideration of Claimants' statute of limitation defense is, moreover, consistent with the general rule in this Circuit that known facts that establish an affirmative defense may not be "deliberately disregard[ed]" in making a probable cause assessment. *See Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003); *United States v. Leasehold Interest in 121 Nostrand Ave., Apartment 1-C, Brooklyn, N.Y.*, 760 F. Supp. 1015, 1029 (E.D.N.Y. 1991) (probable cause hearing "must at least include an opportunity for a claimant to establish defenses to forfeiture"). The District Court's failure to engage with Claimants' statute of limitations defense before

---

[10] In its 2019 decision vacating the forfeiture judgment, this Court directed the District Court to grant Claimants' motion to compel the production of statute of limitations discovery. *See In re 650 Fifth Avenue and Related Properties*, 934 F.3d at 173 ("On remand, the court shall grant the Claimants' motion to compel discovery [regarding Claimants' statute of limitations defense] and ensure the Government's reasonable compliance."). But instead of complying with its discovery obligations, the Government has continued its efforts to prevail in litigation through tactical gamesmanship instead of on the merits. The Government still has not produced a single page of statute of limitations-related discovery in the nearly fifteen months since this Court directed it to do so, and Claimants' repeated inquiries about the status of the Government's review and production efforts have been rebuffed or ignored outright. (*See* SDNY Dkt. 2332-2 at 36–46.) The Government has refused even to confirm that it has sent out document preservation notices to relevant federal agencies. (*See, e.g.*, SDNY Dkt. 2332-14 at Ex. 88.)

making a probable cause finding was error, especially on this record, where the Court has recognized that "fair and procedurally adequate process" has been "lacking" in prior proceedings. *See In re 650 Fifth Avenue and Related Properties*, 934 F.3d at 173.

Moreover, the District Court's assertion that the statute of limitations defense could not fairly be considered at the hearing was belied by the substantial evidence that Claimants did offer at the hearing, notwithstanding the Government's failure to produce compelled discovery. This evidence demonstrated that several federal agencies—including the FBI, IRS, and OFAC—had been actively investigating Alavi and the Fifth Avenue Company over a period of 25 years before November 2004, the relevant cutoff for statute of limitations purposes.[11] (SDNY Dkt. 2205 at 27–28; Dkt. 2332-2 at 48–95; Dkt. 2332-10, Exs. 54, 57–60, 62; Dkt. 2332-11, Ex. 66; Dkt. 2332-13, Exs. 71–75.) Those investigations focused on the same alleged conduct that forms the basis of the Government's Amended Complaint, including Alavi's purported control by Iran, transfer of funds to Iran, links to the Bonyad Mostazafan, direction by the Iranian Ambassador, and formation of a partnership with an entity controlled by Bank Melli. (*See* SDNY Dkt. 2332-2 at 93–94.) Similar allegations appeared in news reports that were published in major media outlets—including the New York Times, the Wall Street Journal, the Washington Post, Newsday, and the Associated Press—throughout the same time period. (SDNY Dkt. 2332-10, Exs. 55–56, 61, 63; 2332-11, Exs. 64–65, 67–68; Dkt. 2332-12, Ex. 69; Dkt. 2332-13, Ex. 70.) The evidence also demonstrates that the Government's continued investigative efforts after November 2004 relied on its earlier investigative work from the 1980s, 1990s, and early 2000s. (*See, e.g.*, SDNY Dkt. 2332-13, Ex. 75 (2013 FBI memo describing how Alavi "has been investigated by the [FBI] for more than twenty years"); *see also* Dkt. 2332-10, Exs. 59–60; Dkt. 2332-13, Exs. 72–74.) In fact, the Government's 2009 Amended Complaint against Alavi extensively quotes a document that was received by the FBI *in 1989*. (SDNY Dkt. 2332-2 at 61–65; Dkt. 2332-10, Exs. 59–60.)

---

[11] The Government must commence a civil forfeiture action within five years of discovery of the offense giving rise to forfeiture. *See* 19 U.S.C. § 1621. The limitations period begins to run when "the Government discovers or possesses the means to discover the alleged wrong, whichever occurs first." *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 502 (6th Cir. 1998) (citation omitted); *see also Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) ("discovery" of alleged facts "encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known"). For a continuing violation—which the Government has conceded it alleged here—the statute of limitations runs from the initial point when the conduct should have been discovered, even if the activity constituting the violation continues thereafter. *See $515,060.42 in U.S. Currency*, 152 F.3d at 502; *see also* SDNY Dkt. 1610 at 6–7 (Government explaining it "ch[ose] to characterize the continuous chain of offenses as an ongoing scheme").

The District Court's rejection of Claimants' request for an adverse inference as "overly hasty" and "not provid[ing] the government with adequate process" was also error. (SDNY Dkt. 2334, Tr. at 185:14–186:7.) This Court directed the Government to produce statute of limitations discovery (initially sought in 2011) in its 2016 decision vacating the initial forfeiture judgment and again in 2019, when it ordered the District Court to compel the production of such discovery. The Government has simply disregarded this Court's unambiguous instruction that it produce documents relevant to Claimants' statute of limitations discovery requests. Claimants do not in any way suggest that every probable cause hearing must be preceded by discovery into affirmative defenses. But this probable cause determination, coming after more than a decade of litigation, two appeals, and multiple directions from this Court that the Government produce discovery on this precise issue, presents a unique and fundamentally different set of circumstances than other cases. Where, as here, the available evidence shows a strong possibility of a complete defense to the forfeiture claims, the Government should not be permitted to avoid consideration of that defense by ignoring court orders.

Respectfully submitted,

Daniel S. Ruzumna

cc. Counsel of Record