

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 7, 2020

**BY ECF**

Catherine O'Hagan Wolfe
Clerk of Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

Re:    <u>In re: 650 Fifth Avenue Company and Related Properties</u>,
        **Dkt. Nos. 20-1212 & 20-1265**

Dear Ms. Wolfe:

      The Government respectfully submits this letter in response to the October 30, 2020 letter submitted by Claimants Alavi and the Partnership. (App. Dkt. No. 191 ("Cl. Letter")).[1] For the reasons that follow, Claimants' arguments are meritless.

## I. Background

      On appeal, Claimants initially argued that the District Court erred by ordering the release of rental income derived from the Building from only December 12, 2019 forward, and instead should have released all such income generated since January 5, 2018, the date this Court entered a protective order restraining its use. (*See* Cl. Br. 3-4). In its cross-appeal, the Government argued that the District Court should not have released such rental income at all because it was properly subject to restraint under 18 U.S.C. § 983(j) and *Monsanto*, and the District Court erred by relying on 18 U.S.C. § 985(d) to order release of the income derived from December 12, 2019 forward. (Gov't Br. 19-21). The Government further argued that even if this Court were to find that the rental income from either period was unlawfully restrained, the remedy is not for the funds to be released so that they can be effectively immunized from forfeiture, but rather for this Court to remand for the District Court to make a prompt probable cause determination. (*See* Gov't Br. 44-47 (citing *United States v. Cosme*, 796 F.3d 226, 235 (2d Cir. 2015)).

      After briefing and oral argument, this Court remanded for the District Court to make a probable cause determination. (App. Dkt. No. 183 (the "Remand Order")). The Remand Order provided that "[s]ubject to the parties' rights to appeal, if the District Court determines that

---

[1] This letter adopts the abbreviations defined in the Government's principal and reply briefs. "Ex." refers to an exhibit submitted by the Government along with this letter.

probable cause existed, the rental income shall continue to be restrained pending a final adjudication on the merits . . . ." (*Id.* ¶ 3).

On remand, Judge Preska conducted a full-day hearing. In connection with the hearing, the parties submitted multiple rounds of briefing, hundreds of documentary exhibits, supplemental witness declarations, and excerpts of trial testimony. (*See* Dkt. 2196, 2200, 2205, 2206, 2214, 2215, 2282, 2285, 2293, 2294, 2295, 2299, 2308, 2317, 2319). Claimants offered several hundred additional pages of exhibits at the hearing itself (Dkt. 2332), and several hours of oral argument by six attorneys from Claimants' legal team (*see* Dkt. 2334 (Transcript of hearing) at 30-143 & 161-65).

At the conclusion of the hearing, Judge Preska issued a detailed oral opinion finding that the Government had "more than met" its burden to establish probable cause to restrain the rental income. (*See* Ex. A (Transcript of Oral Decision) at 3). At the outset, Judge Preska made clear that her decision did not rely on any evidence that had been seized from Alavi's offices. (*Id.* at 4 ("The Court is thus confident that any illegally-seized documents have not influenced the outcome of this proceeding in any way.")). Judge Preska specifically rejected Claimants' arguments that certain specific pieces of evidence were tainted and could not be relied upon. (*Id.* at 4-7). She then gave a detailed explanation of the basis of her probable cause finding (which the Claimants do not meaningfully contest in their letter). (*Id.* at 7-20). Finally, Judge Preska considered Claimants' arguments concerning the statute of limitations, rejecting their contention that probable cause could not be evaluated until all statute-of-limitations related discovery had been produced and concluding that Claimants' "evidence of the running of the statute of limitations" was insufficient to defeat her finding of probable cause. (*Id.* at 21).

On October 30, 2020, Claimants filed a letter seeking to restore jurisdiction to this Court and arguing that (1) Claimants should be permitted to dissipate forfeitable assets going back to January 2018 (Cl. Letter 3-9), and (2) the District Court's finding of probable cause should be vacated (*id.* at 9-14). The Government addresses these claims in turn.

## II. Claimants Should Not Be Permitted to Dissipate Funds Subject to Forfeiture

Claimants first argue that "whether or not the finding of probable cause is affirmed, the Court should find that any prohibition on the release of the Building's rental income is *prospective only*—*i.e.*, from the date of the probable cause finding (October 13, 2020) forward." (Cl. Letter 1). That is, Claimants contend that the rental income generated between January 5, 2018 and October 13, 2020 should be released to pay their legal fees. (*Id.* at 1-2). In support of this argument, Claimants repeat the same meritless contentions made in their opening brief and in response to the Government's cross-appeal. (*Compare* Cl. Letter 3-9, *with* Cl. Br. 15-22 *and* Cl. Reply Br. 4-39).

As an initial matter, the Government reads this Court's Remand Order to have rejected Claimants' position. The Remand Order stated that "[s]ubject to the parties' rights to appeal, if the District Court determines that probable cause existed, the rental income shall continue to be restrained pending a final adjudication on the merits . . . ." (Remand Order ¶ 3). The District Court has now found probable cause and, accordingly, the rental income shall continue to be restrained.

To the extent the Remand Order only determined the prospective effect of a probable cause finding, Claimants' arguments as to why there was an unlawful seizure and they are entitled to the rental income generated between January 5, 2018 and October 13, 2020 are meritless, for the reasons already discussed at length in prior briefing. (*See* Gov't Br. 19-47; Gov't Reply Br. 2-27).

Indeed, the status quo has changed in only one respect since the parties' briefs were submitted and oral argument was heard: Judge Preska has now found probable cause to restrain the rental income after a lengthy hearing. That is precisely what the Government had argued the remedy should be in the event that the restraint of income were deemed unlawful. (*See* Gov't Br. 44-47; Gov't Reply Br. 22-27). That is because it is "settled law" in this Circuit that "even when the initial seizure is found to be illegal, the seized property can still be forfeited." *Cosme*, 796 F.3d at 235.

In *Cosme*, this Court held that funds in certain bank accounts were improperly seized without a warrant or judicial finding of probable cause, but rejected the claimant's argument that the funds should be released. Instead, this Court remanded for the district court to determine whether "probable cause existed at the time of the seizure to support forfeitability." *Cosme*, 796 F.3d at 236. This Court explained that returning the funds would effectively immunize them from forfeiture and, accordingly, if the district court found that probable cause existed "[the claimant's] request for the return of his property must be denied even though the continuing seizure was illegal." *Id.* That is, the defendant would be able to seek return of his seized assets *only* if the district court determined that "no such probable cause existed." *Id.*

The Remand Order issued here mirrors the holding of *Cosme*. Although this Court did not reach the question of whether the rental income was unlawfully seized, it issued a remand for the District Court to determine if probable cause existed, and specified that Claimants would be entitled to return of seized assets only upon a determination that no probable cause existed: "Subject to the parties' rights to appeal, if the District Court determines that probable cause existed, the rental income shall continue to be restrained pending a final adjudication on the merits, and if the District Court determines that probable cause did not exist, the rental income shall be released . . . ." (Remand Order ¶ 3). Here, as in *Cosme*, the District Court's finding of probable cause means that the assets in question shall not be released.

Claimants do not acknowledge, much less attempt to distinguish, this controlling authority, arguing instead that the Government waived the argument. (*See* Cl. Letter 7-9). This waiver argument was unpersuasive when originally made (*see* Gov't Reply Br. 23), and is particularly unpersuasive now that this Court has ordered exactly the sort of remand contemplated by *Cosme*. Claimants' remaining arguments, such as their reliance on distinguishable out-of-circuit cases and attempts to impugn the Government's motives, are also unpersuasive, for reasons already discussed. (*See* Gov't Br. 46-47; Gov't Reply Br. 24-27).

Claimants' letter also cites, for the first time, this Court's decision in *United States v. Parcel of Property*, 337 F.3d 225 (2d Cir. 2003), suggesting that it supports their requested remedy. It does not. In that case, this Court merely noted that the *district court* had stated that, "even assuming" that return-of-rents is a proper remedy, in that case there were no rents to return. *Id.* at 234-35. This Court did not then decide the question, in light of the district court's finding that the government did not actually retain such rents, *id.* at 235, but also reaffirmed prior holdings that

"an illegal seizure standing alone did not immunize property from forfeiture," *id*. at 234. Moreover, not only does that decision pre-date *Cosme*, but, like the out-of-circuit decisions already distinguished, it involved a seizure under 21 U.S.C. § 881, *see Parcel of Property*, 337 F.3d at 229, which does not authorize forfeiture of proceeds of real property, such that the government only collected rent incidentally by virtue of the unlawful physical seizure. Here, by contrast, the rental income generated by the Building is directly subject to forfeiture as proceeds of unlawful conduct, regardless of any seizure of real property. (*See* Gov't Br. 46).

In sum, Claimants should not be permitted to dissipate funds subject to forfeiture, particularly now that the District Court has found probable cause after a lengthy hearing.

### III. There is No Basis to Disturb the District Court's Finding of Probable Cause

Claimants do not contest that the evidence supports Judge Preska's finding of probable cause that the income derived from the Building is traceable to violations of the IEEPA and to property involved in money laundering. Rather, they argue that her finding should be vacated because Judge Preska (a) erroneously relied upon tainted evidence (Cl. Letter 9-12), and (b) erroneously refused to consider Claimants' statute of limitations defense (*id.* at 12-14). Both arguments are meritless.

#### A. The District Court Did Not Erroneously Rely on Tainted Evidence

Claimants first claim that Judge Preska erroneously relied upon evidence recovered during the December 2008 search of Alavi's office. While a district court may rely on improperly seized evidence in making a probable cause finding,[2] the Government disclaimed reliance on documents

---

[2] "[T]he exclusionary rule is a judicially-created mechanism of safeguarding against unreasonable searches and seizures . . . primarily through its deterrent effect." *United States v. Hightower*, 950 F.3d 33, 36 (2d Cir. 2020). While the rule applies at trial, it does not apply in a number of contexts, such as: federal supervised release revocation hearings; state parole revocation proceedings; grand jury proceedings; preliminary hearings; sentencings; bail hearings; federal habeas proceedings; civil tax proceedings; and civil deportation proceedings. *See id.* at 36; *United States v. Alvarez-Porras*, 643 F.2d 54, 67 (2d Cir. 1981). "Because the exclusionary rule is prudential rather than constitutionally mandated, it is applicable only where its deterrence benefits outweigh its substantial social costs." *Hightower*, 950 F.3d at 36. In the criminal context, the Supreme Court has held that the deterrent benefits of applying the exclusionary rule to grand jury proceedings— at which probable cause is determined—do not outweigh the substantial societal costs. *United States v. Calandra*, 414 U.S. 338, 349 (1974). That is so in part because the grand jury "does not finally adjudicate guilt or innocence" and the deterrent effects of exclusion at the ultimate trial were not significantly furthered by also excluding such evidence from the grand jury. *Id.* at 349-51. So too here. Whatever deterrent benefit is gained by the exclusion of unlawfully seized evidence at a forfeiture *trial* is not significantly furthered by its exclusion at a probable cause hearing. Moreover, given Claimants' selective presentation of certain evidence obtained from the search and affirmative factual representations regarding their lack of knowledge (*see, e.g.*, Dkt. 2214 at 5), the District Court was entitled to consider contrary evidence from the search for impeachment purposes. *See, e.g.*, *United States v. Havens*, 446 U.S. 620, 626 (1980).

recovered from the Alavi office search and Judge Preska specifically disclaimed relying on any such evidence. (Ex. A at 4). Instead, Judge Preska specifically found that each of the two types of allegedly tainted evidence described by Claimants on appeal were not in fact tainted and were thus properly considered for purposes of establishing probable cause. (Ex. A at 5-7).[3] The Government reviews each in turn.

### 1. Ebrahimi's Journals

For the first time in this litigation, Claimants asserted before the District Court that journals created and maintained by Alireza Ebrahimi, Alavi's corporate Secretary, should be suppressed because the search warrant affidavit that led to the seizure of the journals relied on the fruits of the search of Alavi's offices in December 2008. But as the District Court held (*see* Ex. A at 5), there was ample evidence providing an "independent source for the warrant," *Segura v. United States*, 468 U.S. 796, 813-14 (1984); *see also United States v. Reilly*, 76 F.3d 1271, 1282 n.2 (2d Cir. 1996) (mere inclusion of tainted evidence in warrant application does not taint the evidence seized pursuant to the warrant; reviewing court should excise tainted evidence and determine whether remaining evidence provides probable cause).

Here, Judge Preska properly examined the degree to which the affidavit supporting the search of Ebrahimi's home relied on evidence from the search of Alavi's office, and concluded that there was an independent source for the warrant. (Ex. A at 5). That conclusion was correct. The search warrant relied on the facts set forth in the 2008 forfeiture complaint (*see* Ex. B (search warrant affidavit) ¶¶ 14-16); the destruction of documents by Alavi's president immediately prior to the search of Alavi's offices (*id.* ¶¶ 19-20); interviews of Ebrahimi conducted in April and December 2008 and January and February 2009 (*id.* ¶¶ 22-23); a December 17, 2008 interview of another Alavi board member (*id.* ¶ 25), and a May 2008 interview of Mohammad Geramian (*id.* ¶ 26).

After a dozen pages describing the evidence supporting probable cause, the affidavit refers to the materials recovered from the Alavi office search only in paragraphs 24 and 27, and only to note that a "preliminary review" of documents "confirmed" what other evidence had already shown, namely, contact between Alavi and Iran's permanent representative to the IMUN. Excising these brief references from the affidavit does not defeat probable cause. The affidavit describes no other role played by that "preliminary review" of documents from Alavi's offices and Ebrahimi's

---

[3] In their letter, Claimants make the generalized claim that because the Government has not yet made a submission supporting its inevitable discovery arguments as to "each particular piece of evidence that the Claimants challenge," *see In re 650 Fifth Avenue and Related Properties*, 934 F.3d 147, 173-74 (2d Cir. 2019), there is "no way to discern how much of the Government's probable cause presentation and the District Court's probable cause determination are tainted by violations of the Fourth Amendment" (Cl. Letter 10). But here Claimants identify only two types of evidence that could plausibly be tainted—neither of which was obtained from the illegal search. As set forth below, with respect to each type of evidence, Judge Preska found that there was an independent source based on the record before her. That is a separate question from whether documents obtained during the search are subject to the "inevitable discovery doctrine," a question that remains to be resolved before trial.

statements do not refer to any search documents. Claimants also suggest that Ebrahimi's post-search statements might be tainted, because "[i]t was during [the post-search] interviews that Mr. Ebrahimi discussed his detailed journals and that Agents asked for them." (Cl. Letter 11). But the affidavit makes clear that Ebrahimi in fact told the agents about his journals *before* the search. (Ex. B ¶ 28). And while the agents did not ask for the journals until after the search, that matters little, since Ebrahimi refused to hand them over. (*Id.* ¶ 29(c)). Judge Preska's conclusion is thus correct and well-supported by the record.

## 2. Alavi and Assa Officers' Interview Statements

Also for the first time below, Claimants asserted that law enforcement testimony about statements made by Alavi's and Assa's former officers and directors was the fruit of the Alavi search and should be suppressed. But as Judge Preska rightly observed, with one exception, the testimony related to statements made by witnesses *before* the December 19, 2008 search. (Ex. A at 6; *see* Dkt. 2200 at 13-14 (citing trial testimony about statements of Assa Officer Tafti in May 2008), Dkt. 2200 at 19, 23, 24 (citing trial testimony about statements of former Alavi board member Houshang Ahmadi Javadi on December 17, 2008)). The agents' testimony simply repeated these pre-search statements—in some instances reading from the interview report as a past recollection recorded—and, as such, cannot possibly have been informed by their review of documents seized during the later search. (*See* Ex. C at 1-9 (relevant excerpts of trial testimony)).

The one exception noted by the District Court was the Government's citation of trial testimony about a single statement made by a witness after the search. (*See* Dkt. 2200 at 16 (citing trial testimony about statement made by former Alavi President Badr-Taleh in August 2009)). As an initial matter, Judge Preska made no reference to that statement in support of her finding of probable cause. (*See* Ex. A at 7-20). In any event, that testimony simply repeated Badr's interview statement that, after his firing, Badr met with his replacement, Mohammad Geramian, and "had a conversation with Geramian about Bank Melli and his role with Assa Corporation." (Ex. C. at 10-11). That testimony did not relate to the search or to any documents seized from the search. And there is no reason to think the December 2008 search influenced the agents in eliciting this fact, given that it was already known to the Government over a year earlier based on an interview of Geramian himself. (*See* Ex. B ¶ 26(c) (description of May 23, 2008 interview of Geramian)).

As such, Claimants are wrong that "the Government has made no showing that the agents' review of the illegally-seized materials did not inform the testimony on which the Government relied." (Cl. Letter 11). Given the subject matter of their testimony, the District Court rightly concluded that it could properly be considered at the probable cause hearing. (Ex. A at 6).

## B. The District Court Did Not Erroneously Refuse to Consider Claimants' Statute of Limitations Defense

As Judge Preska observed, "probable cause is a preliminary finding." (Ex. A at 21). Accordingly, she found that Claimants' position that "the Court cannot rule on probable cause until such time as the government has provided discovery . . . and claimants' statute of limitations defense has been fully litigated" would produce the "absurd result[]" that "the government could not effectuate a pretrial restraint of real property in a forfeiture action for months or even years." (Ex. A at 21). This was entirely correct: Probable-cause determinations under 18 U.S.C. § 985(d)

are, by their nature, preliminary and need not fully explore all possible affirmative defenses. *Cf. Assenberg v. Whitman County*, 730 Fed. Appx. 429, 432 (9th Cir. 2018) (potential affirmative defense did not defeat probable cause for search); *Riccuiti v. N.Y.C. Transit Authority*, 124 F.3d 123, 128 (2d Cir. 1997) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."); *Fridley v. Horrighs*, 291 F.3d 867, 873 (6th Cir. 2002) (probable cause for arrest not defeated by affirmative defense unless the defense is "conclusively established").

Claimants argue that Judge Preska "refused to consider" and "fail[ed] to engage" with their statute of limitations argument. (Cl. Letter 12). That is not accurate. While the District Court went ahead with the probable cause hearing before statute of limitations related discovery had been completed, that is hardly unusual for such a preliminary proceeding.[4] Moreover, the District Court permitted Claimants to submit evidence regarding their purported defense, which they did. (*See, e.g.*, Cl. Letter 13). Far from "fail[ing] to engage" with this evidence, Judge Preska considered it and found that "on this record, the evidence of probable cause is not defeated by the evidence of the running of the statute of limitations." (Ex. A at 21). Further, Judge Preska made clear that she would afford Claimants the opportunity to further litigate the issue after discovery. (Ex. A at 21-22). Thus, Claimants' argument on appeal that Judge Preska simply "refused to consider" the issue is unsupported by the record.

Claimants do not meaningfully contest Judge Preska's finding that the evidence of probable cause is not defeated by the evidence submitted by Claimants regarding the statute of limitations. Nor could they, in light of the unrebutted and uncontested evidence that the investigation that led to this forfeiture action was opened, and all of the evidence and testimony introduced at trial was developed, less than five years before the filing of the Amended Complaint. (*See* Dkt. 2214 at 22-23). Moreover, "[w]here there is a continuing course of conduct with multiple, distinct underlying crimes that independently could support forfeiture of the same property, the limitations period starts afresh with each new offense." *United States v. Kivanc*, 714 F.3d 782, 790 (4th Cir. 2013); *accord United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 508 (7th Cir. 2010). Here, the evidence established there were numerous IEEPA and money laundering violations within the limitations period sufficient to support the probable cause determination even if, *arguendo*, other portions of the forfeiture claims were outside the limitations period. (*See, e.g.*, Dkt. 2214 at 21-22 (citing evidence of approximately $54.2 million in money laundering transactions within the limitations period)). Claimants' continued concealment services, for example, prevented the filing of civil lawsuits that would have divested them of any ownership interests in the Building up until the moment their scheme was revealed by the filing of the forfeiture claims in this action, resulting

---

[4] It is also entirely consistent with the Remand Order, which contemplated that the probable cause could proceed on October 13, 2020, unless the District Court deemed it appropriate to reschedule. (Remand Order ¶ 1).

in the avalanche of private claims that already have resulted in the turnover of Assa's interests and a favorable bench verdict with respect to Claimants' interests.[5] (Dkt. 2200 at 34-35).

Finally, there is no merit to Claimants' contention that Judge Preska erred by not drawing an adverse inference against the Government relating to the statute of limitations. (Cl. Letter 14). Whether to impose such a discovery sanctions lies within the district court's broad discretion, *see, e.g.*, *Ling-Rong Chen v. City of Syracuse*, 385 F. App'x 41, 43 (2d Cir. 2010); *United States v. Thai*, 29 F.3d 785, 804 (2d Cir. 1994), and Claimants have not shown an abuse of that discretion here. There is no support for Claimants' accusation that the Government has "simply disregarded" this Court's 2019 decision regarding discovery. Following remand, Claimants served new supplemental statute-of-limitations-related requests on February 21, 2020, and the Government served objections and responses to those supplemental requests on April 3, 2020. Claimants' new supplemental requests concern, *inter alia*, a large number of FBI national security case files— separate from the case file for this investigation, for which discovery already has been produced— and implicate a large number of classification issues. (*See* Dkt. 2334 at 155-56). Efforts to collect and review those files have been ongoing, but hampered significantly by the global COVID-19 pandemic. (*Id.*). Claimants never moved for discovery sanctions, but instead proffered an on-the-fly request for an adverse inference in the middle of the hearing itself. (*Id.* at 155). The District Court was well within its discretion to reject it.

## Conclusion

For the foregoing reasons, as well as those set forth in the Government's principal and reply briefs, the District Court's Release Orders should be affirmed with respect to the continued restraint of rental income generated prior to December 12, 2019, and reversed to the extent they permit the release of rental income on or after December 12, 2019.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

by: ___/s_____
Daniel Tracer / Michael Lockard /
Martin Bell / Samuel Raymond /
Thomas McKay
Assistant United States Attorneys
(212) 637-2200

cc:     Counsel of record (by ECF)

---

[5] That verdict was vacated based on the erroneous preclusion of two witnesses, *see Havlish v. 650 Fifth Avenue Co.*, 934 F.3d 174, 182-83 (2d Cir. 2019), but there is no dispute that the evidence at trial was sufficient to support judgment in favor of the private claimants.

# Exhibit A

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3

   In re 650 Fifth Avenue and
4  Related Properties                    08 CV 10934 (LAP)

5

   ------------------------------x
6                                       New York, N.Y.
                                        October 13, 2020
7                                       10:30 a.m.

8  Before:

9              HON. LORETTA A. PRESKA,

10                                        District Judge

11                     APPEARANCES
   GEOFFREY S. BERMAN,
12      United States Attorney for the
        Southern District of New York
13 MICHAEL LOCKARD
   SAMUEL RAYMOND
14      Assistant United States Attorneys

15 PATTERSON BELKNAP WEBB & TYLER LLP
        Attorneys for Claimants Alavi Foundation, 650 Fifth
16 Avenue Co.
   BY:  DANIEL SETH RUZUMNA
17      MELISSA RAE GINSBERG
        DIANA MARIE CONNER
18      LEIGH BARNWELL
        -and-
19 DEBEVOISE & PLIMPTON LLP
   BY:  JOHN GLEESON
20      WINSTON MILAGRES PAES
        -and-
21 AGHA & AGHA LLP
   BY:  SAIF MUSVI AGHA
22

23

24

25

1

1

2          THE COURT:  Yes, sir.

3          Before the Court is the issue of probable cause;

4     specifically, whether the government has demonstrated, pursuant

5     to 18, U.S.C., Section 985(d)(B)(i) the existence of probable

6     cause for effectuating a pretrial seizure of the partnership,

7     the building, and the income generated by the building located

8     at 650 Fifth Avenue in Manhattan.

9          The Court need not review in depth the factual

10    background of the case or the legal standard to be applied to

11    the present issue.  The parties are more than well versed on

12    those fronts, a fact amply demonstrated by the more than full

13    day of oral argument that counsel has engaged in today.  It

14    suffices to say that probable cause is a preliminary finding

15    generally undertaken prediscovery.

16         In concept, it "requires only a possibility or

17    substantial chance of criminal activity, not an actual showing

18    of such activity."  *Illinois v. Gates*, 462 U.S. 213, 245 n.13

19    (1983).  "A judge's probable cause determination is not overly

20    strict."  Rather, it is a "practical commonsense decision."

21    *U.S. v. Morton*, 426 F.3d 68, 74 (2d Cir. 2005), a "fluid

22    concept" that "[turns] on the assessment of probabilities in

23    particular factual contexts."  *Illinois v. Gates*, 462 U.S. 213,

24    232 (1983).

25         Accordingly, the Court will engage in such a practical

KADK650O EXCERPT

commonsense review, not a document-by-document review, of all
of the evidence in the voluminous record in this case.  Here,
the government is required to demonstrate probable cause that
the partnership, the building, and the income generated by the
building is subject to forfeiture as the proceeds of violations
of Iranian sanctions laws, including the International
Emergency Economic Powers Act ("IEEPA") and the Iranian
Transactions and Sanctions Regulations ("ITSRs"), and as
property involved in money laundering in violation of 18,
U.S.C., Sections 1956 and 1957.

In the Court's view, the government has more than met
that initial burden.  Before the Court lays out the reasons for
its finding of probable cause, it addresses the issue raised by
claimants that, in attempting to demonstrate probable cause,
the government has improperly relied on unconstitutionally
seized evidence.  The Court agrees with this to a limited
extent.

Of course, the Court of Appeals has already found that
the warrant supporting the government's December 2008 search of
the Alavi offices was deficient in several respects.  *In re 650
Fifth Avenue & Related Properties*, 934 F.3d 147 (Second Circuit
2019).

Even if the government is correct as a formal matter
that it may rely on illegally-seized evidence in the pretrial
proceeding such as this one -- and the Court makes no finding

KADK650O EXCERPT

1    on that issue -- for the Court to rely on such evidence to find

2    probable cause knowing it was illegally obtained might not

3    necessarily comport with the general guidance of the Court of

4    Appeals that "getting to any outcome requires a fair and

5    procedurally adequate process."  Id. at 173.

6          In any event, the government has only relied on four

7    documents that were directly seized in the December 2008 search

8    of the Alavi offices (Government Exhibits 35, 98, 104, 105),

9    and the government, in its reply, disclaimed any reliance on

10   those documents for purposes of establishing probable cause.

11   Government reply at 14.

12         The Court is thus confident that any illegally-seized

13   documents have not influenced the outcome of this proceeding in

14   any way.

15         Claimants also argue that other evidence offered by

16   the government is tainted by the illegality of the

17   December 2008 search and, thus, cannot be relied upon to

18   establish probable cause.  At the outset, it is curious that

19   claimants have never previously identified these supposed

20   buckets of documents as being subject to suppression.

21   Nonetheless, the Court does not share claimants' concern about

22   using these categories of documents to support a finding of

23   probable cause.  The Court also notes that these are not formal

24   findings that such evidence is not subject to suppression at

25   trial.

1          First, with respect to various notes and journals kept

2    by former Alavi Board Member Alireza Ebrahimi, that the

3    government obtained in a May 2009 search of Mr. Ebrahimi's

4    residence, claimants argue that those materials constitute

5    fruit of the poisonous tree because the affidavit supporting

6    the search warrant referenced the illegal search of the Alavi

7    offices.

8          The Court disagrees.  It is well settled that the

9    taint of an illegal search is removed where "there was an

10   independent source for the warrant under which [the] evidence

11   was seized."  *Segura v. United States*, 468 U.S. 796, 813-14

12   (1984).

13         Here, the warrant for the May 2009 search of

14   Ebrahimi's home was supported by a multitude of investigative

15   steps separate from, and most prior to, the illegal search of

16   the Alavi offices, including the public destruction of

17   documents by Alavi's president, interviews of Ebrahimi himself,

18   interviews of other Alavi board members, and a May 2008

19   interview of former Alavi President Geramian.  As a result, the

20   Court is satisfied that the eventual search of Ebrahimi's

21   residence was sufficiently removed from the illegal search of

22   Alavi's office in December 2008 and, thus, will consider

23   evidence from the search of Mr. Ebrahimi's home in its

24   determination of probable cause.

25         Second, claimants object to testimony by Special

1   Agents George Ennis and Dan McWilliams, who claimants say had

2   "substantial exposure" to unlawfully-seized evidence from the

3   December 2008 search.  However, as the government points out,

4   except for the interview of Mr. Badr-Taleh, the testimony is

5   related to statements made in interviews by various witnesses

6   conducted prior to the search, not to information gleaned from

7   the December 2008 search of the foundation's offices.  To the

8   extent that Agents Ennis and McWilliams gave testimony about

9   statements by witnesses or alleged coconspirators, that

10  testimony will not be excluded from the Court's determination

11  of probable cause.

12          Third, with respect to certain Alavi board resolutions

13  and board minutes — that is, Exhibits 26 and 27 to the

14  government's papers — which were produced by the claimants in

15  discovery, claimants argue that the discovery requests were

16  "substantially informed" by the December 2008 search.  However,

17  claimants do not expound on this argument much further.  They

18  do quote language from the Court of Appeals' 2019 decision

19  rejecting the government's argument that illegally-seized items

20  from the 2008 search were subject to the inevitable discovery

21  exception, but they do not explain how the discovery requests

22  themselves were actually informed by the illegal search.  To

23  the contrary, board meetings and board resolutions seem to be

24  pretty obvious subjects of a document request.  Accordingly,

25  the Court will consider these documents for purposes of

1    establishing probable cause.

2            The Court moves on now to the evidence supporting

3    probable cause.

4            As everyone has acknowledged, the critical question is

5    whether there is probable cause to believe that claimants

6    provided services to Assa after the promulgations of the

7    statutes in 1995 with knowledge that Assa, even after the 1995

8    straw transfer to Mr. Shakeri and Ms. Aghamiri, was owned and

9    controlled by Bank Melli, that is, by the Government of Iran.

10   The term "services" here is a broad one and includes the

11   performance of "anything useful, whether or not the service

12   provider is compensated." *United States v. Banki*, 685 F.3d at

13   106-08 (2d Cir. 2012).

14           Here, given the business relationship between Alavi

15   and Assa, it is indisputable that Alavi provided services to

16   Assa and, thus, to Bank Melli in some fashion.  The question is

17   whether Alavi knew at the time that it was providing these

18   partnership-related services to Bank Melli and the Government

19   of Iran.  As mentioned above, the Court finds that there is

20   probable cause to believe that Alavi knew of Iran's role in

21   controlling Assa and the partnership after 1995.

22           Now, the claimants note, correctly, that there is

23   nothing necessarily illegal about Alavi's pre-1995 conduct.

24   For example, it was not illegal for Alavi to obtain a mortgage

25   from Bank Melli in the '70s or to enter into a partnership with

KADK650O EXCERPT

Assa, owned by Bank Melli, in the 1980s.  There was also

nothing illegal about Alavi's transferring an additional

5 percent interest in the partnership to Assa and, therefore,

to Bank Melli, in August of 1994, but, as claimants concede,

pre-1995 events are not irrelevant.  The Court relies on

pre-1995 events, as claimants concede it may, to the extent

that they color or otherwise inform events that took place

after the passage of the statutes in 1995.

Claimants have asserted that the post-1995 evidence

demonstrates that Alavi genuinely believed that Bank Melli had

sold its ownership interest in Assa and no longer had an

interest in the partnership.  See claimants' opposition at

page 15.  In fact, however, there was no notification to Alavi

that Assa had sold its interest, only that the "stock owners of

Assa Ltd. Channel Island" were two named individuals, Shakeri

and Aghamiri, both Iranian citizens.  The Court notes here that

even if this were a bona fide transfer by Assa, the unlicensed

export of money and services for the benefit of Shakeri and

Aghamiri was also illegal under the ITSR and, thus, a basis for

forfeiture.  In any event, the evidence in the record does not

support the assertion by Alavi that it believed Bank Melli had

sold its interest in Assa.

Here, the claimants seem to elide critical parts of

the story.  For example, starting at the beginning of the

relevant time period, claimants note that Bank Melli had

1    expressed frustration with its investment in the partnership

2    prior to 1995, and, thus, they say, Alavi was not surprised

3    that Bank Melli had decided to divest its interest in Assa.

4    Alavi argues, in its opposition papers at 16, that during its

5    August 1992 meeting with Bank Melli, officers and directors at

6    Bank Melli's Tehran headquarters, Bank Melli complained about

7    its investment in the partnership, leaving Alavi to conclude

8    that Bank Melli intended to divest its interests.  But,

9    immediately after the very same meeting, the head of Bank Melli

10   confirmed to the head of Bonyad Mostazafan, the state-run

11   foundation established by the Ayatollah Khamenei to manage the

12   properties confiscated by his regime, their mutual expectation

13   that the partnership would continue for years to come.  See

14   Hassanein declaration, Exhibit 40-T.  Moreover, Alavi's then

15   president, Geramian, brought Bank Melli's concern to the entire

16   Alavi board, Id. at Exhibit 38-T, and Alavi attempted to

17   address those concerns, in part, by transferring an additional

18   5 percent of the partnership to Bank Melli two years later.

19   That is less than a year prior to the 1995 supposed ownership

20   transfer.  The evidence shows that this was to satisfy long

21   overdue financial obligations to Bank Melli and to calm its

22   concerns about its investment.

23        Similarly, a notation from a 2006 meeting that Assa

24   Corp.'s direct parent, Assa Co. Ltd., "is a British company,"

25   opposition Exhibit 38, was not news to Alavi.  Alavi had always

1  known that Bank Melli used Assa Co., a Channel Islands company,

2  to control its interest in the partnership.  That 5 percent

3  interest that was transferred to Bank Melli was valued at

4  $5 million, but, because it related to a major office building

5  on Fifth Avenue, was potentially worth much more.  That Alavi

6  would pay millions of dollars in August 1994 to keep Bank Melli

7  involved in the partnership, but would be completely unfazed by

8  Bank Melli's apparent exit from the investment in April of

9  1995, would be strange unless Alavi knew that Bank Melli was

10  not exiting its investment at all.

11       Indeed, the government's evidence regarding pre-1995

12  events provides more color to this.  Alavi had an extensive

13  course of dealing with Bank Melli and the Government of Iran

14  prior to the 1995 sale, supposed sale, a fact that claimants do

15  not and cannot dispute, and that extensive course of dealing

16  certainly put Alavi on notice that the Government of Iran

17  generally, and Bank Melli specifically, controlled the

18  investment and conducted business in a manner intentionally

19  designed to obfuscate their activities from American knowledge.

20       For example, as demonstrated by the evidence cited in

21  the government's brief at pages 10 to 14, in the 1980s, the

22  Government of Iran repeatedly used Alavi as a front for

23  financing Iranian interests in the United States and in Canada,

24  including funding a Persian studies program at a Canadian

25  university, buying residences for Iranian diplomats, and

1    establishing pro-regime educational and religious programs

2    across the United States.

3            Prior to the establishment of the partnership, Bank

4    Melli discussed using a network of European front companies to

5    facilitate payments from Alavi to Bank Melli on a mortgage,

6    and, of course, Alavi knew that Bank Melli converted its

7    mortgage interest in the building into a partnership with Alavi

8    using shell companies designed to hide its involvement.

9    Tellingly, in 1990, when Bank Melli officially took ownership

10   of Assa, former Alavi President Badr said that he "doesn't see

11   any problem regarding the transfer of the mother company's

12   ownership" and that "his understanding has always been that the

13   ownership of the mother company was with Bank Melli."

14   Hassanein declaration, Exhibit 54-T.

15           The clear inference from this statement is that

16   despite Bank Melli's deliberate masking of its legal

17   relationship to Assa prior to 1990, Alavi always understood

18   that Bank Melli was in control as a practical matter.  Viewed

19   in light of the history between and among Alavi, and Bank

20   Melli, and the Government of Iran, the government's evidence

21   supports the inference that the 1995 supposed sale did not

22   provoke much of a reaction from the foundation for a simple

23   reason — it was more of the same.  Further, with respect to the

24   1995 sale, the continued role of Sayed Mohamed Shafa'at is also

25   suspicious.

1    In 1990, Shafa'at was appointed by Bank Melli to

2  manage Assa's affairs in New York.  He retained that role until

3  1998; that is, three years after the supposed sale of Assa to

4  Shakeri and Aghamiri in 1998, when Bank Melli appointed his

5  successor, Mr. Tafti.  Shafa'at maintained a Dubai post office

6  box throughout his time period -- that would be '90 to '98 --

7  as a contact address.  In November of 1995, Alavi wrote to

8  Shafa'at at that Dubai post office box and asked about the

9  identities of Assa's new owners, so that the foundation could

10  provide the names to a bank to which it had applied for a loan.

11  Shafa'at's response provided the names of Shakeri and Aghamiri

12  and listed their address as the same Dubai post office box that

13  Shafa'at, again Bank Melli's appointed representative, had

14  maintained for some eight years prior.  See Hassanein

15  declaration, Exhibit 72.  The clear inference to be drawn is

16  that Alavi understood, again, that this was more of the same.

17  Bank Melli was still in charge even after the statutes were

18  passed and after the supposed transaction with Shakeri and

19  Aghamiri.

20    The lack of reaction to the 1995 supposed transaction

21  with Shakeri and Aghamiri is even more compelling because the

22  evidence suggests that Alavi was actually quite nervous about

23  the possibility that Assa could be sold to a bona fide third

24  party and about the risk of exposure that such a transaction

25  would create.  The government's evidence demonstrates that Bank

1   Melli began to explore selling its stake in the partnership in

2   the late 1990s and early 2000s.  For example, in 2001, as Bank

3   Melli's efforts to sell its stake continued, former Alavi Board

4   Member Ebrahimi wrote in notes that, "Bank Melli equals

5   conspiracy."Ebrahimi also expressed in these notes the

6   dangerous implications for the foundation should Bank Melli's

7   role be revealed:  "Government separate -- foundation 'sure

8   death.'"  Whether expressed in linear fashion or not, the clear

9   inference is that Ebrahimi feared that if Bank Melli's role

10  were revealed, the foundation would cease to exist.  Assa's

11  potential sale was, thus, an existential threat.

12          The government's evidence shows that Alavi perceived

13  the best way to protect its interests was to purchase Assa

14  itself.  In 2003, such an opportunity presented itself when

15  Assa, that is, Bank Melli, considered selling its stake in the

16  partnership to a third party, the Hanif partnership.  Because

17  Alavi had the right of first refusal under the partnership

18  agreement, Assa offered to sell its interest in the partnership

19  for $42.4 million.  As the claimants note in their brief at

20  page 16, Alavi accepted the offer.

21          The agreement, however, fell apart because Alavi could

22  not get financing from Wachovia Bank or from UBS, both of which

23  had questions about the identities and countries of origin of

24  Assa's ownership.  Claimants end the story there, but the

25  exhibits to claimants' own briefing show that the reason Alavi

1  could not secure financing was Assa's potential ties to Iran.

2  Indeed, Wachovia contacted Alavi's American counsel and

3  inquired about the identity of Assa's ownership because Assa

4  "is under investigation by international financial institutions

5  for alleged connection with an Iranian government bank."

6  Mr. Razumna's declaration in opposition, Exhibit 24.

7  　　　　Indeed, Wachovia asked Alavi to provide "the immediate

8  and ultimate owners and principals of Assa Corp. as well as

9  their countries of origin" (Id.) and, ultimately, declined the

10 loan, as pointed out in the reply declaration, Exhibit 1-T.  If

11 that exchange did not put Alavi on notice of Assa's ties to

12 Iran, it's hard to fathom what would.

13 　　　　Ebrahimi's notes, with or without the doodles from

14 around the time of the proposed Hanif transaction and potential

15 Alavi purchase, reveal massive anxiety about the situation.  In

16 meeting notes dated July 25, 2003, around the time period of

17 the potential Hanif transaction, Ebrahimi wrote, "Assa

18 dangerous – get rid of it – who is going to buy it."  And

19 "Don't borrow – it is illegal – urgent situation – talk –

20 everything – Mafia – duty," reflecting concerns that a sale

21 would risk exposing Bank Melli's involvement, as would any

22 attempts by Alavi to finance a purchase of Assa.

23 　　　　Ebrahimi's notes from an August 10, 2003 meeting

24 reflect heightened anxiety discussing "the issue of danger for

25 the board of trustees," "collusion and illegal arrangement,"

and the "possibility of danger."  The same notes express fear

of the possibility that "everything is revealed," and one note

questions "how to protect foundation's properties."  Government

Exhibit 83-T.  At another point in the notes, Ebrahimi says

that he "cannot sleep at night" and wonders when the issue of

board of trustees will be solved."  Id.

        Given their timing, the inference to be drawn from

these notes is more than clear.  Ebrahimi was terrified that

Bank Melli's role in the partnership would be discovered and

the foundation's properties lost.

        Finally, the Court addresses various recordings of

former Alavi President Geramian and Board Member Hassani by

former Alavi Board Member Hesami-Kiche.  Specifically,

Hesami-Kiche recorded a discussion among himself, Geramian, and

Hassani in 2008 at a mosque in Queens.  In that conversation,

Geramian emphasized that Tafti -- that is, Assa's

representative in New York -- had refused to disclose to them

the true identities of Assa's owners, a fact that claimants

rely heavily on.

        However, Geramian also stated that his "assumption"

that Assa had "an independent organization," and that "even if

Bank Melli owned it, it had split it and formed a committee."

Geramian described exactly what Bank Melli was doing and had

always done — it owned Assa, but had "split it" on paper, with

nominally "independent" straw owners.

1      Geramian also expressed his knowledge that U.S. law

2  prevented Alavi's attempts to buy out Bank Melli.  Geramian

3  wrote, "I knew it was a positive thing for the foundation to

4  become the owner of this place.  Financially, it would be very

5  beneficial and...without any partner.  Only the mechanism

6  wasn't there."  Exhibit 54 to the opposition papers.

7      The missing mechanism, as discussed in an earlier

8  conversation with Geramian and Hassani, was a way to transfer

9  money from the United States to Bank Melli.  Hassanein

10  declaration, Exhibit 89.

11      To devise such a mechanism, Iran turned to

12  Mr. Mazaheri, the Iranian Minister of Finance and head of the

13  Central Bank of Iran, who formerly had been the Deputy Prime

14  Minister of Iran and head of Bonyad Mostazfan.  Id.  "The

15  payment is difficult...Mazaheri's role is the banking system

16  and the financial."  Trial transcript, 1747, 1750, 1803.

17  Geramian worried that despite their efforts, the sanctions made

18  transferring such a large sum impossible.  He wrote, "I sent

19  $2,000 to my mother who was sick in Iran via a friend of mine

20  once.  They gave him such a hard time.  They asked him what the

21  money was for, what its purpose was, where it came from.  Now

22  you want it with 40 percent?"

23      In light of the other facts discussed above, the close

24  alignment between Geramian's comment about Bank Melli's

25  hypothetically "splitting" Assa and the way that Bank Melli

1  structured the 1995 sale supports a finding of probable cause

2  rather than undermines it.

3          Another fact that lends support to the finding of

4  probable cause is former Alavi President Jahedi's attempted

5  destruction of documents after he was served with a grand jury

6  subpoena in December of 2008.  As counsel have discussed here

7  today, FBI surveillance spotted Jahedi ripping up documents and

8  throwing them in a dumpster.  When the FBI retrieved those

9  documents and brought them to an FBI forensic center for

10  reconstruction, it uncovered documents detailing Assa's

11  ownership structure and its relationship to Alavi.  Jahedi

12  eventually pleaded guilty to obstruction of justice.

13          The evidence in the record leads the Court to conclude

14  there is probable cause to believe that Alavi knew that Assa

15  continued to be controlled by Bank Melli and by the Government

16  of Iran after 1995.  Based on that evidence, there is probable

17  cause to believe that Alavi's extensive history with Bank Melli

18  prior to 1995, though not on its own improper, provided Alavi

19  with a base of information about how Bank Melli operated and

20  supports the inference that Alavi knew of Bank Melli's

21  continued role in the operation of the partnership.

22          Moreover, Alavi's apparent anxiety about the sale of

23  Assa to a third party and Ebrahimi's contemporaneous notes

24  substantiating the foundation's fears that a sale could

25  jeopardize the entire operation strongly support a finding of

KADK650O EXCERPT

1     probable cause.

2              Next, the Court must determine whether there is

3     probable cause to believe the building, the partnership, and

4     the income generated by the building is subject to forfeiture

5     as proceeds of violations of IEEPA, the ITSRs, or federal

6     anti-money laundering laws.

7              To review, 18, U.S.C., Section 981 provides that (1)

8     any property, real or personal, which constitutes or is derived

9     from proceeds traceable to a violation of the IEEPA "or any

10    conspiracy formed to commit such offense" and (2) "any

11    property, real or personal, involved in a transaction or

12    attempted transaction, in violation of...Section 1956 or 57 of

13    this title [the money laundering offenses] or any property

14    traceable to such property" is subject to forfeiture.  18,

15    U.S.C., Sections 981(a)(1)(A), (a)(1)(C).

16             Courts apply a "but-for" test to determine whether

17    property is proceeds of an offense.  Under this test, the term

18    "proceeds" means any property that a person would not have

19    obtained or retained but for a criminal offense.  *United States*

20    *v. Grant*, No. S4:05 CR 1192, 2008 WL 4376365, at *2 n.1

21    (S.D.N.Y. September 25, 2008).

22             Here, there is probable cause to believe that the

23    building, the partnership, and all income generated by the

24    building would be considered proceeds of the statutory

25    violations and, thus, be subject to forfeiture.  As the

1  government points out, the value of claimants' ownership rights

2  in the building, which includes income generated by the

3  building, is dependent on the operation of the partnership

4  itself.

5          As we've discussed here today, the operation of the

6  partnership includes all of the activities necessary to manage

7  the building, directly or indirectly, including leasing,

8  maintenance, repairs, capital improvements, everything

9  necessary to generate and enhance the ability of the building

10  to generate revenue.  But for the illegal services provided by

11  the partnership to the building, the building would be

12  worthless.

13          Between 1996 and 2008, the partnership spent at least

14  $143 million to maintain, operate, and improve the building.

15  The partnership, directly or indirectly, managed leases,

16  collected rents, and spent money on capital improvements.  But

17  for the operation of the partnership, which provided services

18  to Bank Melli and the Government of Iran, the building would

19  have been lost.  The economic value of the building is thus

20  tied to the claimants' partnership-related services to Assa

21  and, thus, to Bank Melli, and, accordingly, there is probable

22  cause that the building and the income it generates as the

23  proceeds of statutory violations are subject to forfeiture.

24          Moreover, without the operation of the partnership for

25  the benefit of Bank Melli and, thus, the Government of Iran, it

1  appears doubtful that Alavi would have been able to retain the

2  building at all.  The partnership existed precisely because

3  Alavi was in dire financial straits and was unable to satisfy

4  its mortgage obligation to Bank Melli, its taxes, and the like.

5  And, after 1995, the continued operation of the partnership,

6  and Alavi's concealment thereof, meant that the building

7  remained a somewhat attractive investment for Bank Melli.  But

8  for Bank Melli and the partnership's activities, and its

9  concealment thereof, Alavi's hold on the building and all of

10 the rights of ownership attached to the building would have

11 been lost because of Alavi's inability to generate sufficient

12 evidence.

13        Indeed, Ebrahimi's notes, which questioned "how to

14 protect the foundation's properties," should Bank Melli exit

15 its investment in the partnership, make this fact clear.  This

16 is yet another ground to find probable cause that the building,

17 the partnership, and the income generated thereby are proceeds

18 traceable to the IEEPA violations.

19        In addition, the transactions summarized in part in

20 Government Exhibits 116 to 118 were all involved in the IEEPA

21 violations and were conducted so as to conceal the ownership,

22 nature, and control of the funds, in violation of the

23 money-laundering statutes and, thus, are all forfeitable,

24 including the gross rents.

25        Finally, with respect to claimants' argument that

1  their putative statute of limitations defense bars a finding of

2  probable cause, the Court disagrees.  Again, probable cause is

3  a preliminary finding, and claimants' statute of limitations

4  defense differs in a material way from, for example, an

5  innocent ownership defense, which can be more easily raised in

6  the context of a probable cause proceeding.

7         Here, claimants appear to argue, on one hand, that the

8  Court cannot rule on probable cause until such time as the

9  government has provided discovery that the Court of Appeals

10  ordered they produce, *In re 650 Fifth Avenue*, 934 F.3d at

11  158-60, and claimants' statute of limitation defense has been

12  fully litigated, and, on the other hand, that the few documents

13  the government has produced on this topic compel an adverse

14  inference that, in turn, compels a finding that the statute of

15  limitations should be found to have run.

16         The former approach would produce absurd results, as

17  it would mean that the government could not effectuate a

18  pretrial restraint of real property in a forfeiture action for

19  months or even years.  The latter approach seems overly hasty

20  and does not provide the government with adequate process.

21         The Court finds that on this record, the evidence of

22  probable cause is not defeated by the evidence of the running

23  of the statute of limitations.  Accordingly, the Court will not

24  take up the merits of claimants' statute of limitation defense

25  on this preliminary record.

1        Now, claimants are correct to point out that the

2  government must produce the discovery they are due on their

3  putative statute of limitations defense.  However, for present

4  purposes, it makes far more sense to allow litigation of

5  claimants' statute of limitations defense once discovery is

6  complete.  Accordingly, the Court finds that probable cause is

7  present here, and I will look to the government to confer with

8  counsel and to provide an appropriate order and restraining

9  order --

10        MR. LOCKARD:  Yes, your Honor.

11        THE COURT:  -- in short order.

12        I'll ask counsel then to confer and to inform the

13  Court how you wish to proceed going forward.

14        Shall we thank the court reporter for his yeoman-like

15  service?  I note that it is five minutes to 6:00.

16        Mr. Reporter, thank you.

17        Counsel, is there anything else?

18        MR. LOCKARD:  Not from the government, your Honor.

19        MR. GLEESON:  No, thank you.

20        THE COURT:  Thank you, counsel.  Good afternoon.

21        And the other lawyers who argued, thank you for your

22  arguments.

23        MR. RAZUMNA:  Thank you, Judge.

24                          * * *

25

# Exhibit B

sw.frm (Rev. EDNY 1996) Search Warrant

# United States District Court

_____ EASTERN _____ **DISTRICT OF** _____ NEW YORK _____

In the Matter of the Search of

THE PREMISES KNOWN AND DESCRIBED AS

(1) ALI REZA EBRAHIMI'S OFFICE AT ROOM D-22 OF THE
ACADEMIC VILLAGE OF THE STATE UNIVERSITY OF NEW
YORK, OLD WESTBURY COLLEGE, OLD WESTBURY, NEW
YORK 11568, AND ANY CLOSED AREAS AND CONTAINERS
FOUND THEREIN; AND (2) ALI REZA EBRAHIMI'S
RESIDENCE AT 51 JACKSON AVENUE, SECOND FLOOR,
MINEOLA, NEW YORK 11510, AND ANY CLOSED
CONTAINERS FOUND THEREIN.

**SEARCH WARRANT**
CASE NUMBER:

**M-09-470**

TO:  Special Agent Steve Gonzalez _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____ Special Agent Steve Gonzalez _____ who has reason to

Affiant

believe that ☐ on the person of ☑ on the premises known as

(1) Ali Reza Ebrahimi's office at room D-22 of the Academic Village of the State University of New
York, Old Westbury College, Old Westbury, New York 11568, and any closed areas and containers
found therein (Attachment B); and (2) Ali Reza Ebrahimi's residence at 51 Jackson Avenue, second
floor, Mineola, New York 11510, and any closed areas and containers found therein (Attachment C)

In the _____ EASTERN _____ District of _____ NEW YORK _____ there is now
concealed a certain person or property, namely (describe the person or property) See Attachment A

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person
or property so described is now concealed on the person or premises above-described and establish grounds for the
issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before May 21, 2009
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant
and making the search in the daytime - 6:00 A.M. to 10:00 P.M. and if the person or property be found there to
seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written
inventory of the person or property seized and promptly return this warrant to___ DUTY MAGISTRATE  As required
by law.                                                                                     United States Judge or Magistrate

5/11/09   5 11 pm                at    Brooklyn, New York
Date and Time Issued                   City and State

Honorable Joan M. Azrack, Magistrate Judge, EDNY

Name and Title of Judicial Officer          Signature of Judicial Officer

## Attachment A

Property to be seized at the PREMISES, which is the premises, known and described as, (1) ALI REZA EBRAHIMI's office at State University of New York, Old Westbury College, Old Westbury, New York 11568, and any closed areas and containers contained therein (the "OFFICE"; see Attachment B); and (2) EBRAHIMI's residence at the second floor apartment of 51 Jackson Avenue, Mineola, New York 11510, and any closed areas and containers contained therein (the "RESIDENCE"; see Attachment C): any and all journals covering the period of 1992 to the present.

N.B.: In order to minimize any intrusion into EBRAHIMI's school activities or home activities, or the activities of EBRAHIMI's family, friends, students, and associates, the Government intends to execute the requested warrant only in the event that EBRAHIMI declines to provide all of the journals to law enforcement agents with his consent. In the event a warrant is issued, law enforcement agents executing the warrant will first give EBRAHIMI (and any agents or persons assisting EBRAHIMI) a reasonable opportunity at the time they approach him to provide the journals on consent. At the time they approach him, law enforcement agents will provide EBRAHIMI with convenient means to provide any and all of the journals in his care, custody, or control to law enforcement, whether the journals are located at the RESIDENCE, the OFFICE, on his person or in another place. Only if EBRAHIMI does not provide all of the journals described herein (covering from approximately 1992 to the present) on consent will law enforcement agents then execute the warrant. Law enforcement agents will inform EBRAHIMI that they possess a search warrant that would permit search and seizure of the journals if they are not provided at the time they approach him for his consent. Due to this fact, law enforcement agents will make a search warrant return regardless of how the journals are retrieved.

Attachment B

The OFFICE to be searched is described as a professor's office located at the State University of New York, Old Westbury College ("SUNY College at Old Westbury"), Old Westbury, New York 11568. The OFFICE is Room D-22 in Building D of the Academic Village, which is a student center for SUNY College at Old Westbury. The main entrance for SUNY College at Old Westbury is on Route 107 in Old Westbury, New York 11568, and the Academic Village building is located toward the center of the campus. Building D of the Academic Village has a grey, concrete exterior and a high atrium. The building is two-stories in the front, and extends to a third story toward the back of the building. The OFFICE is located on the second floor of Building D of the Academic Village, in a foyer area, and is directly above a campus security office. The OFFICE, which is marked on the outside of the door, D-22, is approximately 15 feet wide by about 10 to 12 feet deep, with a window overlooking a stairwell connecting the first and second floors of the student center. Toward the center of the OFFICE is a desk, with several drawers, a computer, and a phone. Also inside the OFFICE are file cabinets and open bookshelves, as well as a walk-in closet with a door toward the right of the entrance to the OFFICE.

ii

## Attachment C

The RESIDENCE to be searched is described as a two-bedroom apartment, located inside a two-family house at 51 Jackson Avenue, Mineola, New York 11510.  The house is located on the corner of Jackson Avenue and Roosevelt Avenue, and has a two-car garage.  The majority of the exterior of the house is light grey, with the exception of the first floor of the front of the house, which has a reddish exterior.  The house also has a red chimney extending from the roof, and is surrounded by bushes.  The RESIDENCE is the apartment located on the second floor of the house.  There are two entrance doors to the house, located next to each other, and the door to the right opens to a staircase that leads to the second floor and the RESIDENCE.

iii

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

IN THE MATTER OF THE APPLICATION   :
OF THE UNITED STATES OF AMERICA
FOR A SEARCH WARRANT FOR THE       :
PREMISES KNOWN AND DESCRIBED AS
(1) ALI REZA EBRAHIMI'S OFFICE     :
AT ROOM D-22 OF THE ACADEMIC
VILLAGE OF THE STATE UNIVERSITY    :
OF NEW YORK, OLD WESTBURY COLLEGE,
OLD WESTBURY, NEW YORK 11568, AND  :
ANY CLOSED AREAS AND CONTAINERS
FOUND THEREIN; AND (2) ALI REZA    :
EBRAHIMI'S RESIDENCE AT 51 JACKSON
AVENUE, SECOND FLOOR, MINEOLA,     :
NEW YORK 11510, AND ANY CLOSED
AREAS AND CONTAINERS FOUND         :
THEREIN.
                                   :
- - - - - - - - - - - - - - - - - - x

**M-09-470**

TO BE FILED **UNDER** SEAL

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
SEARCH WARRANT

STATE OF NEW YORK          )
KINGS COUNTY               : ss.:
EASTERN DISTRICT OF NEW YORK )

        STEVE GONZALEZ, being duly sworn, deposes and says
that:

        1.  I am a Special Agent with the Federal Bureau of
Investigation ("FBI"), and have been so employed for
approximately six years.  For approximately the last five years,
I have been assigned to the FBI's Joint Terrorism Task Force
("JTTF").  I am currently assigned to Squad CT-9, which is a
group that focuses on investigations of terrorism activity
concerning Iran, Hezbollah, and Hamas.  As part of my duties with
the JTTF, I investigate, among other crimes, material support of

terrorism, financial support of terrorism, money laundering, violations of the International Emergency Economic Powers Act, and violations of the Iranian Transaction Regulations.  I also have participated in the execution of numerous search warrants over the course of my career with the FBI.

2.    I am familiar with the information contained in this affidavit based on my review of documents, conversations I have had with other individuals and law enforcement officers about this matter, and my training and experience.  Because this affidavit is being submitted for the limited purpose of establishing probable cause to search the PREMISES described below for journals of ALI REZA EBRAHIMI, covering the period of 1992 to the present, I have not included herein the details of every aspect of the investigation.  Where actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated.

3.    I respectfully submit this affidavit in support of an application for a warrant to search the premises known and described as (1) EBRAHIMI's office at Room D-22 of the Academic Village Building at the State University of New York, Old Westbury College, Old Westbury, New York 11568, and any closed areas and containers found therein (the "OFFICE"); and (2)

-2-

EBRAHIMI's residence at the second floor apartment of 51 Jackson Avenue, Mineola, New York 11510, and any closed areas and containers found therein (the "RESIDENCE") (collectively, the "PREMISES"), and to seize the items set forth in Attachment A (attached hereto), namely, any and all journals possessed and maintained by EBRAHIMI, covering the period of 1992 to the present, which constitute evidence, fruits, and/or instrumentalities of, among other crimes, violations of the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Sections 1701 through 1706; the Iranian Transaction Regulations ("ITRs"), Title 31, United States Code of Federal Regulations, Part 560; and the money laundering statutes, Title 18, United States Code, Sections 1956 and 1957.

## EBRAHIMI'S JOURNALS AND THE PREMISES TO BE SEARCHED

4.     As discussed more fully herein, federal agents with FBI's JTTF interviewed EBRAHIMI on several occasions. I participated in interviews of EBRAHIMI on December 17, 2008, January 20, 2009, and February 10, 2009.  On each of these occasions, the other agents and I observed EBRAHIMI in possession of his current journal.  EBRAHIMI's current journal is bound, with a leather or leather-like cover and lined pages.  In addition, during one meeting, EBRAHIMI brought what he claimed

-3-

was an older journal, which closely resembled his current
journal.

     5.    The OFFICE is described as a professor's office
located at the State University of New York, Old Westbury College
("SUNY College at Old Westbury"), Old Westbury, New York 11568.
The OFFICE is Room D-22 in Building D of the Academic Village,
which is a student center for SUNY College at Old Westbury.  The
main entrance for SUNY College at Old Westbury is on Route 107 in
Old Westbury, New York 11568, and the Academic Village building
is located toward the center of the campus.  Building D of the
Academic Village has a grey, concrete exterior and a high atrium.
The building is two-stories in the front, and extends to a third
story toward the back of the building.  The OFFICE is located on
the second floor of Building D of the Academic Village, in a
foyer area, and is directly above a campus security office.    The
OFFICE, which is marked on the outside of the door, D-22, is
approximately 15 feet wide by about 10 to 12 feet deep, with a
window overlooking a stairwell connecting the first and second
floors of the student center.  Toward the center of the OFFICE is
a desk, with several drawers, a computer, and a phone.  Also
inside the OFFICE are file cabinets and open bookshelves, as well
as a walk-in closet with a door toward the right of the entrance

-4-

to the OFFICE.[1]

6.   The RESIDENCE is described as a two-bedroom apartment, located inside a two-family house at 51 Jackson Avenue, Mineola, New York 11510. The house is located on the corner of Jackson Avenue and Roosevelt Avenue, and has a two-car garage. The majority of the exterior of the house is light grey, with the exception of the first floor of the front of the house, which has a reddish exterior. The house also has a red chimney extending from the roof, and is surrounded by bushes. The RESIDENCE is the apartment located on the second floor of the house. There are two entrance doors to the house, located next to each other, and the door to the right opens to a staircase

---

[1]   Federal agents with the FBI's JTTF interviewed EBRAHIMI at the OFFICE on or about April 30, 2008, December 17, 2008, and February 10, 2009. I participated in the interviews conducted at the OFFICE on December 17, 2008 and February 10, 2009, and have reviewed the report prepared by the agents who conducted the April 30, 2008 interview. I have learned that, during the April 30, 2008 interview, EBRAHIMI explained that he is a professor of computer science at SUNY Old Westbury and that he has been teaching at the college since 1983. The information contained in this paragraph is based on observations that I and the other interviewing agents made during the interviews of EBRAHIMI that were conducted in the OFFICE. In addition, on or about May 7, 2009, I learned from U.S. Postal Inspectors assisting this investigation confirmed that EBRAHIMI continues to reside at the RESIDENCE. Furthermore, on or about May 7, 2009, I learned from employees and documents from SUNY Old Westbury that EBRAHIMI continues to be a professor at SUNY Old Westbury and continues to use the OFFICE there.

-5-

that leads to the second floor and the RESIDENCE.[2]

## STATUTORY AND REGULATORY FRAMEWORK

7.    IEEPA, codified at 50 U.S.C. §§ 1701 et seq., was
enacted in 1977.  The statute authorizes the President of the
United States to regulate financial transactions with foreign
countries and foreign nationals in order to deal with threats
with respect to which a national emergency has been declared, and
prescribes criminal penalties for violations of the statute and
the regulations promulgated thereto.

8.    Using the powers conferred by IEEPA, the President
of the United States and the Executive Branch declared a national
emergency and issued orders and regulations prohibiting certain
transactions with Iran and the Government of Iran by United
States persons or involving the export of goods or services from
the United States to Iran.  See 50 U.S.C. § 1704 ("The President
may issue such regulations, including regulations prescribing
definitions, as may be necessary for the exercise of the
authorities granted by this chapter.").  Section 1705 of Title
50, United States Code, provides, in part, that "[i]t shall be

---

[2]    On or about December 17, 2008, I traveled to 51 Jackson
Avenue, Mineola, New York 11510.  On this occasion, I observed
the exterior of the house and, from the door for the RESIDENCE,
observed the interior stairwell leading up to the second floor
apartment.

unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a). IEEPA also provides for criminal penalties for individuals who willfully violate the statute. Pursuant to Section 1705(c), "A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both." 50 U.S.C. § 1705(c).

9.   In 1995, in order to implement a series of executive orders issued pursuant to IEEPA, the Department of Treasury promulgated the Iranian Transaction Regulations ("ITRs"), Title 31, United States Code of Federal Regulations, Part 560. The United States Department of Treasury, Office of Foreign Assets Control ("OFAC"), is responsible for administering the ITRs and for granting licenses that authorize transactions with Iran, which otherwise would be barred by the ITRs.

10.   The relevant portions of the ITRs generally prohibit (1) the exportation, sale, or supply, directly or indirectly, by a United States person or from the United States,

of any goods, technology, or services to Iran or the Government
of Iran, and (2) the engagement by United States persons in any
transaction or dealing, in or related to, goods, technology, or
services, for exportation to Iran or the Government of Iran,
without having first obtained a valid license from OFAC.  With
respect to the provision of services to the Government of Iran,
the ITRs prohibit, except as otherwise authorized, the "supply,
directly or indirectly, from the United States, or by a United
States person, wherever located, of any goods, technology, or
services to Iran or the Government of Iran."  31 C.F.R.
§ 560.204.

11.  Pursuant to 31 C.F.R. § 560.304, the term
"Government of Iran" includes:  "(a) The state and the Government
of Iran . . . (b) [a]ny entity owned or controlled directly or
indirectly by the foregoing; (c) [a]ny person to the extent that
such person is, or has been, or to the extent that there is
reasonable cause to believe that such person is, or has been,
since the applicable effective date, acting or purporting to act
directly or indirectly on behalf of any of the foregoing; and (d)
[a]ny person or entity designated by the Secretary of the
Treasury as included within paragraphs (a) through (c) of this
section."

-8-

12.  The term "entity owned or controlled by the Government of Iran" is defined at 31 C.F.R. § 560.313, and "includes any corporation, partnership, association, or other entity in which the Government of Iran owns a majority or controlling interest, and any entity which is otherwise controlled by that government."  Bank Melli Iran ("Bank Melli") is wholly owned and controlled by the Government of Iran.  As such, in 1999, OFAC identified Bank Melli and all of its offices worldwide, as entities "owned or controlled by the Government of Iran."  31 C.F.R. Part 560, App. A.

13.  Pursuant to 31 C.F.R. § 560.314, the term "United States person" means "any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States."

## PROBABLE CAUSE

A.  Background Into the Investigation

14.  This application for a search warrant is based on information gathered in the course of an investigation by the JTTF ("the Investigation") of: the Alavi Foundation of New York (the "Alavi Foundation"), a New York-based non-profit; Assa Corporation ("Assa Corp."), a New York corporate entity; Assa

Company Limited ("Assa Co. Ltd."), a corporation domiciled in Jersey, Channel Islands; and Bank Melli, an Iranian-chartered bank owned by the Government of Iran.

15.   The Investigation concerns a 1989 transaction involving 650 Fifth Avenue, New York, New York, a large Manhattan office tower ("the Building") which is primarily filled by commercial tenants.  The Building was constructed in or about 1975, with a loan from Bank Melli to the Pahlavi Foundation, a prior name of the Alavi Foundation.  In 1989, in order to avoid a substantial anticipated tax liability, the Alavi Foundation repaid its mortgage to Bank Melli by selling a 40% interest in the Building to Assa Corp., a subsidiary of Assa Co. Ltd.  Both Assa Corp. and Assa Co. Ltd. are shell companies owned by Bank Melli, which, as noted above, was designated by OFAC in 1999 as an entity "owned or controlled by the Government of Iran."  31 C.F.R. Part 560, App. A.[3]  Because of this OFAC designation, transactions with Bank Melli are governed by the ITRs and Assa Corp.'s interest in the Building and its rents is subject to civil forfeiture.

16.   Accordingly, on December 17, 2008, a civil

---

[3]    In or about 1979, after the Iranian Revolution, the revolutionary government in Iran nationalized Bank Melli, as well as other Iranian banks.

-10-

Complaint, which I verified, was filed in the United States District Court for the Southern District of New York in *United States v. All Right, Title, and Interest of Assa Corporation, Assa Company Ltd., and Bank Melli Iran in 650 Fifth Avenue Company et al.*, 08 Civ. 10934 (RJH), seeking the civil forfeiture of the interests of Assa Corp., Assa Co. Ltd., and Bank Melli in the Building and its rents. The civil asset forfeiture complaint is attached to this Affidavit as Exhibit A, and is incorporated by reference herein.

17. In addition to the transaction underlying Bank Melli's acquisition of its interest in the Building, the Investigation concerns efforts of the Government of Iran to control the activities of the Alavi Foundation, its President, and its Board of Directors (the "Board") by, among other ways, directing the activities of the Alavi Foundation through the Permanent Representative to the Iranian Mission to the United Nations ("IMUN"). The Investigation has revealed that, since at least 1992, several individuals serving as the Permanent Representative to the IMUN have successfully directed actions taken by the Alavi Foundation, both through interactions with the Foundation's Board and with the Foundation's President.

18. By complying with the directions from the

-11-

Permanent Representative to the IMUN and other officials of the Government of Iran, the Alavi Foundation, its Presidents, and the members of the Alavi Foundation's Board violated IEPPA and the ITRs.  More specifically, by receiving input from and following the directions of various Permanent Representatives to the IMUN (and other Iranian officials), the Alavi Foundation, its Presidents, and the members of its Board have provided "suppl[ied], directly or indirectly, from the United States . . . Services to Iran or the Government of Iran."  31 C.F.R. § 560.204.

19.  On December 17, 2008, a Grand Jury subpoena was personally served on Farshid Jahedi, who at the time was the President of the Alavi Foundation.  The Grand Jury subpoena commanded the Alavi Foundation to provide, for the time period from 1989 to the present, "any and all documents relating to and referring to" the following entities: 650 Fifth Avenue Company; the Alavi Foundation of New York; Assa Corporation; and Assa Company, Limited."  The next day, December 18, 2008, Jahedi was observed leaving work at the end of the day and taking a train to the area of his residence.  Upon departing the train, Jahedi drove to a location near his residence, parked his car, and walking to a public trash can where Jahedi discarded papers that

he had removed from his pockets.  Law enforcement officers retrieved the papers from the trash can, and determined that they were torn documents, both in English and in Farsi, that were responsive to the Grand Jury subpoena.

20.   On December 19, 2008, Jahedi was charged in a criminal complaint, documented 08 Mag. 2793, with one count of obstruction of justice, in violation of Title 18, United States Code, Section 1503.  Jahedi was arrested in the Southern District of New York on December 19, 2008.  On May 5, 2009, an indictment was filed by a federal grand jury sitting in the Southern District of New York, charging Jahedi in two counts: (1) altering, destroying, mutilating, and concealing a record, document, or other object, with the intent to impair that object's integrity and availability for use in an official proceeding, in violation of Title 18, United States Code, Sections 1512(c)(1) and 2; and (2) influencing, obstructing, and impeding, and endeavoring to do the same, the due administration of justice, in violation of Title 18, United States Code, Sections 1503 and 2.

21.   On December 19, 2008, federal agents of the JTTF executed a judicially-authorized search warrant of the Alavi Foundation's offices at 500 Fifth Avenue, New York, New York,

-13-

for, among other things, all documents related to Assa Corp.,
Assa Co. Ltd., 650 5th Avenue, and Bank Melli, and for the
computers of the Alavi Foundation.  The execution of the search
warrant resulted in the seizure of a massive amount of
documentation and computer files from the Alavi Foundation.

   B.   **The Government of Iran's Control Over Presidents and
        the Board of Directors of the Alavi Foundation**

        22.   In addition to the Alavi Foundation's dealings
with Bank Melli, in violation of the ITRs, the Investigation has
revealed that, since at least 1992, officials of the Government
of Iran, including Permanent Representatives to the IMUN, have
exercised direct control over the activities of the Alavi
Foundation, including its President and the Board.

        23.   In the course of the JTTF's investigation into the
Alavi Foundation, I have learned that EBRAHIMI is a member of the
foundation's Board of Directors (the "Board").  On or about April
30, 2008, December 17, 2008, January 20, 2009, and February 10,
2009, law enforcement agents with the JTTF interviewed EBRAHAMI.
I participated in the interviews that were conducted on December
17, 2008, January 20, 2009, and February 10, 2009, and I have
reviewed the report of the agents who conducted the April 30,
2008 interview.  Prior to each interview, the other interviewing
agents and I advised EBRAHIMI of our identities and the nature of

the interview, and that EBRAHIMI willingly agreed to speak. During these interviews, EBRAHIMI provided the following information, in sum, substance, and part:

### 1. Background on the Alavi Foundation and the Alavi_Foundation's Board of Directors

a. EBRAHIMI, who maintains dual citizenship in Iran and the United States, has been a member of the Board of the Alavi Foundation since approximately 1992. EBRAHIMI explained that he currently serves as the Board's Secretary and that his responsibilities include keeping minutes at meetings and assuring that all Board members engage in legal and transparent activities. As a Board member, EBRAHIMI has a vote on all issues affecting the Alavi Foundation and can propose new ideas to the Board.

b. EBRAHIMI explained that, over the time he served on the Board, the Alavi Foundation's mission has shifted from assisting individual students, primarily through academic scholarships, to aiding Islamic schools in need. According to EBRAHIMI, the President of the Alavi Foundation makes the final decision as to the allotment of money from the foundation.

### 2. Direction of the Activities of the Alavi Foundation by Permanent Representative to the Iranian Mission to the United Nations

a.   At his initial interview with the JTTF on April 30, 2008, EBRAHIMI insisted that the Alavi Foundation had no involvement with any Iranian officials and that the Alavi Foundation's Board is completely independent and makes its own decisions.  In subsequent interviews, however, EBRAHIMI acknowledged that the Government of Iran, both through officials of the Government of Iran and through Permanent Representatives to the IMUN, exercises direction and influence over the activities of the Alavi Foundation.

b.   EBRAHIMI reported that, prior to 2001, the Alavi Foundation held its Board meetings in Tehran, Iran, out of convenience to officials of the Government of Iran.  Mohammad Geramian (former Alavi Foundation President), Alavi Foundation Board members, and Government of Iran officials would attend these Board meetings.  In addition, when Kamal Kharazi served as Permanent Representative to the IMUN, Kharazi also would travel to Tehran to attend these Board meetings.  The Alavi Foundation ceased holding its Board meetings in Tehran once Iranian-based Board members were no longer active.

c.   In 1998, EBRAHIMI learned that 40% of 650 Fifth Avenue was owed by Assa Corp.  Once EBRAHIMI learned about this partnership, he urged the other Alavi Foundation Board

-16-

members that the Alavi Foundation needed to purchase the other
40% of 650 Fifth Avenue from Assa Corp. EBRAHIMI explained that,
at this time, he thought that Bank Melli may have been the true
owner of 650 Fifth Avenue. EBRAHIMI stated that control of Assa
Corp. has been linked to Bank Melli, Bank Sepah, and Bank
Sadarat, and that Bank Melli and Assa Corp. had representatives
who worked together. EBRAHIMI also said he thought that Assa
Corp. was "not right" from the first time he learned about the
corporation.

     d.   When EBRAHIMI joined the Board in or around
1992, Kharazi was the Permanent Representative to the IMUN.
According to EBRAHIMI, Kharazi attended most meetings of the
Alavi Foundation's Board, was an active participant in those
meetings, and influenced the decision-making process of the Alavi
Foundation's Board.

     e.   Nejad Hosseinian, the Permanent
Representative to the IMUN who followed Kharazi, came up with the
idea for the current recipient funding structure for the Alavi
Foundation. Pursuant to that formula, the recipient pays one-
third of the total amount, the Alavi Foundation funds the second
third via a grant, and the final third also comes from the Alavi

Foundation in the form of a no-interest loan.[4]

        f.   Former Alavi Foundation President Mohammad Hossein Mahalatti and three or four other individuals established a group called the Hanif Partnership. The Hanif Partnership wanted to purchase Assa Corp.'s shares of 650 Fifth Avenue. The Hanif Partnership ultimately sued the Alavi Foundation for Assa Corp.'s shares. Mahalatti threatened to publicly expose the Alavi Foundation's connection to the Government of Iran. Mohammad Javad Zarif, who at the time was the Permanent Representative to the IMUN, encouraged Alavi to enter into a $4 million settlement. According to EBRAHIMI, Zarif warned EBRAHIMI of serious consequences should the Alavi Foundation lose the Building. Zarif explained that his (Zarif's) life would be at risk, and that, on his next trip to Iran, EBRAHIMI may find that he would not be able to return to the United States. In light of this threat, EBRAHIMI decided to approve the settlement of the Hanif Partnership lawsuit.

        g.   When Geramian was removed as President of the Alavi Foundation, Geramian threatened to publicly expose the Alavi Foundation's relationship with the Government of Iran. In

---

[4]    Another member of Alavi Foundation's Board of Directors ("Board Member-1") confirmed that the Alavi Foundation funds recipients pursuant to this one-thirds formula.

-18-

response to Geramian's threat, the Board offered Geramian sham employment with the Alavi Foundation, which Geramian accepted and continues to hold.  The Alavi Foundation pays Geramian an annual salary of approximately $100,000, even though Geramian does not perform any actual work for the Alavi Foundation.  According to EBRAHIMI, the Alavi Foundation determined that paying Geramian this salary for the sham employment was the least costly and most convenient way to deal with Geramian.

h.   EBRAHIMI explained that when former Alavi Foundation President, Jahedi, was in a position to make a decision, he looked not only to members of the Board, but also to Mohammad Khazaee, the current Permanent Representative to the IMUN, for advice.  According to EBRAHIMI, Khazaee would meet regularly with Jahedi at the Islamic Institute of New York[5] to discuss issues relating to the Alavi Foundation.  EBRAHIMI stated that the Islamic Institute of New York, the Alavi Foundation, and the IMUN are all interconnected and interrelated entities. EBRAHIMI further noted that the Islamic Institution of New York would not survive without support from the Alavi Foundation.

i.   EBRAHIMI explained that Khazaee and Jahedi

---

[5]   The Islamic Institute of New York is located in Woodside, New York, and is comprised of the Imam Ali Mosque and the Razi School, which is a K-12 Islamic Education Center.

-19-

would meet at the Iman Ali Mosque, which is part of the Islamic Institute of New York, in a designated room that is used solely for Alavi Foundation meetings. During these meetings, Khazaee provided Jahedi with direction concerning the work of the Alavi Foundation. Upon completion of their meetings, Khazaee would depart the mosque, and Jahedi would meet with the Alavi Foundation's Board in the same room and relay Khazaee's instructions. EBRAHIMI reported that Khazaee had similar meetings with Geramian when Geramian served President of the Alavi Foundation.

j.    EBRAHIMI discussed one such meeting between Jahedi and Khazaee at the Iman Ali Mosque during Jahedi's tenure as President of the Alavi Foundation. On or about April 12, 2008, Alavi held an unofficial Board meeting at the Iman Ali Mosque. This meeting was preceded by a one-on-one meeting between Jahedi and Khazaee. EBRAHIMI stated that he could not recall any specific instructions that Jahedi relayed from Khazaee to the Alavi Foundation's Board.

k.    EBRAHIMI stated that, by virtue of the lack of established diplomatic relations between the United States and the Government of Iran, all Alavi Foundation Board members are "guilty" by association, and "guilty" due to their contact with

-20-

members of the IMUN.

24.    The information provided by EBRAHIMI regarding the control exercised by the Government of Iran over the Alavi Foundation, primarily through Permanent Representatives to the IMUN, has been corroborated by other individuals associated with the Alavi Foundation. As set forth below, this corroboration has come from another Board member of the Alavi Foundation, a former President of the Alavi Foundation, and preliminary results of a judicially-authorized search of the Alavi Foundation's offices.

25.    On or about December 17, 2008, federal agents with the FBI's JTTF interviewed Board Member-1, who as noted earlier, is a member of the Board of the Alavi Foundation. I was not present for the December 17, 2008 interview of Board Member-1, but I have spoken with the agents who conducted that interview. I have learned that, prior to commencing the interview, the agents identified themselves and explained the purpose of the interview. Board Member-1 then voluntarily agreed to participate in the interview and provided the following information, among other information, in sum and substance:

a.    Board Member-1 recalled Zarif, the former Permanent Representative to the IMUN, attending at least one meeting of the Board of the Alavi Foundation. According to Board

Member-1, Zarif always sought to provide guidance to the Board. The Board directed Zarif to provide his input through Geramian, who at the time was the President of the Alavi Foundation.

        b. During Alavi Foundation Board meetings, Geramian would tell the Board that things would happen a particular way because that was how Zarif wanted it.

        c. Like EBRAHIMI, Board Member-1 also discussed Zariff's involvement in the settlement of the lawsuit filed against the Alavi Foundation by the Hanif Partnership. During a Board meeting concerning possible settlement of the lawsuit filed by the Hanif Partnership, Geramian told the Board that Zarif said that the Alavi Foundation would settle the lawsuit by making a lump sum payment to Hanif Partners of $4,000,000. Geramanian told the Board that Zarif wanted the money to be paid and ultimately the Board voted unanimously to settle the lawsuit for $4,000,000.

        d. According to Board Member-1, Geramian was fired as the President of the Alavi Foundation under pressure from Zarif.

     26. On or about May 23, 2008, federal agents with the FBI's JTTF interviewed Geramian in a hotel room at the Hyatt Hotel in Grand Central Station, New York, New York. I was not

-22-

present for the May 23, 2008 interview of Geramian, but I have spoken with the agents who conducted the interview. I have learned that, prior to commencing the interview, the agents advised Geramian of their identities and explained the purpose of the interview. Geramian voluntarily agreed to speak with the agents and provided the following information, among other information, in sum and substance:

    a.    Geramian was appointed President of the Alavi Foundation in 1991 by Kharazi, who at the time was the Permanent Representative to the IMUN. According to Geramian, this appointment made it clear to him that the Alavi Foundation answered to the Government of Iran and, specifically, to the Permanent Representative the IMUN.

    b.    The level of control that the Government of Iran exercised over the Alavi Foundation has varied based upon which Permanent Representative to the IMUN was in position at the time. Kharazi had oversight over the Alavi Foundation, but preferred to keep his distance. Hosseinian, who succeeded Kharazi, attended every Alavi Foundation Board meeting and directly influenced matters before the Board. When Zarif followed Hosseinian, Geramian barred Zarif from attending the Board meeting. Zarif took being excluded from Board meetings

-23-

personally and complained about receiving different treatment
than Hosseinian.  Although Geramian did not compromise on barring
Zarif's attendance at Alavi Foundation Board meetings, Zarif
continued to exercise control by providing directions to Geramian
and Alavi Foundation Board members by more indirect means.

      c.   According to Geramian, the Alavi Foundation
was in partnership with Assa Corp., which was a front company for
Bank Melli, for the purpose of evading state and federal taxes.
According to Geramian, this scheme originated under the term of
former Alavi Foundation President, Mohammad Badr-Taleh, who
preceded Geramian.  Geramian advised that Mahallati, another
former President of the Alavi Foundation, was involved with the
scheme as well.  Geramian also stated that Hamid Firooznia, Alavi
Foundation's accountant, was fully aware of Bank Melli's
ownership of Assa Corp. and was intimately involved in every
aspect of the deal.

      d.   Geramian also discussed the Hanif Partnership
lawsuit against the Alavi Foundation, and Zarif's role in the
settlement of the lawsuit.  At some point in the late 1990s or
early 2000s, Mahallati approached the Alavi Foundation about
purchasing Assa Corp.'s shares of 650 5th Avenue Company.  The
Alavi Foundation wished to exercise its right of first refusal

-24-

and rebuffed Mahallati.  In 2003 or 2004, Mahallati, through his company, Hanif Partnership, approached Assa Corp. with an offer of $40 million for their shares in 650 5th Avenue Company, which according to Geramian, was only about half of the value of the shares.  The Alavi Foundation then decided to try to purchase the shares from Assa Corp. itself, and Geramian secured financing through Wachovia Bank.  At some point thereafter, Wachovia Bank received an anonymous email stating that 650 5th Avenue was owned by the Government of Iran and, as a result, Wachovia Bank backed out of financing the Alavi Foundation's purchase of Assa Corp.'s shares.  Although the Alavi Foundation could not go forward on the deal, they continued to negotiate with Assa Corp.  This interference led Mahallati to sue the Alavi Foundation for $40 million, which was what Mahallati believed was the profit he would have made on the deal.

   e. Geranian opposed making any payment to Mahallati and preferred to fight the lawsuit in court.  However, the Alavi Foundation agreed to negotiate with Mahallati.  Geramian had a several hour meeting with Mahallati and Firooznia (former accountant for the Alavi Foundation), which was directed by Zarif.  In the meeting, Mahallati threatened to reveal in open court what he knew about Assa Corp.'s true ownership.  During

this time, Geramian had a meeting at the Islamic Institute of New York with Mehdi Faridzadeh, who worked at the time was Iran's Cultural Permanent Representative and worked directly for Zarif. Faridzadeh told Geramian that, if the building at 650 Fifth Avenue was lost as a result of the Assa Corp. information becoming public, Geramian would be held responsible by the Government of Iran. Geramian stated that he understood this to mean that his life, and the lives of his family members in the United States and Iran, would be at risk. Following this conversation, Firooznia approached the Alavi Foundation with a settlement offer of $4,000,000, Assa Corporation agreed to pay 40% of this amount, and Geramian settled the lawsuit for $4,000,000.[6]

27. As noted above, on December 19, 2008, federal agents executed a search warrant of the Alavi Foundation's offices. A preliminary review of the materials recovered during

---

[6]     On or about July 8, 2008, approximately 1 ½ months after the interview discussed above, Geramian met again with agents of the JTTF.  I was not present for this interview on July 8, 2008, but I have spoken with the agents who conducted the interview.  I have learned that, on this occasion, Geramian's attorney was present, as was a federal prosecutor from the United States Attorney's Office for the Southern District of New York.  During the July 8, 2008 interview, Geramian denied making several statements that he previously made to the agents on May 23, 2008, particularly with respect to the Government of Iran's control over the Alavi Foundation and Firooznia's knowledge of Bank Melli's ownership of Assa Corporation.

the search has confirmed contact between the Alavi Foundation and the Permanent Representative to the IMUN. In particular, among the materials seized during the December 19, 2008 search were handwritten notes, written in Farsi apparently by Jahedi, summarizing a meeting between Jahedi and Khazaee concerning various topics relating to the Alavi Foundation, including allocation of the foundation's money, income for the Building, and the frequency of Board meetings. In addition, the search led to the recovery of a letter from December 2006, signed by Geramian, then-President of the Alavi Foundation, and addressed to the Board, appearing to reference specific objectives that the Government of Iran wanted funded by the Alavi Foundation.

C.   EBRAHIMI's Journals

28.   As indicated earlier, other agents assisting this investigation and myself have interviewed EBRAHIMI on three separate occasions about is membership on the Board of the Alavi Foundation and his memorializing notes of meetings in journals since approximately 1992. On or about December 17, 2008, EBRAHIMI was consensually interviewed at the OFFICE. During that meeting, EBRAHIMI explained that he kept detailed notes of his meetings and conversations as a member of the Board of the Alavi Foundation since approximately 1992. At that time, the agents

did not ask EBRAHIMI for the journals. At the next meeting, on or about January 20, 2009, law enforcement agents met again with EBRAHIMI at a hotel in Long Island, New York. This meeting was scheduled at a time convenient to EBRAHIMI, and EBRAHIMI met law enforcement agents at the hotel to speak with the agents. During this meeting, agents specifically requested that EBRAHIMI provide all of the journals he kept on the subject of his membership and meetings as a Board member of the Alavi Foundation. EBRAHIMI initially responded reluctantly, but eventually stated that he would provide all of his journals to law enforcement at the next scheduled meeting. That next meeting was scheduled to occur on or about February 10, 2009.

29. During the interview that another federal agent of the JTTF and I conducted of EBRAHIMI on February 10, 2009, EBRAHIMI again discussed his practice of maintaining daily journals of his personal and professional activities. As with the other interviews, prior to commencing this interview, we identified ourselves and the purpose of the meeting, and EBRAHIMI voluntarily agreed to speak with us. With regard to his journals, EBRAHIMI provided the following information, among other information:

a. EBRAHIMI maintains a set of historical

journals detailing his daily activities and schedule, in which he reports both his activities occurring at the workplace and during his personal time. EBRAHIMI keeps his current journal with him wherever he goes in order to add new details or to review his schedule. EBRAHIMI attaches a watch to the most recent day's page. The watch functions as a bookmark and as a timestamp for new entries.

b. EBRAHIMI explained that his journals contain details regarding all official and unofficial Alavi Foundation Board meetings. According to EBRAHIMI, these details include dates and times of the meetings, as well as all those who participated in the meeting.

c. EBRAHIMI showed law enforcement agents two journals at the February 10, 2009 meeting: (1) a journal that EBRAHIMI explained was a current journal; and (2) an older journal. At this time, law enforcement agents specifically asked EBRAHIMI if they could take the two journals into their possession, and EBRAHIMI declined to allow them to take possession of the journals.

D. Conclusion

29. In light of the foregoing, there is probable cause to believe that the Alavi Foundation has engaged in unlawful

transactions with Bank Melli and that the Alavi Foundation, its
Board, and its past Presidents unlawfully have provided services
to the Government of Iran by complying with directions of
officials of the Government of Iran and Permanent Representatives
to the IMUN, all in violation of IEPPA and the ITRs.  There also
is probable cause to believe that, given EBRAHIMI's service on
the Board of the Alavi Foundation since in or about 1992 and his
practice of maintaining notes in his journals memorializing his
professional activities, including Alavi Foundation Board
meetings, that EBRAHIMI's current and past journals contain
information concerning the services provided by the Alavi
Foundation to the Government of Iran and the Alavi Foundation's
financial dealings with Assa Corp., which, as discussed more
fully in the attached civil Complaint, is a front company for
Bank Melli.

### REQUEST TO SEARCH THE PREMISES

30.  Based on my experience and training, I know that
persons often maintain journals in which they report professional
activities.  Indeed, EBRAHIMI has advised agents of the JTTF that
he maintains a daily journal in which he reports details
regarding meetings of the Alavi Foundation Board.  Based on my
experience and training, I also know that persons who maintain

-30-

journals often keep not only their current journal, but also their historical journal, typically storing the historical journals in closed areas of their place of business or their residence. Indeed, with respect to EBRAHIMI's maintenance of historical journals, on one occasion when he met with the JTTF agents, EBRAHIMI brought both his current journal and one of his prior journals. Furthermore, on each occasion that JTTF agents interviewed EBRAHIMI, EBRAHIMI was in possession of his current journal. These journals are likely to reveal important aspects and details of crimes committed by Alavi Foundation, the foundation's Board, and other individuals, including with respect to the services provided by the Alavi Foundation to the Government of Iran and the Alavi Foundations's dealings with Assa Corp. These journals also likely will identify additional co-conspirators who have participated in these offenses.

31.   Based on my experience and training, I also know that individuals who possess records reflecting violations of federal law often destroy those records when they learn that they are the subject of a federal investigation. JTTF agents have asked EBRAHIMI to voluntarily turn over copies of his past journals, but to date he has failed to do so. As such, notwithstanding the limited cooperation of EBRAHIMI thus far in

the investigation, by voluntarily speaking with the FBI and providing incriminating evidence regarding the conduct of the Alavi Foundation, I believe that making another request for EBRAHIMI voluntarily to turn over his journals would entail unacceptable risks. Such a request for voluntarily turning over the records could result in the destruction and loss of essential evidence of violations of federal laws and regulations, including IEEPA, the ITRs, and the federal money laundering statutes.

32. Based upon all of the foregoing, I submit that there is probable cause to believe that the PREMISES will contain evidence of violations of IEEPA, Title 50, United States Code, Sections 1701 through 1706; the ITRs, Title 31, United States Code of Federal Regulations, Part 560; and the federal money laundering statutes, Title 18, United States Code, Sections 1956 and 1957. In order to minimize any intrusion into EBRAHIMI's school activities or home activities, or the activities of EBRAHIMI's family, friends, students, and associates, the Government intends to execute the requested warrant only in the event that EBRAHIMI declines to provide all of the journals to law enforcement agents with his consent. In the event a warrant is issued, law enforcement agents executing the warrant will first give EBRAHIMI (and any agents or persons assisting

-32-

EBRAHIMI) a reasonable opportunity at the time they approach him to provide the journals on consent.  Law enforcement agents will provide EBRAHIMI with convenient means to provide any and all of the journals in his care, custody, or control to law enforcement, at the time they approach him, whether the journals are located at the RESIDENCE, the OFFICE, or on his person or in another place.  Only if EBRAHIMI does not provide all of the journals described herein (covering from approximately 1992 to the present) on consent will law enforcement agents then execute the warrant.  Law enforcement agents will inform EBRAHIMI that they possess a search warrant that would permit search and seizure of the journals if they are not provided at the time they approach him for his consent.  Due to this fact, law enforcement agents will make a search warrant return regardless of how the journals are retrieved.

33.  It is also requested that this Affidavit (along with its attachments), as it reveals an ongoing investigation, be sealed in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

WHEREFORE, I respectfully request, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, that a warrant be

issued permitting authorized agents or officers to search for and seize items at the PREMISES listed in Attachment A.

_____
STEVE GONZALEZ
Special Agent
Federal Bureau of Investigation
Joint Terrorism Task Force

Sworn to before me this
__ll day of May, 2009.

_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

-34-

## Attachment A

Property to be seized at the PREMISES, which is the premises, known and described as, (1) ALI REZA EBRAHIMI's office at State University of New York, Old Westbury College, Old Westbury, New York 11568, and any closed areas and containers contained therein (the "OFFICE"; see Attachment B); and (2) EBRAHIMI's residence at the second floor apartment of 51 Jackson Avenue, Mineola, New York 11510, and any closed areas and containers contained therein (the "RESIDENCE"; see Attachment C): any and all journals covering the period of 1992 to the present.

N.B.: In order to minimize any intrusion into EBRAHIMI's school activities or home activities, or the activities of EBRAHIMI's family, friends, students, and associates, the Government intends to execute the requested warrant only in the event that EBRAHIMI declines to provide all of the journals to law enforcement agents with his consent. In the event a warrant is issued, law enforcement agents executing the warrant will first give EBRAHIMI (and any agents or persons assisting EBRAHIMI) a reasonable opportunity at the time they approach him to provide the journals on consent. At the time they approach him, law enforcement agents will provide EBRAHIMI with convenient means to provide any and all of the journals in his care, custody, or control to law enforcement, whether the journals are located at the RESIDENCE, the OFFICE, on his person or in another place. Only if EBRAHIMI does not provide all of the journals described herein (covering from approximately 1992 to the present) on consent will law enforcement agents then execute the warrant. Law enforcement agents will inform EBRAHIMI that they possess a search warrant that would permit search and seizure of the journals if they are not provided at the time they approach him for his consent. Due to this fact, law enforcement agents will make a search warrant return regardless of how the journals are retrieved.

i

## Attachment B

The OFFICE to be searched is described as a professor's office located at the State University of New York, Old Westbury College ("SUNY College at Old Westbury"), Old Westbury, New York 11568. The OFFICE is Room D-22 in Building D of the Academic Village, which is a student center for SUNY College at Old Westbury.  The main entrance for SUNY College at Old Westbury is on Route 107 in Old Westbury, New York 11568, and the Academic Village building is located toward the center of the campus. Building D of the Academic Village has a grey, concrete exterior and a high atrium.  The building is two-stories in the front, and extends to a third story toward the back of the building.  The OFFICE is located on the second floor of Building D of the Academic Village, in a foyer area, and is directly above a campus security office.  The OFFICE, which is marked on the outside of the door, D-22, is approximately 15 feet wide by about 10 to 12 feet deep, with a window overlooking a stairwell connecting the first and second floors of the student center.  Toward the center of the OFFICE is a desk, with several drawers, a computer, and a phone.  Also inside the OFFICE are file cabinets and open bookshelves, as well as a walk-in closet with a door toward the right of the entrance to the OFFICE.

ii

## Attachment C

The RESIDENCE to be searched is described as a two-bedroom apartment, located inside a two-family house at 51 Jackson Avenue, Mineola, New York 11510. The house is located on the corner of Jackson Avenue and Roosevelt Avenue, and has a two-car garage. The majority of the exterior of the house is light grey, with the exception of the first floor of the front of the house, which has a reddish exterior. The house also has a red chimney extending from the roof, and is surrounded by bushes. The RESIDENCE is the apartment located on the second floor of the house. There are two entrance doors to the house, located next to each other, and the door to the right opens to a staircase that leads to the second floor and the RESIDENCE.

iii

**EXHIBIT A**

08 CIV 10934

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
By:  SHARON COHEN LEVIN
     ANNA E. ARREOLA
     HARRY A. CHERNOFF
     ERIC SNYDER
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1060/2218/2481/2534

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA                      :

          -v.-                                :

ALL RIGHT, TITLE, AND INTEREST OF ASSA        :     08 Civ.
CORPORATION, ASSA COMPANY LIMITED, AND BANK
MELLI IRAN IN 650 FIFTH AVENUE COMPANY,       :
INCLUDING BUT NOT LIMITED TO THE REAL
PROPERTY AND APPURTENANCES LOCATED AT 650     :     VERIFIED
FIFTH AVENUE, NEW YORK, NEW YORK, WITH ALL          COMPLAINT
IMPROVEMENTS AND ATTACHMENTS THEREON,         :

ALL FUNDS FORMERLY ON DEPOSIT AT CITIBANK,    :
N.A., NEW YORK, NEW YORK, IN ACCOUNT NUMBER
78429712, IN THE NAME OF ASSA CORPORATION,    :
AND ALL FUNDS TRACEABLE THERETO,

                                              :
ALL FUNDS FORMERLY ON DEPOSIT AT CITIBANK,
N.A., NEW YORK, NEW YORK, IN ACCOUNT NUMBER   :
8881654552, IN THE NAME OF ASSA CORPORATION,
AND ALL FUNDS TRACEABLE THERETO,              :

ALL FUNDS FORMERLY ON DEPOSIT AT JPMORGAN     :
CHASE BANK, N.A., BATON ROUGE, LOUISIANA, IN
ACCOUNT NUMBER 2724409590, IN THE NAME OF     :
ASSA CORPORATION, AND ALL FUNDS TRACEABLE
THERETO, AND                                  :

ALL FUNDS FORMERLY ON DEPOSIT AT JPMORGAN     :
CHASE BANK, N.A., BATON ROUGE, LOUISIANA, IN
ACCOUNT NUMBER 725700280, IN THE NAME OF      :
ASSA CORPORATION, AND ALL FUNDS TRACEABLE
THERETO,                                      :

               Defendants in rem.             :

- - - - - - - - - - - - - - - - - - - - - -  x

Plaintiff United States of America, by its attorney, Lev L. Dassin, Acting United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## I. NATURE OF THE ACTION

1.     This is an action by the United States of America seeking forfeiture of the properties described below:

     a.    All right, title, and interest of Assa Corporation, Assa Company Limited, and Bank Melli Iran in 650 Fifth Avenue Company, including but not limited to the real property and appurtenances located at 650 Fifth Avenue, New York, New York, with all improvements and attachments thereon, and all property traceable thereto (the "Defendant Real Property");

     b.    All funds formerly on deposit in Account Number 78429712, at Citibank, N.A., New York, New York ("Defendant Account-1");

     c.    All funds formerly on deposit in Account Number 8881654552, at Citibank, N.A., New York, New York ("Defendant Account-2");

     d.    All funds formerly on deposit in Account Number 2724409590, at JPMorgan Chase Bank, N.A., Baton Rouge, Louisiana ("Defendant Account-3");

     e.    All funds formerly on deposit in Account Number 725700280, at JPMorgan Chase Bank, N.A., Baton Rouge, Louisiana ("Defendant Account-4").

(collectively, the "Defendant Properties").

2.     The Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq*. In addition, the Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C.

-2-

§ 981(a)(1)(A), as property involved in money laundering
transactions and attempted money laundering transactions, in
violation of 18 U.S.C. §§ 1956 and 1957, and as property traceable
to such property.

## II. JURISDICTION AND VENUE

3.   This Court has jurisdiction pursuant to 28 U.S.C.
§§ 1345 and 1355.

4.   Venue is proper pursuant to 28 U.S.C. § 1395(b)
because the Defendant Properties are located in the Southern
District of New York and pursuant to 28 U.S.C. § 1355(b)(1)(A)
because acts and omissions giving rise to the forfeiture took
place in the Southern District of New York.  The Defendant
Accounts are currently in the custody of the United States
Marshals Service for the Southern District of New York.

## III. PROBABLE CAUSE FOR FORFEITURE

### The International Emergency Economic Powers Act ("IEEPA") and the Iranian Transaction Regulations

5.   This civil forfeiture action relates to violations
of regulations issued pursuant to IEEPA, codified at 50 U.S.C.
§ 1701 et seq.  This law, which was enacted in 1977, authorizes
the President of the United States to regulate financial
transactions with foreign countries and foreign nationals in
order to deal with threats with respect to which a national
emergency has been declared, and prescribes criminal penalties
for violations of the statute and the regulations promulgated
thereto.

6.   Using the powers conferred by IEEPA, the President

-3-

and the Executive Branch declared a national emergency and issued orders and regulations prohibiting certain transactions with Iran and the Government of Iran by United States persons or involving the export of goods or services from the United States.  Section 1705 of Title 50, United States Code, provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

7.    In 1995, in order to implement a series of executive orders issued pursuant to IEEPA, the Department of Treasury promulgated the Iranian Transaction Regulations ("ITRs"), Title 31, United States Code of Federal Regulations, Part 560.  The relevant provisions of the ITRs generally prohibit (1) the exportation, sale or supply, directly or indirectly, by a United States person or from the United States, of any goods, technology, or services to Iran or the Government of Iran, and (2) the engagement by United States persons in any transaction or dealing, in or related to goods, technology or services, for exportation to Iran or the Government of Iran, without having first obtained a valid license from the United States Department of Treasury, Office of Foreign Assets Control ("OFAC").

8.    The ITRs impose the following prohibitions, among others:

> 31 C.F.R. § 560.204 - Prohibited exportation, reexportation, sale or supply of goods, technology, or services to Iran.
>
> Except as otherwise authorized pursuant to this part,

-4-

including § 560.511, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation . . . sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . . .

31 C.F.R. § 560.203 - Evasions; attempts.

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

9.    Courts have recognized that the term "services," as used in the ITRs, includes the performance of something useful for a fee, such as conducting money transfers from the United States to Iran on behalf of others.

10.    Pursuant to 31 C.F.R. § 560.304, the term "Government of Iran" includes: "(a) The state and the Government of Iran . . . (b) [a]ny entity owned or controlled directly or indirectly by the foregoing; (c) [a]ny person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the applicable effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing; and (d) [a]ny person or entity designated by the Secretary of the Treasury as included within paragraphs (a) through (c) of this section."

-5-

11.   The term "entity owned or controlled by the Government of Iran" is defined at 31 C.F.R. § 560.313, and "includes any corporation, partnership, association, or other entity in which the Government of Iran owns a majority or controlling interest, and any entity which is otherwise controlled by that government."

12.   Bank Melli Iran ("Bank Melli") is wholly owned and controlled by the Government of Iran.   In addition, in 1999, OFAC identified Bank Melli in Iran, and all of its offices worldwide, as entities "owned or controlled by the Government of Iran."   31 C.F.R. Part 560, App. A.

13.   The ITRs further impose the following prohibitions:

> 31 C.F.R. § 560.206 - Prohibited trade-related transactions with Iran; goods, technology, or services.
>
> (a) Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, no United States person, wherever located, may engage in any transaction or dealing in or related to . . .
>
> (2) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran.
>
> (b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

14.   Pursuant to 31 C.F.R. § 560.314, the term "United States person" means "any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United

-6-

States."

## Overview

15.   This civil forfeiture action concerns the
ownership of a 36-story office building located at 650 Fifth
Avenue, New York, New York (the "Building").

16.   As explained below, the Building is owned by 650
Fifth Avenue Company (the "Fifth Avenue Company), which is a
partnership between the Alavi Foundation of New York and Bank
Melli.  Bank Melli owns 40% of the Fifth Avenue Company through
two shell companies, Assa Corporation ("Assa Corp."), which is a
a New York corporate entity, and Assa Company Limited ("Assa Co.
Ltd."), which is a corporation domiciled in Jersey, Channel
Islands, United Kingdom.  Assa Corp. is wholly owned by Assa Co.
Ltd.

17.   As set forth below, Assa Corp. has been providing
numerous services to Bank Melli in contravention of the ITRs,
including transferring rental income generated from the Fifth
Avenue Company to Bank Melli, following Bank Melli's instructions
with regard Assa Corp.'s affairs, reporting back to Bank Melli on
Assa Corp.'s financial situation and business dealings, and
managing the affairs of Assa Corp. for the benefit of Bank Melli.

### The Formation of 650 Fifth Avenue Company and
### Bank Melli's Straw Companies, Assa Corp. and Assa Co. Ltd.

18.   The Building was constructed in the 1970's by the
Pahlavi Foundation, a non-profit organization operated by the
Shah of Iran to pursue Iran's charitable interests in the United
States.   In the 1970's, Bank Melli loaned the Pahlavi Foundation

approximately $42 million to be used for the construction and acquisition of the Building.

19.   Following the Iranian revolution of 1979, the Pahlavi Foundation was renamed the Mostazafan Foundation of New York (the "Mostazafan Foundation"), and later renamed the Alavi Foundation of New York (the "Alavi Foundation").  The Alavi Foundation is presently a not-for-profit corporation organized under the laws of New York.  A substantial portion of the Alavi Foundation's funds come from the significant rent roll of the Building.

20.   In 1989, the Mostazafan Foundation entered into a partnership with Bank Melli in order to avoid paying taxes on rental income from the Building.  Under the debt-financed property rules of the federal tax code, the Foundation's rental income was unrelated business income and therefore subject to tax.

21.   In order to remove the debt and avoid paying taxes on income from the Building, the Mostazafan Foundation formed the 650 Fifth Avenue Company (the "Fifth Avenue Company"), a partnership with Bank Melli.  However, Bank Melli disguised its ownership interest by establishing two shell companies, Assa Corp. and Assa Co. Ltd.  Mohammad Behdadfar ("Behdadfar"), a Bank Melli board member, was appointed the President of Assa Corp., and a director of Assa Co. Ltd.

22.   The Mostazafan Foundation and Assa Corp. entered into a written Partnership Agreement on or about July 31, 1989. The Partnership Agreement provided, in part, that the partnership

-8-

would be called 650 Fifth Avenue Company, that the Foundation would contribute the Building to the Partnership, and that Assa Corp. would contribute $44.8 million to the capital of the partnership. As a result of this partnership, the debt on the Building was removed, permitting the Alavi Foundation to avoid paying U.S. taxes on revenue from the Building.

23.   Today, the two straw owners of Assa Co. Ltd. are Davood Shakeri ("Shakeri") and Fatemeh Aghamiri ("Aghamiri"), who are residents of Iran and represent the interests of Bank Melli. Financial statements for Assa Co. Ltd. state that Shakeri and Aghamiri each own 50% share capital of the company.

24.   Since at least 1990, Assa Corp. has repeatedly transferred rental income from the Fifth Avenue Company to Bank Melli through Assa Co. Ltd. Assa Corp. has also regularly followed Bank Melli's instructions with regard to Assa Corp.'s business affairs and its management of the investment, and has regularly reported back to Bank Melli on its financial situation.

25.   Assa Corp. and Assa  Co. Ltd. have never received a license from OFAC. Bank Melli has never received a license from OFAC relating to the Building.

### Tafti's Employment by Assa Corp.

26.   In the United States, Assa Corp. has a single employee working for it, Mohammad Hassan Dehghani Tafti ("Tafti"). Tafti is a naturalized Iranian citizen, born in India.

27.   Tafti first came to the United States in or about 1999 with an L-1 visa, which was issued on the basis of a

-9-

petition made on his behalf by his employer, Assa Corp.  An L-1 visa is a visa issued to managers or executives of companies doing business in the United States.  Assa Corp. submitted a petition in or about May 1999 in support of Tafti's application for the L-1 visa.  The petition described Tafti's "proposed duties in the U.S." as "Treasurer, oversee financial operations and investments."  The L-1 visa was initially granted to Tafti in or about July 1999 for three months, and was subsequently renewed upon further applications in or about September 2000, March 2001, August 2001, and December 2001.

28.  In or about November 2002, Tafti applied for an H-1B visa at the United States Embassy in Ankara, Turkey.  An H-1B visa is a visa issued to employees with specialized knowledge. In the application, Tafti identified his present employer as "Assa Corp., 500 Fifth Avenue, NY, NY," and his present occupation as "financial executive."  However, Tafti stated that he intended to work in the United States at Optima Mortgage Company in Santa Ana, California.  Shortly after submitting his application for an H-1B visa, Tafti submitted another application.  In this subsequent application, Tafti again stated that he intended to work for Optima Mortgage.  The H1-B visa was issued in January 2003, after which Tafti again entered the United States.

29.  While living in the United States with his H-1B visa, Tafti in fact continued to work for Assa Corp., pretending to work for Optima Mortgage Corporation ("Optima Mortgage") only for immigration purposes.  To create the image that he worked for

-10-

Optima Mortgage, Tafti moved money from Assa Corp. to Optima Mortgage to cover his payroll from Optima Mortgage. In order to do this, Tafti transferred monies from Assa Corp. to his personal bank account, and from his personal bank account to Optima Mortgage. On approximately 23 occasions from in or about May 2003 through in or about September 2005, checks and wire transfers in the approximate amount of $3,800 each were made from Tafti's personal bank account to the president of Optima Mortgage, or his wife, also an employee of Optima Mortgage. Close in time to each of these checks and wire transfers, Tafti was paid approximately $2,800 by Optima Mortgage. These transactions appeared to be designed to return to Tafti the $3,800 payments, minus requisite payroll taxes. Additionally, on or about July 27, 2006, Assa Corp. paid Optima Mortgage the sum of $22,500.

30.   On or about December 31, 2006, Tafti left the United States for Turkey. In or about May 2007, Tafti applied for an H-1B visa at the United States Embassy in Dubai, United Arab Emirates. In this application, Tafti stated that he was employed as a "market analyst manager" for Optima Mortgage in Tustin, California, but that he would be living in Tuckahoe, New York. Initially, no action was taken on the application. In February 2008, Tafti reactivated this application and an H-1B visa was subsequently granted. In May 2008, Tafti returned to New York from Dubai.

Bank Melli's Control of Assa Corp. through Tafti

31.   Tafti used the email account ▓▓▓▓▓▓▓▓▓▓

-11-

to conduct business on behalf of Assa Corp. Emails sent to and
from this account show that Tafti regularly provided reports to
Bank Melli about Assa Corp.'s business dealings, and then
followed Bank Melli's instructions with regard to Assa Corp.'s
business affairs. The following emails, which have been
translated from Farsi, were among the emails sent to or from the
account:

        a.    On or about June 12, 2003, Tafti sent an email to
the email address ████████████████████. In this
email, Tafti forwarded to Ahmad Azizi ("Azizi")
correspondence from a New York attorney for Assa Corp.
Upon information and belief, Azizi is an official at
Bank Melli in London, England.

        b.    On or about June 19, 2003, Tafti received an email
from the email address ████████████████████. In
this message, the sender wrote, in part, "I have had
the letter of Intent and the Contract for Sale
reviewed." The sender of the email identified himself
as "A. Azizi." Upon information and belief, Azizi sent
this message using the email account of Maria
Chowdhury, a Bank Melli employee in London. Upon
information and belief, this email was referring to a
proposed deal, which ultimately collapsed, to sell Assa
Corp.'s interest in the Fifth Avenue Company.

        c.    On or about November 20, 2004, Tafti received an
email from the email address ████████████████████ In
this message, the sender wrote, "You are kindly
requested [to] . . . send the monthly expenses of Assa
Corp from April 2004 onward, to please make some
arrangement so that the detailed expenses of this Co.
are available for the use of the auditors." Upon
information and belief, this email was sent by Ali
Safari, an employee in Bank Melli's Overseas Network
Supervisory Department, known as "ONSD," which is
located in Tehran, Iran.

        d.    On or about December 3, 2004, Tafti received an
email from the email address ████████████████████
containing a list of Assa Corp. expenses.

        e.    On or about February 5, 2005, Tafti sent an email
to the email address ████████████████████ and
wrote, "Dear brother Mr. Ghadimipour: As you are aware
approximately two months ago two sets of minutes

-12-

regarding the ending of the court file and extension of
the loan were sent for the signature of the
shareholders, Mrs. Aghamiri and Mr. Shakeri.
Regretfully, it has not been received yet.  Because the
matter is important, and the lawyer and the secretary
of the Company . . . are anxious, please issue proper
order because any delay will cause doubt and
sensitivity here and God forbid will cause irrevocable
loss. Once more asking an urgent action."  Upon
information and belief, "Mr. Ghadimipour" is Mohsen
Ghadimipour, the current head of ONSD.

f.    On or about March 5, 2005, Tafti sent an email to
▉▉▉▉▉▉▉▉▉▉▉▉.  In this email, Tafti wrote, "To
shareholders of Assa Co.: With reference to the message
of 2/28/05, this is to inform you that the financial
statements of both Assa Ltd. Co. and Assa Corp. New
York, were sent to you in the last week via London."
Upon information and belief, this email address belongs
to ONSD.

g.    On or about March 16, 2005, Tafti sent another
email to ▉▉▉▉▉▉▉▉▉▉▉.  In this email, Tafti
wrote, "To the shareholders of Assa Corp.:  With
reference to today's email, this is to inform you that
the financial statements of Assa Corp up to 3/31/04
were sent to your office addressed to Mr. Ghadimipour."

h.    On June 19, 2005, after Citibank in New York, New
York, had refused to wire $1.3 million from an Assa
Corp. bank account to Assa Ltd., Tafti sent an email
from the email address ▉▉▉▉▉▉▉▉▉▉ to the
"shareholders of Assa Co. Ltd."  In this email, Tafti
wrote, "With reference to the email #M-KH of 6/16/2005
this is to inform you that the Company [Assa Corp.] has
made an extended action to remit the monies to banks
outside of the U.S.  In this regard, many meetings were
held with Citibank.  Tomorrow I have a meeting with the
bank because they invited all of the directors of Assa
New York to participate.  The only problem is the
absence of Mr. Shakeri.  I thought I might tell them
that Mr. Shakeri is on a trip or resigned from
directorship, and that [a New York attorney for Assa
Corp.] and I are the directors of Assa in New York now;
however, I will consult with [the New York attorney]
because he will participate in the meeting as the
director and secretary of the Co.  Hoping God will
help.  As you are aware, Citibank has not transferred
the sum of $1,360,800 to the account of Assa Ltd. to
London auditors.  I spoke many times with the bank and
presented evidence such as payment of the tax, and hope
with activity can solve the problem.  I will make a
report to you of the result of tomorrow's session.

Also I believe after solving the above issue, that we should send smaller amounts in the form of monthly, maximum in 3 months payments, to London, so that the amounts would not appear big.  Meanwhile I will try to open an account in another bank, unfortunately owing to special problems here, because the bank wants to know all the directors.  However, the interests of the shareholders will be preserved in the best way.  Thanks. Assa Corp. Tafti." By this email, Tafti acknowledged the apparently fictional nature of Shakeri's ownership of Assa Corp. through Assa Co. Ltd., and that Shakeri was apparently unwilling or unable to travel to the United States to attend to his substantial financial concerns here.

i.    On or about July 2, 2005, Tafti sent an email to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  In this email, Tafti wrote, "Mr. Ghadimipour, the director of the branches of Bank Melli, outside of Iran.  As you are aware, the issue of the place of residence of shareholders and the director of the Company in the USA has a special importance.  At present, shareholders are forbidden from having residences in Iran, and as per the view of the legal experts, the American government may freeze the capital of the shareholders.  At the present time, owing to prevention of our Iranian companies, the issues are more sensitive.  Fortunately, Assa Corp. has not had a problem, except for the weakness of residence location of the shareholder which should be removed.  Therefore, please make some arrangement that the residence location of the shareholders of Assa, Mr. Davood Shakeri and Mrs. Aghamiri be changed to another country, and considering my knowledge of the United Arab Emirates, one of the Emirates is proposed.  Please order appropriately."

j.    On or about July 6, 2005, Tafti sent another email to the email address ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  In this email, Tafti wrote, "To Mr. Ghadimipour, the director of the branches outside of the country.  With reference to the email and phone conversations of 4/7/2005, this is to inform you the result of my discussions and investigations with the consultants and the lawyers in America and London: changing the shareholder of Assa Ltd. is possible, but the shareholder should reside in a tax free country.  Otherwise, the country of residence will collect a tax from the income of the shareholder."  By this communication proposing to "chang[e]" the shareholders, Tafti acknowledged the fictional nature of ownership of Assa Co. Ltd. by Shakeri and Aghamiri.

k.    On August 9, 2005, Tafti received an email from

-14-

the email address ████████████████  In this email, the sender wrote, "With reference to the email of 7/7/2005, regarding the location of residence of the shareholders, this is to inform you that, as per the orders of the Bank Manager, until the appointment of the qualified individuals, act as before."

l.    On or about February 26, 2006, Tafti sent an email to the email address ████████████████.  Tafti wrote, in part, "To the Shareholders of Assa Co.:  With reference to the today's e-mail this is to inform you that the financial statements of Assa Corp. of New York today were sent to you via London.  Please note that the reason of the delay was the preparing the financial statements of Sherkate Tazamoni (General Partnership Co.) of Alavi Foundation Co. Ltd., which is to be regretted."

m.    On or about May 17, 2006, Tafti sent an email to the email address ████████████████.  Therein, he wrote: "Following the email of 4/29/06, this is to inform you that the financial statements of Assa Co. Ltd. up to 3/31/05 after auditing . . . have been dispatched to you via London."

## The Defendant Accounts

32.    Defendant Accounts-1, -2, -3, and -4 (collectively, the "Defendant Accounts") are held in the name of Assa Corp.  Tafti is the only signatory on the Accounts.

33.    Between January 7, 2000 and December 5, 2007, approximately $17,083,000 from the Fifth Avenue Company was deposited into Account-1.  The bank records for Account-1 also show the following financial activities, among others:

a.    On or about December 3, 2007, Tafti wrote a check for $10,500, from Account-1, to pay the rent for the house in which he lived.

b.    On or about December 5, 2007, Account-1 received a wire transfer of $200,000 from the Fifth Avenue Company.

c.    On or about April 2, 2008, Tafti wrote a check for $40,000 to New York State Corporation Tax from Account-1.

-15-

d.   On or about April 2, 2008, Tafti wrote a check for
$1,240 to New York State Corporation Tax from
Account-1.

e.   On or about April 2, 2008, Tafti wrote a check for
$202 to New York State Corporation Tax from Account-1.

f.   On or about April 3, 2008, Tafti wrote a check for
$37,500 to the New York City Department of Finance from
Account-1.

34.   Approximately $1.09 million was transferred from
Account-1 to Account-3 in November 2006.  In addition, Tafti
transferred substantial amounts from Account-1 to Assa Co. Ltd.

35.   In or about October 2008, agents of the Federal
Bureau of Investigation ("FBI") executed federal seizure warrants
for the funds in the Defendant Accounts.  Approximately $1.9
million was seized from Citibank, and approximately $1.2 was
seized from JPMorgan.

IV. **CLAIMS FOR FORFEITURE**

**STATUTORY BASES FOR FORFEITURE**

36.   The statutory provisions pursuant to which the
Defendant Properties are subject to seizure and forfeiture are as
follows.

**Proceeds Traceable to Violations of IEEPA**

37.   Title 18, United States Code, Section 981(a)(1)(C)
subjects to forfeiture "[a]ny property, real or personal, which
constitutes or is derived from proceeds traceable to a violation
of . . . any offense constituting 'specified unlawful activity'
(as defined in section 1956(c)(7) of this title), or a conspiracy
to commit such offense."

38.   Under Section 1956(c)(7), the term "specified

-16-

unlawful activity" includes, among other things, violations of
"section 206 (relating to penalties) of the International
Emergency Economic Powers Act [50 U.S.C. § 1705]." Section 1705
provides, in part, that "[i]t shall be unlawful for a person to
violate, attempt to violate, conspire to violate, or cause a
violation of any license, order, regulation, or prohibition
issued under this title." 50 U.S.C. § 1705(a).

39.   Because the Defendant Properties constitute or
were derived from proceeds traceable to violations of regulations
promulgated under IEEPA (namely, 31 C.F.R. §§ 560.203, 560.204,
and 560.206), the Defendant Properties are subject to forfeiture
pursuant to 18 U.S.C. § 981(a)(1)(C).

## Property Involved in Laundering Proceeds of IEEPA Violations

40.   Title 18, United States Code, Section 981(a)(1)(A)
subjects to forfeiture "[a]ny property, real or personal,
involved in a transaction or attempted transaction in violation
of . . . section 1956 or 1957 of this title [relating to money
laundering], or any property traceable to such property."

41.   Title 18, United States Code, Section 1956(a)
provides criminal penalties for:

> (a)(1) [w]hoever knowing that the property
> involved in a financial transaction
> represents the proceeds of some form of
> unlawful activity, conducts or attempts to
> conduct a financial transaction which in fact
> involves the proceeds of specified unlawful
> activity –
>
> (A)(i) with the intent to promote the carrying on of
> specified unlawful activity; or

(B) knowing that the transaction is designed
in whole or in part --

(i) to conceal or disguise the nature, the location,
the source of ownership, or the control of the proceeds
of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under
State or Federal law . . . .

(2) Whoever transports, transmits, or transfers, or
attempts to transport, transmit, or transfer a monetary
instrument or funds from a place in the United States
to or through a place outside the United States or to a
place in the United States from or through a place
outside the United States--

(A) with the intent to promote the carrying on of
specified unlawful activity; or

(B) knowing that the monetary instrument or funds
involved in the transportation represent the proceeds
of some form of unlawful activity and knowing that such
transportation, transmission, or transfer is designed
in whole or in part--

(i) to conceal or disguise the nature, the location,
the source, the ownership, or the control of the
proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under
State or Federal law.

42.   In addition, Section 1956(h) provides, in part,

that "[a]ny person who conspires to commit any offense defined in

this section or section 1957 shall be subject to the same

penalties as those prescribed for the offense the commission of

which was the object of the conspiracy."

43.   18 U.S.C. § 1957 provides in relevant part that:

Whoever . . . knowingly engages or attempts
to engage in a monetary transaction in
criminally derived property of a value
greater than $10,000 and is derived from
specified unlawful activity, shall be
punished as provided in subsection (b).

44.   "Monetary transactions" is defined in 18 U.S.C.

-18-

§ 1957(f)(1) as the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce of funds . . . by, through, or to a financial institution . . . including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . . ."

45.    "Criminally derived property" is defined in 18 U.S.C. § 1957(f)(2) as "any property constituting, or derived from, proceeds obtained from a criminal offense."

46.    "Specified unlawful activity" is defined in 18 U.S.C. § 1957(f)(3) as having the same meaning as that term has in 18 U.S.C. § 1956. As noted above, the term "specified unlawful activity," as defined in Section 1956, includes violations of IEEPA.

47.    In addition, the term "financial transaction" is defined in 18 U.S.C. § 1956(c)(4), and includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . ."

48.    Because the Defendant Properties constitute properties involved in transactions or attempted transactions in violation of Sections 1956 and 1957, they are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Properties and that all persons having an interest in the Defendant Properties be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Properties to the United States of America for disposition according to law and that this Court grant plaintiff such further relief as this Court may deem just and proper together with the costs and disbursements in this action.

Dated:   New York, New York
         December 17, 2008

LEV L. DASSIN
Acting United States Attorney for
Plaintiff United States of America

By: _____
SHARON COHEN LEVIN
ANNA E. ARREOLA
HARRY A. CHERNOFF
ERIC SNYDER
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1060/2218/2481/2534

VERIFICATION

STATE OF NEW YORK        )
COUNTY OF NEW YORK       :
SOUTHERN DISTRICT OF NEW YORK )

GEORGE J. ENNIS, JR. being duly sworn, deposes and says

that he is a Special Agent with the Federal Bureau of

Investigation ("FBI"); that he has read the foregoing complaint

and knows the contents thereof, and that the same is true to the

best of his knowledge, information and belief.

The sources of deponent's information and the grounds

of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement

officers and others.

GEORGE J. ENNIS, JR.
Special Agent
Federal Bureau of Investigation

Sworn to before me this
17th day of December 2008

Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires May 8, 2010

Exhibit C

1              (Government's Exhibit FBI 302 received in evidence)

2    BY MR. BELL:

3    Q.  In that case, Mr. Ennis, what I will ask you to do is I

4    will ask you to turn to page 2 of the document before you.  I

5    ask you to read the first two paragraphs.

6    A.  Start with "The board" or "Under?"

7    Q.  Starting with "Under," thank you.

8    A.  Under the terms of the partnership, AFNY -- that's Alavi

9    Foundation of New York.  It's abbreviated AFNY in the document.

10             So AFNY had first right of refusal to buy out Assa.

11   Subsequently, Geramian told the board that AFNY could not get a

12   loan.  Then Geramian told the board that Hanif Partnership had

13   a contract with Assa to buy Assa's share of the building.  The

14   board was unaware of the contract.

15             AFNY went to court to stop the sale.  Ahmadi was

16   against paying Hanif to settle the dispute.  Initially Hanif

17   wanted between 7 and 8 million dollars to settle the problem.

18   Hamid Firooznia was involved in the settlement negotiations.

19   Q.  Now what, if anything, did Mr. Ahmadi tell you about

20   interactions that he had with an individual named --

21             MR. RUZUMNA:  Your Honor, rather than going through

22   this, if we're going to admit this, let's admit the next three

23   paragraphs so the full story is in.

24             THE COURT:  I will let Mr. Bell proceed with his

25   examination and you can do it on cross if you would like.

1          Mr. Bell, go ahead, pose a new question.

2          MR. BELL:  I will take Mr. Ruzumna's suggestion.

3   Q.  Could you go ahead and read the next three paragraphs, sir?

4   A.  Once the foundation's name was changed from Mostazafan to

5   Alavi it became independent of the government of Iran.

6   Initially Mostazafan may have been influenced by the government

7   of Iran.  Indirectly there was pressure from Zarif, Z-A-R-I-F.

8   Ahmadi does not control the board as he has only one vote.

9   Ahmadi met with Zarif at at least one of the board meetings.

10  The board told Zarif that if Zarif wanted to give input, Zarif

11  should do it through Geramian.  Zarif always wanted to give

12  guidance.

13         During the board meetings, Geramian would come in and

14  say this is the way Zarif wants it.  Ahmadi could not exchange

15  the decision of the board because he only had one vote.

16         During the board meeting wherein they were discussing

17  the settlement, Geramian came in and said that Zarif said that

18  AFNY would settle by making a lump sum payment to Hanif of $4

19  million.  Geramian said that Zarif wants the money to be paid.

20  Ahmadi told Geramian to let the issue go to the board.  The

21  board members present for the vote were Mirakhor,

22  M-I-R-A-K-H-O-R, Afshar, A-F-S-H-A-R, Ahmadi and Geramian.

23         Ahmadi was against the pay out plan, but went with the

24  "suggestion of the crowd," meaning an informal poll before the

25  vote.  As the vote had to be unanimous, all members voted in

1   favor of the plan.  Additionally, Geramian went to settle with

2   Hanif based on John Winter's advice.  AFNY paid Hanif $4

3   million to settle.

4   Q.  Now there's reference made in the paragraphs that you just

5   read to an individual named Zarif.  Do you know who Zarif is?

6   A.  Yes, he was the Iranian Ambassador to the United Nations at

7   the time.

8   Q.  What, if anything, did Mr. Ahmadi tell you about the

9   circumstances under which Geramian's connection to the Alavi

10  Foundation terminated?

11  A.  I don't remember specifically, but he basically wasn't

12  doing what he was told.  He was not executing the wishes or

13  desires of the ambassador.

14  Q.  Now yesterday you described handling a number of documents

15  that were taken from a house in Queens owned by Bank Melli.

16  A.  Yes.

17  Q.  Did you also, in your capacity as case agent, review

18  documents that had been maintained at the Alavi Foundation's

19  offices?

20  A.  Yes.

21          MR. BELL:  Your Honor, at this point I would like to

22  return to Government Exhibit 82, a stipulation from yesterday

23  that we published a portion of.

24          THE COURT:  All right.

25          MR. BELL:  And I would like to begin at paragraph one.

1  This is on the third page.  It's the stamp number at the bottom

2  ends with 75.

3        Can I ask you to read that sentence from your 302?

4  A.  Geramian was fired under pressure from Zarif.  Ahmadi was

5  against Geramian's policies.

6  Q.  Did you, as part of your investigation, Special Agent

7  Ennis, have occasion to interview an individual named Mohammad

8  Deghani Tafti?

9  A.  Yes.

10  Q.  Who was Mohammad Deghani Tafti?

11  A.  Tafti was the New York representative and sole employee of

12  Assa Corp.

13  Q.  And approximately when did you have occasion to interview

14  him?

15  A.  Some time in 2009, I believe.

16  Q.  What were the circumstances under which you interviewed

17  him?

18  A.  It was a proffer agreement at the U.S. Attorney's Office.

19  Q.  What was it that actually brought Mr. Tafti to your

20  physical location?

21  A.  I'm trying to remember now.  We asked to interview him.  He

22  declined.  He was in Dubai at the time, having departed the

23  country after the DA's office interviewed him a couple of years

24  before, so we ended up with I believe a material witness

25  warrant at some point, and he flew here under either subpoena

1    A.  That it was owned by Bank Melli Iran.

2    Q.  With respect to control.

3    A.  Control, thoroughly and completely by Bank Melli Iran.

4    Q.  What, if anything, did Mr. Tafti say with respect to who

5    owns and controls the Alavi Foundation of New York?

6    A.  The government of Iran.

7    Q.  Did he provide any details as to who or what entity within

8    the government of Iran controlled the foundation?

9    A.  Yes.

10   Q.  And what did he offer?

11   A.  Bonyad Mostazafan.

12   Q.  Did Mr. Tafti discuss his own relationship with Bank Melli?

13   A.  Yes.

14   Q.  What is Mr. Tafti's relationship with Bank Melli?

15   A.  He was essentially hired for the position at Assa by

16   whoever was the then head of Bank Melli at some point in late

17   '96.  I'm sorry.  Mid to late '90s.  And the head of the bank

18   at the time basically hired him to be the Assa Corp. treasurer,

19   is what they called it, but he was really the only employee.

20   Q.  Who was the head of the bank official who hired him?  Did

21   Mr. Tafti say?

22   A.  He did.

23   Q.  Do you happen to recall off the top of your head?

24   A.  There were several Bank Melli heads through the his time

25   with Assa.  The first one I think was Islami was the first one.

1    So I believe it was Islami.

2    Q.  Do you remember Mr. Islami's first name?

3    A.  No.

4    Q.  Do you need to be refreshed on that?

5    A.  Yes.

6    Q.  Why don't we take a moment to refresh your recollection on

7    that.  And I am also going to ask you what that individual's

8    title was.  Is your recollection refreshed?

9    A.  Yes.

10   Q.  Who was it who hired Tafti?

11   A.  Bank Melli Iran managing director, Amir Aslani.

12   Q.  According to the interview with Tafti, what instruction, if

13   any, did Islami give to Tafti concerning Assa Corporation?

14   A.  Make sure that he keeps the relationship, ownership, and

15   control of Assa by Bank Melli Iran from the U.S. authorities,

16   make sure that is kept confidential and concealed.

17   Q.  What, if anything, did Mr. Tafti tell you about how he went

18   about communicating with officials in Bank Melli Iran?

19   A.  He would generally e-mail for the most part certain

20   officials at Bank Melli Iran and in the Bank Melli office in

21   London.

22   Q.  How did Tafti characterize his relationship with Alavi

23   Foundation officials in New York?

24   A.  He characterized it in that it wasn't very -- all that

25   good.

1    Q.  Could you walk us through what terms are familiar and what

2    significance do they have to you, based on your participation

3    in the investigation?

4    A.  Based on my participation with reviewing documents and

5    speaking to others, and reviewing these journals, there were a

6    number of references and instances of discussions relating to

7    legal problems with Assa Company.

8              MR. FISHBEIN:  Objection.  Foundation.

9              THE COURT:  It's the type of foundation which is the

10   objection?

11             MR. FISHBEIN:  Say it again.

12             THE COURT:  Overruled.  You can answer.

13   Q.  Please continue.

14   A.  The legal problems relating with Assa Company.  And

15   possible losses of going to court, there was references and

16   discussions of around this time the Alavi Foundation was going

17   into court to try to stop a transaction relating to someone

18   buying Assa shares from Assa called Hanif Partners.

19   Q.  And the amount.  It says the amount is $4 million?

20   A.  Yes.

21   Q.  Does that amount have any significance in connection with

22   that Hanif litigation that you spoke about?

23   A.  Yes.

24   Q.  What significance does it have?

25   A.  The $4 million was an amount that Mr. Zarif determined

1    would be paid to the Hanif partnership to settle the legal

2    dispute.

3    Q.  I want to break that down a little bit.  You mentioned

4    earlier that as part of your investigation you conducted a

5    number of interviews.

6    A.  Yes.

7    Q.  Did there come a time when you interviewed an individual

8    named Hooshang Ahmadi?

9    A.  Yes, there was.

10   Q.  Can you remind us, who is Hooshang Ahmadi?

11   A.  He is the treasurer of the foundation.

12          MR. TRACER:  Your Honor, may I approach.

13          THE COURT:  Yes.

14   Q.  And when was it that you interviewed Mr. Ahmadi?

15   A.  December 17, 2008.

16   Q.  Did he agree to speak voluntarily with you?

17   A.  He did.

18   Q.  Approximately how long was the interview?

19   A.  Approximately an hour.

20   Q.  During that interview was he still a member of the board

21   during that time?

22   A.  Yes.

23   Q.  And did the topic of the Hanif litigation come up during

24   that interview?

25   A.  Yes, it did.

1  Q.  What, if anything, did Mr. Ahmadi tell you about the Hanif

2  litigation?

3  A.  Mr. Ahmadi told us that Hanif partnership had an option to

4  buy the Assa shares and it was a surprise to the board and to

5  Mr. Ahmadi that the Hanif partnership had an option to buy

6  where the Alavi Foundation had first right of refusal.  They

7  had the first option to buy the shares.  So it was a surprise

8  to learn that Hanif partnership was in contract with Assa to

9  buy the shares of the foundation, of Assa Corp.

10  Q.  What, if anything, did Mr. Ahmadi tell you how that

11  litigation got resolved?

12  A.  Mr. Ahmadi said during a board meeting, Mr. Geramian,

13  Mohammad Geramian, president of the foundation at the time,

14  came into the board and said, Mr. Zarif wants the money paid.

15  He wants the $4 million paid to Hanif Partners.

16  Q.  And is that how the lawsuit was in fact settled?

17  A.  It was.

18  Q.  Now, did the topic come up during the interview with

19  Mr. Ahmadi of Mr. Geramian's resignation from the Alavi

20  Foundation?

21  A.  Yes.  Pardon me.  I was just collecting my thoughts for a

22  moment.  Mr. Ahmadi said that Zarif was -- put pressure on

23  Mr. Geramian and had him fired.

24          MR. TRACER:  Thank you, Mr. McShea.  We can take this

25  one down.

1    Mr. Zobeidi received the information and passed it to

2  the Bonyad Mostazafan in Iran with a plan.  That plan was

3  rejected.  Then Bank Melli came up with an option to create a

4  partnership and form an entity called Assa Corporation.  Assa

5  Corporation would buy into the foundation's share to form a

6  partnership, 650 Fifth Avenue.  They would have a 40 percent

7  share and that would alleviate their money problems.

8  Q.  Thank you, sir, I think that's sufficient.

9    Did the topic of Mr. Badr's transition to the next

10 president come up during your conversation with Mr. Badr?

11 A.  Yes, it did.

12 Q.  What, if anything, did he tell you about the transition to

13 Mr. Geramian?

14 A.  A new ambassador to -- Iranian ambassador to the UN came

15 in, Mr. Kamal Kharazi.  Mr. Kharazi was making demands on

16 Mr. Badr.  One of the demands was for $150,000 to pay for a

17 seminar of Iranian officials to come to the United States and

18 put on a seminar.  Mr. Badr didn't want to pay the money, so

19 Mr. Kharazi put a lot of pressure on him and had him fired.

20 Q.  Before he left, did Mr. Badr tell you whether he

21 communicated with Mr. Geramian?

22 A.  Yes.

23 Q.  What, if anything, did he tell you about that topic?

24 A.  I didn't finish a portion about your previous question.

25 Can I go back and answer it?

1  Q.  Sure.

2  A.  When Mr. Kharazi was putting pressure on him to fire him,

3  Mr. Badr was writing letters to Bonyad Mostazafan in Iran

4  asking for them to not have him be fired.  And he traveled to

5  Iran -- or pardon me, he and the board traveled to Zurich,

6  Switzerland during a regular board meeting.  And at that

7  meeting the Bonyad Mostazafan was present and they --

8  Rafighdoost was the president of Bonyad Mostazafan, and

9  Rafighdoost had just come into the role.  Rafighdoost was

10  previously the first minister of the Iranian Revolutionary

11  Guards Corps and then he came to Bonyad Mostazafan.  During the

12  board meeting Rafighdoost told Mr. Badr that he and the board

13  would be fired.  They agreed to resign their posts, and

14  Mr. Badr had asked Mr. Rafighdoost for permission to stay in

15  his post for a little longer to take care of some family

16  matters and to hand over to the incoming president later.

17       Then leading to your question with Mr. Geramian,

18  Mr. Geramian met with Mr. Badr in August of 1991 where Mr. Badr

19  handed off all the paperwork and documents relating to the

20  foundation to Mr. Geramian, and those documents and papers

21  included the papers about Assa Corp. and Bank Melli.  And then

22  Mr. Geramian had a conversation -- or Mr. Badr had a

23  conversation -- I mean Badr had a conversation with Geramian

24  about Bank Melli and his role with Assa Corporation.

25       THE COURT:  I think we're at about the end of the day.